## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **VOTER REFERENCE** | ) | |
| **FOUNDATION, LLC,** | ) | |
| | ) | |
| Plaintiff, | ) | **Case Number:** _____ |
| v. | ) | |
| | ) | |
| **ALBERT SCHMIDT**, in his official | ) | |
| capacity as Secretary of the | ) | |
| Commonwealth of Pennsylvania, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT
## AND PERMANENT INJUNCTIVE RELIEF

**COMES NOW** Plaintiff Voter Reference Foundation, LLC ("VRF"), by and through undersigned counsel, and for its Complaint against the Honorable Albert Schmidt (the "Secretary"), in his official capacity as Secretary of the Commonwealth of Pennsylvania and head of the Pennsylvania Department of State (the "Department"), states and alleges as follows:

1.     Plaintiff VRF is a nonprofit organization dedicated to increasing voter participation in elections while protecting election integrity. In service of those goals, VRF engages in political speech regarding states' maintenance of accurate voter rolls. Specifically, VRF files requests with state officials to obtain data showing who has voted in recent elections and how state officials are maintaining

their voter lists. This data is publicly available under the National Voter Registration Act ("NVRA"). VRF then analyzes the state data, engages in political speech on its linked websites, www.voterreferencefoundation.com and www.voteref.com, and makes its data available to the public at www.voteref.com (collectively, the "Website"). This means that interested citizens in Pennsylvania and many other states, provided that they contract with VRF to verify they are not using the data for unlawful purposes, can search public records of voting histories on VRF's Website. This allows participants to compare state records of who has voted, where, and when, with their own sources of information. Citizen participants can then engage in political speech with each other and with VRF concerning the accuracy and maintenance of the voter rolls and can contact their election officials to help correct inaccurate or outdated information.

2.      As an initial step towards VRF's goals, VRF lawfully requested Pennsylvania voter data from the Secretary pursuant to the NVRA's Public Disclosure Provision, 52 U.S.C. § 20507(i)(1).

3.      But the Secretary has refused to make Pennsylvania voter data available to VRF. In doing so, the Secretary has not only violated the NVRA but also violated VRF's First Amendment right to free speech. The Secretary justifies this unlawful restriction by citing a Pennsylvania restriction on publishing a limited amount of that data on the Internet. But the NVRA preempts any state law that impermissibly

impedes the implementation and objectives of the NVRA. *See* Count I. Even absent preemption, the Secretary violated the NVRA by failing to provide to Plaintiff records it requested which are subject to the NVRA's public inspection provision. *See* Counts II-III.

4.     Regardless of any theory the Secretary cites to justify his failure to make Pennsylvania voter data available to VRF, the Secretary has violated the First Amendment. Specifically, a ban on VRF's political speech in sharing the data fails strict scrutiny and therefore violates the First Amendment. *See* Count IV. Additionally, a blanket ban on all sharing of voter data between entities is fatally overbroad because it regulates substantially more protected speech than can be justified in relation to its legitimate sweep, and for that reason, too, it violates the First Amendment. *See* Count V.

5.     VRF sues the Secretary in his official capacity to obtain injunctive relief vindicating its federal statutory right to access voter data, and its First Amendment right to engage in political speech to share that data. VRF also seeks a declaration that its speech and conduct is lawful. *See* Count VI.

## JURISDICTION AND VENUE

6.     The Court has subject matter jurisdiction over this case pursuant to each of the following:

> a.     52 U.S.C. § 20510, as VRF is an "aggrieved party", and this action seeks to redress a violation of the NVRA;

3

b.     28 U.S.C. § 1331, as the action arises under the First and Fourteenth Amendments to the United States Constitution;

c.     28 U.S.C. § 1343(a)(3), in that it is brought to redress deprivations, under color of state law, of rights, privileges, and immunities secured by the United States Constitution;

d.     28 U.S.C. § 1343(a)(4), in that it seeks to secure equitable relief under an Act of Congress, specifically 42 U.S.C. § 1983, which provides a cause of action for the protection of civil rights; and,

e.     28 U.S.C. § 2201(a), in that it seeks to secure declaratory relief; and,

f.     28 U.S.C. § 2202 in that it seeks to secure permanent injunctive relief.

7.     Venue is proper within this judicial district pursuant to 28 U.S.C. § 1391(b) in that Defendant is situated within this judicial district.

## **PARTIES**

8.     VRF is a nonpartisan Ohio nonprofit limited liability company and subsidiary of Restoration of America, a 501(c)(4) social welfare organization. VRF operates the Website. VRF is dedicated to ensuring transparent, accurate, and fair elections in the United States of America and does so, in part, by making state voter registration information available on the Website. The purpose of the Website is to provide public access to official government data pertaining to elections, including voter registration rolls. The public dissemination of this information is intended to increase voter participation and make the state's election processes more transparent. A close review of the data can show that it is wrong or was entered incorrectly. VRF

4

encourages users of the Website to report these errors directly to the appropriate government official. This transparency fosters confidence in the integrity of the election system and thereby encourages voter participation. VRF desires to post, distribute, and otherwise share Pennsylvania voter data available on the Website so that the public may become and remain informed regarding Pennsylvania's elections and voter registration rolls. VRF intends to post this information for the public to access and view free of charge. VRF believes this use would be for one of the purposes permitted by statute (related to "elections, political activities or law enforcement"). *See* § 1404(b)(3).

9.      Defendant Albert Schmidt is the Secretary of the Commonwealth of Pennsylvania and, in that capacity, is the head of the Department of State. 71 Pa. Stat. § 271.

10.     The Department is responsible under state law for furnishing voter data to requesters. *See* 25 Pa.C.S. § 1404(b)(1); *see also* 4 Pa. Code § 183.13(c) (governing "Street Lists"), and § 183.14(b) (governing "Public Information Lists").

11.     Secretary Schmidt performs the functions of the Secretary of the Commonwealth in, and can be found in, Harrisburg, Pennsylvania, which is in this judicial district.

12.     Secretary Schmidt is named in his official capacity only.

## BACKGROUND FACTS

**A. The National Voter Registration Act requires states to make voter records publicly available.**

13.　　The NVRA prescribes certain state actions regarding voter records:

(i) Public disclosure of voter registration activities

> (1) Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

> (2) The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

52 U.S.C. § 20507(i) (the "Public Disclosure Provision").

14.　　Those "records" which must be made available pursuant to the NVRA include the Full Voter Export List, which is a compilation of Public Information Lists, compiled by the Secretary pursuant to 25 Pa.C.S. § 1404.

15.　　The Full Voter Export List includes data of all Pennsylvania voters (unless a requestor only requests data from certain counties), including voter ID number, name, sex, date of birth, date registered, status (i.e., active or inactive), date status last changed, party, residential address, mailing address, polling place, date

last voted, all districts in which the voter votes (i.e., congressional, legislative, school district, etc.), voter history, and date the voter's record was last changed.

16.     The NVRA was enacted to "establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," 52 U.S.C. § 20501(b)(1); to "enhance[ ] the participation of eligible citizens as voters in elections for Federal office," § 20501(b)(2); "to protect the integrity of the electoral process," § 20501(b)(3); and "to ensure that accurate and current voter registration rolls are maintained." § 20501(b)(4).

17.     The NVRA also requires states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of — (A) the death of the registrant; or (B) a change in the residence of the registrant[.]" 52 U.S.C. § 20507(a)(4)(A)-(B). Otherwise, under Section 20507(a)(3)(A)-(B), "the name of a registrant may not be removed from the official list of eligible voters except — (A) at the request of the registrant;" or "(B) as provided by State law, by reason of criminal conviction or mental incapacity."

18.     The NVRA provides for a private right of action. 52 U.S.C. § 20510(b).

19.     That private right of action is available to any person "aggrieved" by a violation of the NVRA. *Id.*

**B. Federal and state law mandate that Pennsylvania implement certain programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters.**

20.    The Help America Vote Act ("HAVA") requires Pennsylvania to maintain an electronic database, "contain[ing] the name and registration information of every legally registered voter in the State." 52 U.S.C. § 21083(a)(1)(A).

21.    HAVA requires Pennsylvania's election system to "include provisions to ensure that voter registration records in the State are accurate and are updated regularly." 52 U.S.C. § 21083(a)(4).

22.    HAVA also mandates that "[a]ll voter registration information obtained by any local election official in the State shall be electronically entered into the computerized list on an expedited basis at the time the information is provided to the local official." 52 U.S.C. § 21083(a)(1)(A)(vi).

23.    HAVA further requires "appropriate State or local election official[s to] perform list maintenance with respect to the computerized list on a regular basis . . . in a manner that ensures that . . . the name of each registered voter appears in the computerized list;" that "only voters who are not registered or who are not eligible to vote are removed from the computerized list; and" that "duplicate names are eliminated from the computerized list." 52 U.S.C. 21083(a)(2)(A), (a)(2)(B)(i)-(iii).

24.    Pennsylvania law, following HAVA, also mandates programs and activities to ensure that voter registration records in the State are accurate and

updated regularly. Pennsylvania's programs and activities for ensuring accurate voter registration records, or to ensure that they are updated regularly, include but are not limited to the following:

- 25 P.S. § 292 (The registrar must change voters' political designation on the register)
- § 293 (the assessor or registry assessor shall make an enrollment of each voter residing within the district in which he is authorized to make an assessment and registration of voters)
- § 294 (the assessor shall record the party affiliation of electors)
- § 295 (the county commission shall prepare the register of voters to permit the assessor or registry assessor to insert the party enrollment of each elector)
- § 298 (providing for the correction of an elector's party affiliation in the register)
- § 1201(3) (stating the Department must develop, establish, implement, and administer the SURE registry)
- § 1203 (providing for county commissions' correction of voter data within the SURE registry and its own registration records)
- § 1222 (mandating the Department develop the SURE registry and detailing its maintenance as the general register)
- § 1401 (detailing the information for each registered elector that must be reflected in the SURE register and various maintenance procedures)
- § 1403 (requiring each county commission to prepare a list of names and addresses of all registered electors in that district, known as "Street lists")
- § 1404 (requiring each county commission to prepare lists of names, addresses, dates of birth, and voting history for inspection)
- § 1501 (requiring county commissions to make and send "removal notices" to electors who are registered in the county)
- § 1502 (detailing how a county commission shall proceed to remove an individual from the voting register)
- § 1503 (providing for the change of a voter's enrollment information regarding political party)

- § 1505 (requiring the county commission to cancel the registration of deceased voters)
- § 1506 (allowing the county commission to perform a "checkup of registers" to ensure accurate data)
- § 1507 (allowing the county commission to perform a "canvass of registered electors" to verify the registration in an election district by visiting each building from which an elector is registered and to make a record of each person registered who is not found to reside at the address from which the person is registered)
- § 1508 (requiring the county commission to compare and correct the general and district registers of voters 30 days before each election)
- § 1509 (providing that qualified electors may petition any registrar or inspector of registration to cancel or suspend the registration of a registered elector)
- § 1510 (requiring county commissions to conduct checks of electors who have failed to vote in previous elections in order to cancel registration)
- § 1511 (providing for the cancellation or removal of electors and the preservation of registration records)
- § 1512 (allowing the commission to reinstate a canceled or suspended elector after application)
- § 1514 (requiring the Department to convert the registration records of each commission in order to be input into the SURE system, and requiring the Department to assign each registered elector a SURE registration number).

**C. Pennsylvania makes voter registration data publicly available, subject to certain restrictions on how that data may be used.**

25.    Pursuant to § 1404(b)(1), the Secretary "may promulgate reasonable regulations governing access to the list." In ostensible reliance on this statutory grant, the Department promulgated regulations for two types of lists, "street lists"

and "public information lists." One of those regulations, 4 Pa. Code § 183.13

(entitled, "Street Lists") provides in pertinent part:

> (c) Street lists will be available for public inspection and copying at the Department and the commissions during business hours, subject to reasonable safeguards[.]

> (g) The street list may not be published on the Internet.

26. Likewise, 4 Pa. Code § 183.14 (entitled, "Public Information Lists")

provides in pertinent part:

> (b) A commission and the Department will make copies of the public information lists available for public inspection during business hours, subject to reasonable safeguards, including:

> (1) A commission and the Department will maintain a form prescribed by the Department that includes the name, address and telephone number of an individual who inspects or obtains a copy of the public information list, as well as verification that a commission or Department official confirmed the identification of the individual requesting access to the list or its duplication. This form will not be available for public inspection or copying.

> [. . .]

> (k) The list may not be published on the Internet.

27.    Under each of the two code sections, the restriction, "The list may not

be published on the Internet," appears separately within a list of lettered sub-

paragraphs that either allow, require, or restrict conduct by the Department and

election commissions. It does not appear within the separate sub-paragraph that

governs requirements for conduct by individual requesters.

28. The Secretary also makes available a separate Full Voter Export List on the

Department's website[1], which states:

> As provided by 25 Pa.C.S. Section 1404(b)(1) (relating to Public Information Lists), as well as the SURE Regulations at 4 Pa. Code Section 184.14(b) (relating to Public Information Lists), the Department of State will provide the Full Voter Export List to requestors.

> This version of the Public Information List is a full export of all voters in the county and contains the following fields: voter ID number, name, sex, date of birth, date registered, status (i.e., active or inactive), date status last changed, party, residential address, mailing address, polling place, date last voted, all districts in which the voter votes (i.e., congressional, legislative, school district, etc.), voter history, and date the voter's record was last changed.

29. The site then provides the link to purchase the Full Voter Export.

30. However, as a condition of requesting the Full Voter Export, the

website requires the requester to agree to the following affirmation:

> PA Full Voter Export

> AFFIRMATION

> I affirm that any information obtained from the records requested from the Department of State will not be used for commercial or other purposes, except purposes related to elections, political activities and law enforcement, as required by 25 Pa.C.S. sections 1207(b) & 1404(c)(2). *I further affirm that I will not publish any of the above lists on the Internet, as such publication is prohibited by 4 Pa. Code sections 183.13 (g) & 183.14 (k).*

---

[1] PA Full Voter Export List, Pennsylvania Department of State, https://www.pavoterservices.pa.gov/pages/PurchasePAFullVoterExport.aspx?Lang code=en-US, last accessed November 20, 2023.

I verify that this statement is true and correct. I understand that false statements made are subject to the penalties of 18 Pa.C.S. Section 4904, relating to unsworn falsification to authorities.

**By submitting this form I understand that I am entering into an electronic transaction with the Pennsylvania Department of State as defined under 73 P.S. section 2260.301(b). By entering my name below I am submitting my signature electronically, which I recognize has the full legal effect and enforceability as a "wet" signature under 73 P.S. section 2260.301.[2]**

31.    A requester cannot complete the online process of requesting the Full Voter Export without agreeing to the bolded conditions above regarding publication on the Internet.

32.    VRF refers to the Full Voter Export List, Public Information Lists, and Street Lists as the "Lists."

33.    VRF refers to the complete prohibition on publishing the contents of the Lists on the Internet as the "Internet Sharing Ban."

34.    A requestor that attests to a false statement using the Secretary's Affirmation commits a second-degree misdemeanor under 18 Pa.C.S. § 4904(a) and must pay a fine of at least $1,000. § 4904(d).

---

[2]    PA Full Voter Export, Pennsylvania Department of State, https://www.pavoterservices.pa.gov/pages/PurchasePAFullVoterExport.aspx?Lang code=en-US, last accessed November 20, 2023 (emphasis added).

**D. The Lists and their contents are "records" which must be made available under the NVRA.**

35.     Pennsylvania's Lists, and the data they contain, are "records" that "concern[] the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" under the NVRA. *See* 52 U.S.C. § 20507(i)(1).

36.     A "program" is "a plan of procedure" or "schedule or system under which action may be taken toward a desired goal," while an "activity" is a "natural or normal function or operation." Webster's Third New International Dictionary 22, 1812 (1993). The Lists are "records" of Pennsylvania's list maintenance "programs" or "activities" "conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" under either definition.

37.     Both federal and state law require Pennsylvania to make ongoing, continuous efforts to verify applicants' eligibility to vote, register eligible voters in its central voter registration system, revise its voter registration records, remove ineligible voters from its voter rolls, and maintain records of all these activities. *See supra* Part B.

38.     Each of these processes "is a 'program' because it is" a plan of procedure "carried out in the service of a specified end—maintenance of voter rolls." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 335 (4th Cir. 2012). And

each "is an 'activity' because it is a particular task and deed of [Pennsylvania] election employees," a normal operation for which they are responsible. *Ibid.*

39.   These registration, maintenance, and removal activities are "conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *See* 52 U.S.C. § 20507(i)(1).

40.   Pennsylvania's after-the-fact list-maintenance activities ensure that the voter rolls remain both current and accurate as voters move, die, change their names, or titles with new political parties. *See also* 52 U.S.C. §§ 20507(a)(4) and (b)-(g), 21083(a)(2)(B) and (a)(4) (requiring States, under both the NVRA and HAVA, to conduct continuous list maintenance activities while imposing safeguards to prevent improper removals).

41.   The only way to meaningfully evaluate whether the state is faithfully and accurately performing these list maintenance "programs" and "activities" is to review the underlying voter data itself, including the data contained in the Lists.

**E. VRF shares voter data made available under the NVRA on its website**

42.   As referenced above, VRF operates VoteRef.com as part of the Website. The purpose of the Website is to provide public access to official government data pertaining to elections, including voter registration rolls. The public dissemination of this information is intended to increase voter participation and make the state's election processes more transparent.

15

43.     The Website typically provides any information made public by the state agency charged with maintaining the voter registration database if state law allows that information to be shared. For example, a user can typically view a voter's name, registration address, registration date, year of birth, party affiliation, registration status, precinct, and voting participation history. Social security numbers, phone numbers, email addresses, and driver's license numbers, even if made available by the State, are not published on the Website.

44.     VRF associates who access the Website can search by name or address for registered voters and they also will be able to peruse voting histories, a list of elections that voters participated in, as well as other important election data obtained via official sources.

45.     Educational material on www.voterreferencefoundation.com explains voter data, where it comes from, and how it can be used to track the accuracy of voter rolls and increase voter participation.

46.     On VoteRef.com, citizens can check their own voting status, voting history, and those of their neighbors, friends, and others, and are thereby able to "crowdsource" the process of rectifying any errors. The public is enabled to check on the validity of the data by recognizing common errors in larger data sets; for example, citizens could examine the data for their precinct and recognize many

voters were given placeholder birthdates. This also allows citizens to encourage others to vote, increasing overall voter participation.

47.    A close review of the data can show that it is wrong or was entered incorrectly. VRF encourages users of the Website to report these errors directly to the appropriate Secretary of State or clerk.

48.    VRF accomplishes its efforts to create and maintain the Website by requesting voter registration data from state agencies and then compiling and posting that data in a way that is easily accessible, searchable, and usable by the public.

49.    After it acquires raw voter data from a state, VRF's database analysts map the data that would otherwise be unusable by the public and put the data into a searchable, understandable format for the public to review and analyze.

50.    In many states, access to the data is prohibitively expensive, and members of the general public lack the knowledge to map the raw data in a usable manner.

51.    VRF has, and intends to, post this data for the public to access and view free of charge so that the public can fulfill its oversight duties under the NVRA.

52.    VRF currently has voter data for 32 states posted on the Website.

53.    VRF desires to access, post, distribute, and otherwise use publicly available Pennsylvania voter data on the Website in the future so that the public may

become and remain informed regarding Pennsylvania's elections and voter registration rolls, and conduct the oversight envisioned in the NVRA.

54.    VRF's actual and proposed use is limited to voter information that is publicly available under both Pennsylvania law and the NVRA, and it does not seek to disseminate or use any information prohibited from being disclosed by law, including voters' social security numbers or voters' telephone numbers.

55.    VRF desires to update its website over time with new data from the Department.

**F.  VRF first requested Pennsylvania voter data in early 2022.**

56.    On March 7, 2022, VRF filed a request with the Department, seeking "a copy of the Full Voter Export List," including all data in the Public Information Lists compiled pursuant to § 1404. A true and accurate copy of the March 7, 2022 Request is attached hereto as Exhibit A and incorporated by reference.

57.    The request specified that the information would be used only for purposes allowed by law, including purposes related to elections, political activities, and law enforcement, and that the information would not be used for commercial purposes. *Id.*

58.    The request explained that, though there is a form available online to seek the Full Voter Export, VRF could not use the form because it required VRF to

agree not to publish the information online; that is, the form required VRF to agree to restrictions which violate its First Amendment rights. *Id*.

59.    Because VRF wished to comply with those provisions governing access to the List that are consistent with the United States Constitution, it included an attestation stating that it would only use the List for statutorily permissible purposes relating to elections, political activities, and law enforcement as required by 25 Pa.C.S. § 1401 et seq. and 4 Pa. Code § 183.14. *Id*.

60.    It did not, however, agree to refrain from publishing the requested data online.

61.    On March 14, 2022, Petitioners received a letter from the Department indicating it required a 30-day extension to respond to the request. A true and correct copy of the March 14, 2022 Letter is attached hereto as Exhibit B and incorporated by reference.

62.    Subsequently, the Department denied Petitioners' request in a Denial Letter signed by the Department's Open Records Officer, Janelle Hawthorne (the "Denial Letter"). The Denial Letter is attached hereto as Exhibit C and incorporated by reference.

63.    In the Denial Letter, the Department stated that the requested records "are only available upon completion of an affirmation that the information will only

be used for purposes relating to elections, political activities, and law enforcement," citing 25 Pa. C.S. § 1404 et seq. and 4 Pa. Code § 183.14. *Id*.

64.    As addressed above, VRF's request to the Department met that requirement: it included an affirmation agreeing to the various conditions outlined on the Department's website. *See* Ex. A. It only omitted the agreement that the information would not be posted on the Internet. *Id*. Thus, at the time it denied VRF's request, the Department had an affirmation from VRF that the information would only be used for purposes relating to elections, political activities, and law enforcement. The Denial Letter ignored this and asserted the absence of that affirmation as grounds for denial. *See* Ex. C.

65.    The Department then identified another basis for denying VRF's request. *Id*. It claimed VRF had previously obtained the Full Voter Export "but violated the voter registration law and the Department's regulations by publishing the information obtained on the Internet, namely, [its] website," and stated that "[a]s a result of those actions, your request for voter registration information is denied." *Id*. The Denial Letter did not cite any legal authority for denying a request on these grounds. *Id*.

66.    Though VRF appealed that decision to both the Office of Open Records and the Pennsylvania Commonwealth Court, the Pennsylvania Commonwealth

Court affirmed the decision on October 20, 2023. *See Swoboda v. Pennsylvania Department of State*, 304 A.2d 105 (Pa. Cmwlth. 2023).

67.     In its October 20, 2023 ruling, the Commonwealth Court determined that the Pennsylvania Voter Registration Act allows the Department to deny a records request on the basis that a requester did not execute the required affirmation. The Commonwealth Court specifically refrained from addressing whether the Lists must be made available under the NVRA. The Commonwealth Court noted that the NVRA has its own enforcement mechanism, 52 U.S.C. § 20510, should VRF desire to litigate the NVRA issues. The Commonwealth Court also held that it lacked jurisdiction to consider VRF's First Amendment challenge to Pennsylvania's internet publication ban and the related restrictions on access.

### G. VRF notifies the Secretary several times that he is in violation of the NVRA for failing to produce the voter data VRF requests.

68.     Before an injured party may file suit for a violation of the NVRA, it must "provide written notice of the violation to the chief election official of the State involved." *Id*. § 20510(b)(1). And the injured party may file suit only if "the violation is not corrected within 90 days after receipt of a notice" or "within 20 days after receipt of the notice if the violation occurred within 120 days before the date of an election for Federal office[.]" *Id*. § 20510(b)(2). But notice need not be provided if the violation occurred "within 30 days before the date of an election for Federal office." *Id*. § 20510(b)(3).

69.     On November 2, 2023, VRF sent the Secretary and Department of State a Notice of Violation of the National Voter Registration Act (the "VRF's First NVRA Notice"). VRF's First NVRA Notice is attached hereto as Exhibit D and incorporated by reference.

70.     In VRF's First NVRA Notice, VRF apprised the Secretary and Department that denying VRF's March 7, 2022 request for voter data was a violation of the NVRA's Public Disclosure Provision. *Id*.

71.     The November 2, 2023, NVRA Notice also argued that the Internet Sharing Ban is preempted by the NVRA's broad Public Disclosure Provision. *Id*.

72.     VRF informed the Secretary and Department that it would seek legal recourse if they did not take timely and specific action to correct that violation. *Id*.

73.     On the same day—November 2, 2023—VRF, in a separate letter, sent the Secretary and Department a new request for records pursuant to the NVRA (the "VRF's Nov. 2 Request"). A true and correct copy of the November 2, 2023 Request is attached hereto as Exhibit E and incorporated by reference.

74.     In VRF's Nov. 2 Request, it requested a copy of the Full Voter Export List solely under the NVRA. *Id*.

75.     VRF also made the Secretary and Department aware of its intention to use the data for two of its projects—one involving online posting and one that does not:

22

> VRF intends to use the Voter List for two distinct projects. For its first project, just as VRF publishes voter data for many other states, VRF intends to publish the requested information on its website for election related purposes, allowing citizens who agree to the terms of VRF's website to review the data and report any errors to the relevant election authority.
>
> For its second project, VRF intends to analyze the records, information, and data provided in response to the above request in order to engage in a discrepancy review of the Pennsylvania voter rolls. For the second project, VRF intends to publish its analysis online, but will not post any voter data or the personal information of any individual voter in conjunction with the publication of that analysis.

*Id.*

76.     The Secretary responded to VRF's First NVRA Notice and VRF's Nov. 2 Request in a single letter on November 16, 2023 ("State's Nov. 16 Response"). A true and correct copy of the Secretary's November 16, 2023 Response is attached hereto as Exhibit F and incorporated by reference.

77.     As to VRF's First NVRA Notice, the Secretary argued that VRF's March 7, 2022 request for Pennsylvania voter data did not constitute a valid NVRA request because VRF did not specifically invoke the NVRA in that request. *Id.* Thus, the Secretary argued that VRF's First NVRA Notice was "defective." *Id.*

78.     Second, as to VRF's Nov. 2 Request, the Secretary stated: "that request is granted on the condition that VRF completes the affirmation required for obtaining this data pursuant to Pennsylvania law. See 25 Pa.C.S.A. § 1404; 4 Pa. Code § 183.14." *Id.*

79.    The Secretary did not acknowledge VRF's plans to publish the requested Pennsylvania voter data on the Internet or the fact that VRF made the Secretary aware of those plans in both VRF's March 7, 2022, and Nov. 2 Requests.

80.    VRF then sent the Secretary and Department a second notice on November 17, 2023, apprising the Secretary and the Department that they continued to violate the NVRA by failing to produce the requested documents ("VRF's Second NVRA Notice"). VRF's Second NVRA Notice is attached hereto as Exhibit G and incorporated by reference.

81.    In its Second NVRA Notice, VRF noted that its March 7, 2022 request was for data that must be made available under the NVRA, and thus was a request under the NVRA regardless of whether it used any "magic words" invoking the Secretary's obligations under the NVRA. Additionally, the Notice stated, that even if the Secretary or Department were confused regarding their obligations under the NVRA, both were on notice as of VRF's November 2, 2023, NVRA Notice that the March 7, 2022 request was made under the NVRA and any further denial of those requested records is a further violation of the NVRA. *Id*.

82.    Further, VRF stated that the Secretary's conditions on access— surrender free speech rights or risk prosecution—conflict with the NVRA's unqualified right of access to the requested records, that those conditions are preempted by the NVRA to the extent of that conflict, and that the Secretary's

imposition of such conditions and failure to provide the requested records constituted further and additional violations of the NVRA. *Id.*

83.   VRF's Second NVRA Notice explained that what the Secretary referred to as a "conditional grant" of VRF's request was effectively a denial of VRF's request, because the Secretary knows VRF cannot satisfy that condition, and such conditional grant was yet another violation of the NVRA's Public Disclosure Provision. *Id.*

84.   VRF fully complied with the NVRA's pre-suit notice requirements before filing this Complaint.

### H. The Internet Sharing Ban severely burdens VRF's First Amendment Rights.

85.   The Internet Sharing Ban effectively muzzles VRF's transparency and voter outreach efforts before they can even get off the ground and, in doing so, violates VRF's First Amendment rights.

86.   The Internet Sharing Ban limits VRF's ability to effectively speak in furtherance of its mission by sharing relevant voter and election related information with the public.

87.   VRF desires to post and distribute Pennsylvania Voter Information online. Doing so is far more effective than sharing the same information in person, by mail, or via any physical medium. This transparency allows ordinary citizens—

not just political parties and the operatives they favor—to work together and with VRF to identify issues with voter participation and election integrity.

88.    However, because of the Internet Sharing Ban, VRF has refrained and will continue to refrain from exercising its core First Amendment political speech rights to disseminate and use the voter information out of fear of prosecution.

**COUNT I**
**INTERNET SHARING BAN:**
**PREEMPTION BY THE NATIONAL VOTER REGISTRATION ACT**
**(52 U.S.C. § 20507(i))**

89.    Plaintiff restates and realleges the allegations in Paragraphs 1 through 88 as if fully rewritten verbatim herein.

90.    The NVRA's Public Disclosure Provision requires each state to maintain for at least two years and "make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official voter lists of eligible voters." 52 U.S.C. § 20507(i)(1).

91.    The Public Disclosure Provision confers rights on members of the public to request and be given access to those "records."

92.    To the extent Pennsylvania law prevents access to "records" which must be made available under the NVRA's Public Disclosure Provision, including by refusing to provide access to records unless the recipient agrees not to engage in

protected speech which furthers the purposes of the NVRA, such restrictions are preempted by the NVRA.

93.    "Records," as used in the NVRA's Public Disclosure Provision, includes individual and identifiable voter information files. *See Judicial Watch, Inc. v. Lamone*, 399 F.Supp.3d 425, 439 (D. Md. 2019) (individual voter registration information "records"); *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 335-36 (4th Cir. 2012) (registration applications are "records"); *Pub. Int. Legal Found., Inc. v. Bellows*, Case No. 23-1361, Slip Op. at *21 WL 396134 (February 2, 2024);[3] *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 940 (C.D. Ill. 2022) (voter list is "record").

94.    The NVRA specifically requires states to make reasonable efforts to maintain the accuracy of voter rolls, 52 U.S.C. § 20507(a)(4), and documents reflecting or related to this maintenance function are "records" which must be made available for public inspection. *See* § 50507(i)(1) (public inspection requirement applies to "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters[.]").

---

[3] Attached as Exhibit H.

95.     Those "records" which must be made available pursuant to the NVRA include the  Full Voter Export List, Public Information Lists, and Street Lists; the same records that VRF requested and the Department refuses to produce.

96.     Pennsylvania restricts the public from using Pennsylvania voter data via the Internet Sharing Ban and uses that restriction as justification for denying access to records that otherwise must be made available under the NVRA.

97.     First, because the Department controls access to voter data via the Internet Sharing Ban by requiring, as a condition of access, that requesters surrender their rights to engage in political speech or other protected speech that consists of sharing the data or discussing its contents with third parties over the Internet, the Internet Sharing Ban is preempted by the NVRA's unqualified right of access under the Public Disclosure Provision.

98.     Second, to the extent that Pennsylvania law actually prohibits the publication of voter data on the internet, that Internet Sharing Ban is likewise preempted by the NVRA. Allowing citizens to individually access voter data so that they can detect fraud and error in the maintenance of voter rolls, but then prohibiting them from discussing the details of that data online with each other, manifestly defeats the NVRA's purpose of allowing public access in the first place.

99.     Congress expressly stated the NVRA has four core objectives relevant to this case: "establish procedures that will increase the number of eligible citizens

who register to vote in elections for Federal office," 52 U.S.C. § 20501(b)(1); to "enhance [] the participation of eligible citizens as voters in elections for Federal office," *id*. § 20501(b)(2); "to protect the integrity of the electoral process," *id*. § 20501(b)(3); and "to ensure that accurate and current voter registration rolls are maintained." *Id*. § 20501(b)(4).

100.    The Internet Sharing Ban contradicts Congress's stated objectives in the NVRA and creates many improper obstacles to its implementation.

101.    First, "[o]rganizations . . . have the resources and expertise that few individuals can marshal. By excluding such organizations from access to voter registrations, the State law undermines Section 8(i)'s efficacy." *Judicial Watch, Inc. v. Lamone*, 399 F.Supp.3d 425, 445 (D. Md. 2019).

102.    VRF has resources that individual citizens do not: it can purchase statewide data, which typically costs thousands of dollars per state. It can then purchase that data in multiple states so that it can be aggregated and voter behavior can be tracked across multiple jurisdictions. It also has access to the expertise and resources needed to convert the large and difficult-to-use data files produced by most states into a format that citizens without computer programming and data analysis skills can easily search on a website.

103.    The NVRA's objective of empowering citizens to aid states in detecting fraud and errors in voter rolls would be entirely defeated if states could require what

Pennsylvania seems to envision: that each individual citizen wishing to analyze state data for error and fraud must invest the enormous amounts of time and money that VRF commits to obtaining and formatting statewide data.

104. Detecting errors requires citizens to compare the state's official data with their own personal knowledge regarding friends, neighbors, relatives, and community events. Citizens are much more effective, and their knowledge grows exponentially, when they can share their analyses—and the underlying data—with each other. In contrast, if each citizen must operate in a silo that involves only that individual's isolated communications with a government election administrator's office, then citizens cannot effectively combine their knowledge, experience, and analysis, and will be relegated to occasionally providing their own confidential "tips" directly to a bureaucrat. This, too, defeats the objectives of the NVRA.

105. Preventing organizations such as VRF from obtaining and sharing voter data is not only in conflict with sound public policy but also with the express objectives of the NVRA. Thus, to the extent Pennsylvania law prohibits VRF from (a) accessing voter data; (b) using it for lawful purposes; and (c) sharing it online, the Internet Sharing Ban is preempted by the NVRA.

106. VRF complied with all pre-suit notice requirements under the NVRA by providing timely and sufficient notice describing Pennsylvania's violations before filing this suit. *See above*, ¶¶ 62, 73.

## COUNT II
## VIOLATION OF THE NATIONAL VOTER REGISTRATION ACT'S
## PUBLIC DISCLOSURE PROVISION
## FAILURE TO RESPOND TO THE MARCH 7, 2022 REQUEST
## (52 U.S.C. § 20507(i)(1))

107.   VRF restates and realleges the allegations in Paragraphs 1 through 106 as if fully rewritten verbatim herein.

108.   On March 7, 2022, VRF sent a letter to the Secretary requesting the Full Voter Export List compiled pursuant to 25 Pa.C.S. § 1404. *See* Ex. A.

109.   The Full Voter Export List and the data contained within it are "records"  subject to mandatory public disclosure under the NVRA's Public Disclosure Provision because they are "records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1).

110.   The Secretary failed and/or refused to provide the requested records in response to VRF's request, denying the request on April 13, 2022.

111.   By failing or refusing to provide the requested data, the Secretary has violated the NVRA's Public Disclosure Provision.

112.   VRF complied with all pre-suit notice requirements under the NVRA by providing timely and sufficient notice describing Pennsylvania's violations before filing this suit. *See above*, ¶¶ 62, 73.

## COUNT III
## VIOLATION OF THE NATIONAL VOTER REGISTRATION ACT'S
## PUBLIC DISCLOSURE PROVISION
## FAILURE TO RESPOND TO THE NOVEMBER 2, 2023 REQUEST
## (52 U.S.C. § 20507(i)(1))

113.   VRF restates and realleges the allegations in Paragraphs 1 through 112 as if fully rewritten verbatim herein.

114.   On November 2, 2023, VRF sent a letter to the Secretary requesting the Full Voter Export List compiled pursuant to 25 Pa.C.S. § 1404. *See* Ex. E.

115.   The Full Voter Export List and the data contained within it are "records"  subject to mandatory public disclosure under the NVRA's Public Disclosure Provision because they are "records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1).

116.   The Secretary failed and/or refused to provide the requested records in response to VRF's request, stating that VRF must still execute the Secretary's affidavit and surrender its right to engage in speech by sharing Pennsylvania voter data on the Website.

117.   By conditioning the granting of VRF's request on VRF's surrender of its right to engage in speech sharing the voter data, the Secretary has violated the NVRA's Public Disclosure Provision.

118.   VRF complied with all pre-suit notice requirements under the NVRA by providing timely and sufficient notice describing Pennsylvania's violations before filing this suit. *See above*, ¶¶ 63, 74.

**COUNT IV**
**INTERNET SHARING BAN:**
**FIRST AMENDMENT—BAN ON CORE POLITICAL SPEECH**
**(42 U.S.C. § 1983)**

119.   VRF restates and realleges the allegations in Paragraphs 1 through 118 as if fully rewritten verbatim herein.

120.   The First Amendment to the United States Constitution commands, "Congress shall make no law [. . .] abridging the freedom of speech[.]" and the speech protections of the First Amendment have been incorporated against the states. *See Gitlow v. New York*, 268 U.S. 652 (1925); *Stromberg v. California*, 283 U.S. 359 (1931).

121.   "The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). "Expression on public issues 'has always rested on the highest rung of the hierarchy of First Amendment values.'" *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (quoting *Carey v. Brown*, 447 U.S. 455, 467, (1980)). The strongest protection of the First Amendment's free speech guarantee goes to the right to criticize the government or advocate change in

governmental policy. "[E]xpression of dissatisfaction with the policies of this country [is] situated at the core of our First Amendment values." *Texas v. Johnson*, 491 U.S. 397, 411 (1989). Criticism of official policy or action is the kind of speech that a state would be most keen to suppress.

122.   The NVRA requires the Commonwealth of Pennsylvania to make its voter data available, especially for the types of tasks contemplated by VRF and users of VRF's online platform. Because federal law requires that the data be made available to citizens, the First Amendment protects citizen speech that communicates this data to their fellow citizens, as the creation and dissemination of information are speech within the meaning of the First Amendment. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) (citing *Bartnicki v. Vopper,* 532 U.S. 514, 527, (2001) ("[I]f the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category, as distinct from the category of expressive conduct.").

123.   The First Amendment protects speech over the internet with the same vigor that it protects other forms of written and spoken communication mediums used before the high-tech era. *Reno v. ACLU,* 521 U.S. 844, 868 (1997).

124.   A state may violate the protections of the First Amendment in many ways, *e.g., Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819

(1995); *Keller v. State Bar of Cal.,* 496 U.S. 1 (1990), but a law imposing criminal penalties on protected speech is a stark example of speech suppression.

125.   VRF's sharing of Pennsylvania voter data is constitutionally protected speech. Pennsylvania routinely makes voter data available to political parties for inherently political means.  Additionally, sharing Pennsylvania voter data in order to evaluate and potentially criticize the government is at the core of the First Amendment. Because voter data cannot be divorced from its wholly political nature, the dissemination of that data is protected under the First Amendment.

126.   VRF made the Secretary and the Department fully aware of its intentions: to share the requested voter data online along with commentary regarding how ordinary citizens can use and review the data to assess and potentially criticize or critique the Secretary's voter roll maintenance function.

127.   The sharing of voter data online is core political speech about Pennsylvania's election systems. That Pennsylvania may disagree with VRF's viewpoint or methodology does not lessen the constitutional protection afforded VRF's core political speech.

128.   Even if discussing the data online were not itself core political speech, Pennsylvania's Internet Sharing Ban—a complete ban on publishing voter data on the internet—would still have the effect of burdening core political speech by

banning the sharing of the underlying data necessary to effectively engage in that speech.

129.    The Internet Sharing Ban is a direct restriction on constitutionally protected, core political speech and cannot stand unless it survives strict scrutiny.

130.    "[P]olitical speech must prevail against laws that would suppress it, whether by design or inadvertence. Laws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest…Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints. Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others." *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 340–41 (2010) (internal quotations and citations omitted).

131.    "As instruments to censor, these categories are interrelated: Speech restrictions based on the identity of the speaker are all too often simply a means to control content. Quite apart from the purpose or effect of regulating content, moreover, the Government may commit a constitutional wrong when by law it identifies certain preferred speakers. By taking the right to speak from some and giving it to others, the Government deprives the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's

voice. The Government may not by these means deprive the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration. The First Amendment protects speech and speaker, and the ideas that flow from each." *Id.*

132.   The Internet Sharing Ban makes it more difficult, more expensive, and essentially impossible for VRF to disseminate the most meaningful information regarding Pennsylvania's elections. It also imposes massive costs on individuals who are not affiliated with a political party or candidate or ballot measure campaign, and therefore cannot receive that campaign's access to the data.

133.   Due to the volume of voter information that VRF wishes to share—including data on millions of voters—it is virtually impossible to distribute through any other non-Internet means. Further, it is the very accessibility of the data on the Internet that draws interested listeners and political associates to VRF's speech, and that will motivate them to engage in their own speech. Having the data accessible on the Internet also sends its own message: that this is the public's data, and that it is and should be transparent. VRF hopes that thousands or even millions of concerned citizens who share its interest in election transparency, participation, and integrity will view, analyze, and discuss the data. VRF plans to crowdsource the analysis of the data so that interested citizens can associate with VRF and with each other to analyze and engage in political speech regarding the data. Yet the Department's

position implies that it is precisely the use of the Internet to bring the data to ordinary citizens and to facilitate speech among non-campaign-insiders that renders VRF's sharing unlawful.

134.   The Internet Sharing Ban does not leave open ample, comparable, and effective alternative channels for communication.

135.   The Internet Sharing Ban also infringes on and abridges VRF's speech by limiting the size of the audience that can be reached.

136.   For the reasons stated above and herein, the Internet Sharing Ban violates VRF's First Amendment rights, including its free speech rights. These rights are incorporated against the Commonwealth of Pennsylvania through the Fourteenth Amendment.

137.   As a result of the Internet Sharing Ban, VRF is suffering and will continue to suffer irreparable harm, including through the chilling of its First Amendment-protected speech.

138.   The Internet Sharing Ban is enforced under the color and pretense of state law and VRF seeks to enjoin Defendant, who as an agent of the Commonwealth of Pennsylvania is statutorily obligated to enforce the Internet Sharing Ban, from enforcing it under the color and pretense of state law in deprivation of Plaintiff's rights. *See* 42 U.S.C. § 1983.

## COUNT V
## INTERNET SHARING BAN:
## FIRST AMENDMENT-OVERBREADTH
## (42 U.S.C. § 1983)

139.   Plaintiff restates and realleges the allegations in Paragraphs 1 through 138 as if fully rewritten verbatim herein.

140.   The Internet Sharing Ban is overbroad in that it regulates and prohibits substantially more protected speech than is necessary to accomplish any legitimate government interests furthered by the restriction.

141.   "The Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002). "[T]he overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973).

142.   The concern that an overbroad statute deters protected speech is especially strong where, as here, the statute imposes criminal sanctions. *See Virginia v. Hicks*, 539 U.S. 113, 119 (2003). The severity of criminal sanctions may well cause speakers, including Plaintiff, to remain silent rather than communicate even arguably unlawful words, ideas, and images. *See, e.g., Dombrowski,* 380 U.S. at 494.

143.   The Internet Sharing Ban prohibits the sharing of Public Information Lists and Street Lists on the Internet.

39

144.   As applied by the Secretary, the Ban also prohibits the sharing of data from another list, the Full Export List, even though the plain language of Pennsylvania law applies only to the Public Information Lists and Street Lists.

145.   The reach of the Internet Sharing Ban is far broader than necessary to accomplish any legitimate purpose that a statute dedicated to ensuring that voter data is not used for commercial or nefarious purposes seeks to accomplish.

146.   Because of the overbreadth of the restrictions and the uncertainty as to the boundary between that which is permissible and that which is prohibited, VRF and others like it have refrained and will refrain from engaging in speech protected by the First Amendment out of fear of prosecution.

147.   The Internet Sharing Ban is enforced under the color and pretense of state law and Plaintiff seeks to enjoin Defendant, who as an agent of the Commonwealth of Pennsylvania has undertaken the statutory obligation to enforce the Internet Sharing Ban, from enforcing it under the color and pretense of state law in deprivation of Plaintiff's rights. *See* 42 U.S.C. § 1983.

## COUNT VI
## DECLARATORY JUDGMENT
### (28 U.S.C. § 2201, et seq.)

148.   Plaintiff restates and realleges the allegations in Paragraphs 1 through 147 as if fully rewritten verbatim herein.

149.   The Internet Sharing Ban unlawfully restricts and conflicts with the objectives of the NVRA and, as such, is preempted to the extent of that conflict.

150.   For the reasons stated above and herein, the Secretary violated the NVRA by refusing to fulfill VRF's requests for voter data on March 7, 2022, and November 2, 2023, because Pennsylvania voter data and the Lists in which that data is contained are "records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters[.]" 52 U.S.C. § 20507(i)(1).

151.   To prevent further violation of Plaintiff's federal constitutional rights by Defendant, it is appropriate and proper that a declaratory judgment be issued, pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. Pro. 57, declaring the Internet Sharing Ban violates the First Amendment, in that it severely burdens core political speech rights as guaranteed by the First and Fourteenth Amendments to the United States Constitution.

152.   Any justification provided by the Commonwealth for imposing the Internet Sharing Ban alleged is insufficient to withstand constitutional scrutiny.

153.   The Internet Sharing Ban is unconstitutionally overbroad and has a substantial chilling effect on the First Amendment rights of Plaintiff and others not before the Court.

154.   Further, pursuant to 28 U.S.C. § 2202, it is appropriate and hereby requested that this Court issue a permanent injunction enjoining Defendant and all of his agents and employees from enforcing the Internet Sharing Ban against Plaintiff in violation of its constitutional rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Voter Reference Foundation respectfully prays for judgment in its favor and against Defendant, and that the Court:

a.   Pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declare the Internet Sharing Ban is preempted by the Public Disclosure Provision of the National Voter Registration Act and is invalid to the extent of that conflict.

b.   Pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declare that the Internet Sharing Ban violates the First Amendment to the United States Constitution.

c.   Pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declare that the Internet Sharing Ban is unconstitutionally overbroad.

d.   Pursuant to 28 U.S.C. § 2202, Fed. R. Civ. P. 65, and 42 U.S.C. § 1983, permanently enjoin the Defendant, his agents, employees, and all persons acting in active concert or participation with them, from enforcing the Internet Sharing Ban against Plaintiff, its agents, and others similarly situated.

e.   Pursuant to 42 U.S.C. § 1988, 52 U.S.C. § 20510, and other applicable law, award Plaintiff its costs and expenses incurred in bringing this action, including its attorneys' fees.

f.   Grant all other and further relief that the Court deems equitable, just, and proper.

Dated: February 19, 2024.                Respectfully submitted,

                                         **GRAVES GARRETT GREIM LLC**

                                         */s/ Edward D. Greim*
                                         Edward D. Greim
                                         Missouri Bar No. 54034
                                         *Pro Hac Vice Forthcoming*
                                         Matthew R. Mueller
                                         Missouri Bar no. 70263
                                         *Pro Hac Vice Forthcoming*
                                         Jackson C. Tyler
                                         Missouri Bar no. 73115
                                         *Pro Hac Vice Forthcoming*
                                         GRAVES GARRETT GREIM LLC
                                         1100 Main Street, Suite 2700
                                         Kansas City, Missouri 64105
                                         Tel.: (816) 256-3181
                                         Fax: (816) 222-0534
                                         edgreim@gravesgarrett.com
                                         mmueller@gravesgarrett.com
                                         jtyler@gravesgarrett.com

                                         **BECKLEY & MADDEN, LLC,**

                                         */s/ Charles O. Beckley, II*
                                         Charles O. Beckley, II (PA 47564)
                                         212 North Third Street, Suite 301
                                         Harrisburg, PA 17101
                                         Tel: (717) 233-7691
                                         Email: cbeckley@pa.net