**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **VOTER REFERENCE** | ) |
| **FOUNDATION, LLC,** | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) **Civil Action No.: 1:24-CV-00294** |
| | ) |
| **ALBERT SCHMIDT**, in his official | ) Judge Christopher C. Conner |
| capacity as Secretary of the | ) |
| Commonwealth of Pennsylvania, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**PLAINTIFF VOTER REFERENCE FOUNDATION'S BRIEF IN**
**<u>OPPOSITION TO DEFENDANT'S RULE 12(B)(6) MOTION TO DISMISS</u>**

Plaintiff Voter Reference Foundation, LLC respectfully submits this brief in opposition to

Defendant's Motion to Dismiss pursuant to Rule 12(b)(6). *See* ECF No. 12 (Motion to Dismiss);

No. 19 (Brief in Support).

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iv

INTRODUCTION ...................................................................................................... 1

PLAINTIFF'S COUNTER STATEMENT OF FACTS & PROCEDURAL HISTORY ............ 2

    A.    VRF, its Mission, and VoteRef.com ..................................................... 2

    B.    The National Voter Registration Act's Public Inspection Provision ......... 3

    C.    Pennsylvania Law Regarding Voter Data ............................................ 4

    D.    VRF's First Request for Voter Data is Denied ..................................... 5

    E.    VRF Appeals the Denial to the Office of Open Records and the Pennsylvania Commonwealth Court ............................................................ 6

    F.    VRF's First NVRA Notice of Violation to the Secretary ........................ 7

    G.    VRF's Second Request for Voter Data is Denied ................................. 7

COUNTER STATEMENT OF ISSUES PRESENTED ................................................ 8

ARGUMENT ........................................................................................................... 8

    I.    Legal Standard: 12(b)(6) Motion to Dismiss ...................................... 8

    II.    The data requested by VRF, including the FVE, are records which must be made available pursuant to the NVRA's Public Inspection Provision ......... 8

    III.    Pennsylvania's Internet Sharing Ban, the Secretary's sole reason for refusing to produce voter data, is preempted by the NVRA ........................ 10

        a.    The Internet Sharing Ban is preempted by the NVRA ...................... 10

        b.    VRF's preemption claim is not "boundless," nor would it lead to the doomsday scenarios the Secretary prophesizes ................................. 13

    IV.    The Secretary violated the NVRA by failing to produce the FVE to VRF ...... 16

        a.    The Secretary's failure to produce the records requested in VRF's 2022 request violated the NVRA's Public Inspection Provision ............... 16

b.   The Secretary's failure to produce the records requested in VRF's 2023 request violated the NVRA's Public Inspection Provision ............................................ 17

V.   The Internet Sharing Ban also violates the First Amendment ........................... 18

a.   Because federal law requires states to make their voter lists available, the subsequent dissemination of the lists is protected by the First Amendment ........ 18

b.   *Anderson-Burdick* is not applicable; strict scrutiny applies ........................ 21

c.   Regardless of which test applies, the First Amendment claims are inappropriate to resolve at the motion to dismiss stage ................................. 22

d.   Pennsylvania's total ban on Internet Speech involving voter data is overbroad ... 23

CONCLUSION .......................................................................................................... 25

CERTIFICATE OF WORD COUNT ......................................................................... 27

CERTIFICATE OF SERVICE .................................................................................... 27

# TABLE OF AUTHORITIES

**Case**                                                                                         **Pages**

*ACORN v. City of Frontenac,*
    714 F.2d 813 (8th Cir.1983) ............................................................................ 24

*Anderson v. Celebrezze,*
    460 U.S. 780 (1983) .................................................................... 18, 21, 22, 23

*Arizona v. Inter Tribal Council of Arizona, Inc.,*
    570 U.S. 1 (2013) ........................................................................................... 12

*Ashcroft v. Free Speech Coalition,*
    535 U.S. 234 (2002) ....................................................................................... 24

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ......................................................................................... 8

*Bartnicki v. Vopper,*
    532 U.S. 514 (2001) ....................................................................................... 18

*Benezet Consulting, LLC v. Boockvar,*
    433 F. Supp. 3d 670 (M.D. Pa. 2020) ............................................................ 23

*Broadrick v. Oklahoma,*
    413 U.S. 601 (1973) ....................................................................................... 24

*Burdick v. Takushi,*
    504 U.S. 428 (1992) .................................................................... 18, 21, 22, 23

*Dombrowski v. Pfister,*
    380 U.S. 479 (1965) ....................................................................................... 24

*Fusaro v. Cogan,*
    930 F.3d 241 (4th Cir. 2019) .......................................................................... 21

*Harkless v. Brunner,*
    545 F.3d 445 (6th Cir. 2008) .......................................................................... 12

*Jud. Watch, Inc. v. Lamone,*
    399 F. Supp. 3d 425 (D. Md. 2019) ................................................................. 9

*L.A. Police Dep't v. United Reporting Pub. Corp.,*
    528 U.S. 32 (1999) ......................................................................................... 18

*McIntyre v. Ohio Elections Comm'n,*
514 U.S. 334 (1995) .................................................................. 21

*Mecinas v. Hobbs,*
30 F.4th 890 (9th Cir. 2022) ...................................................... 23

*Mi Familia Vota v. Fontes*,
No. CV-22-00509-PHX-SRB, 2023 WL 8183070 (D. Ariz. Feb. 16, 2023) ............... 23

*Phillips v. County of Allegheny*,
515 F.3d 224 (3d Cir. 2008) ........................................................ 8

*PLIVA, Inc. v. Mensing,*
564 U.S. 604 (2011) ................................................................ 10

*Project Vote, Inc. v. Kemp,*
208 F.Supp.3d 1320 (N.D. Ga. 2016) ................................................ 15

*Project Vote/Voting for Am., Inc. v. Long,*
682 F.3d 331 (4th Cir. 2012) ............................................. 4, 11, 13, 14

*Project Vote/Voting For Am., Inc. v. Long,*
752 F. Supp. 2d 697 (E.D. Va. 2010) ............................................... 15

*Pub. Int. Legal Found., Inc. v. Bellows*,
92 F.4th 36 (1st Cir. 2024) ..................................................... 9, 10

*Pub. Int. Legal Found., Inc. v. Matthews*,
589 F. Supp. 3d 932 (C.D. Ill. 2022) ............................................. 4, 9

*Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections,*
996 F.3d 257 (4th Cir. 2021) ...................................................... 15

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) ................................................................ 19

*Republican Party of Minnesota v. White,*
536 U.S. 765 (2002) ................................................................ 23

*Rogers v. Corbett,*
468 F.3d 188 (3d Cir. 2006) ....................................................... 23

*Rosen v. Port of Portland,*
641 F.2d 1243 (9th Cir.1981) ...................................................... 24

*Schrader v. Dist. Att'y of York Cnty,*
    74 F.4th 120 (3d Cir. 2023) ................................................. 19, 20

*Smith v. Daily Mail Publ'g Co.*,
    443 U.S. 97 (1979) ................................................................. 20

*Soltysik v. Padilla*,
    910 F.3d 438 (9th Cir. 2018) ................................................ 23

*Swoboda v. Pennsylvania Dep't of State (Office of Open Records)*,
    304 A.3d 105 (Pa. Cmwlth. 2023) ......................................... 17

*True the Vote v. Hosemann*,
    43 F. Supp. 3d 693 (S.D. Miss. 2014) ................................. 9, 14

*United States v. Williams*,
    553 U.S. 285 (2008) .............................................................. 24

*Virginia v. Hicks*,
    539 U.S. 113 (2003) .............................................................. 24

*Voter Reference Found., LLC, v. Torrez, et. al,*
    No. CIV 22-0222 JB/KK, 2024 WL 1347204 (D.N.M. Mar. 29, 2024) .............. 4, 9, 11

*Williamson v. Mazda Motor of Am., Inc.,*
    562 U.S. 323 (2011) .............................................................. 10

**STATUTES**

18 Pa.C.S. § 4904 ............................................................................. 5

23 Pa. C.S. § 6349(b) ....................................................................... 19

25 Pa.C.S. § 1207(b) ........................................................................ 5

25 Pa.C.S. § 1401 ............................................................................. 6

25 Pa.C.S. § 1404 ....................................................................... 4, 5, 15

52 U.S.C. § 20501(b) ................................................................... 3, 11

52 U.S.C. § 20507 .................................................................... 3, 4, 11

52 U.S.C. § 20510(b) ....................................................................... 16

**RULES**

Fed. R. Civ. P. 12(b)(6) .................................................................8, 13, 14, 22, 23

**REGULATIONS**

4 Pa. Code § 183.13 ...........................................................................4, 5, 20, 24

4 Pa. Code § 183.14 ...........................................................................4-6, 20, 24

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I § 4 ...................................................................................12

## INTRODUCTION

Voter Reference ("VRF") sues the Secretary to vindicate the public's right to access records fundamental to the integrity of our elections: state voter lists. As it does in 32 other states, VRF plans to analyze those records and, by making them available online, invites the citizens of Pennsylvania to do the same. VRF encourages them to join it in putting the records and analysis to productive use by engaging in political speech and by petitioning the government to properly maintain the lists.

The Secretary recoils from the scrutiny that online review of his list maintenance efforts will invite. Yet his attacks against VRF for supposedly endangering voter privacy are misdirected. First, Pennsylvania has long granted a plethora of individuals and groups within and without the Commonwealth broad access to the same data with oversight no different from what VRF applies to its own user/associates. There has been no apparent epidemic of voter privacy violations. But assuming the Secretary is truly concerned, his real opponent is Congress.

Since passing the National Voter Registration Act ("NVRA") in 1993, Congress has invited citizens and groups like VRF to access the data and use it to join in open, candid, public-spirited debate—including debate with the states themselves—over voter list integrity and maintenance. The NVRA requires states to unify their voter data and maintain it properly. Rather than exclusively vesting enforcement powers in a federal bureaucracy, Congress trusted the ingenuity and diligence of the voting public to publicly inspect the data and thereby ensure state officials complied. Citizens in two-thirds of the states covered by the NVRA can now do this through VRF by agreeing to follow state restrictions on data use. They no longer must join a state-favored political group, pay costly fees to access the data, or code a platform to make it viewable.

VRF is accomplishing Congress's purpose. Pennsylvania is impeding it solely based on unproven privacy concerns. This Court should deny the Secretary's Motion to Dismiss and allow the parties to present this dispute on a full record. It should then enforce the NVRA and First Amendment to restore the rights of VRF and Pennsylvania citizens to engage in online speech sharing that data—and their suggestions, criticisms, or plaudits for state election administrators.

## PLAINTIFF'S COUNTER STATEMENT OF FACTS & PROCEDURAL HISTORY

### A.     VRF, its Mission, and VoteRef.com

VRF is a nonprofit organization dedicated to increasing voter participation while protecting election integrity. Complaint (ECF No. 1) ("Comp.") at ¶1. VRF requests voter lists from state officials to evaluate and assist states in their list maintenance functions as contemplated by the NVRA. *Id.*, ¶¶1, 48. VRF publishes the voter lists on VoteRef.com (the "Website") and analyzes the data on other websites. *Id.*, ¶¶1, 8, 42. VRF intends this speech to allow interested citizens in Pennsylvania (and elsewhere) to check the data's accuracy against their own knowledge or other sources of information, to gain confidence in the electoral system, and increase voter participation. *Id.*, ¶¶1, 8, 42, 46. VRF encourages citizens to report any errors to officials who maintain the lists. *Id.*, ¶¶1, 8, 47.[1]

---

[1] The Secretary attacks VRF for its allegations that citizens "can" and are "encouraged" to contact their election officials when errors are identified. Motion to Dismiss Brief (ECF No. 19) ("MTD"), p.18. The Secretary essentially contends that VRF must plead evidentiary facts as absolute certainties: that citizens have been contacting their officials using VRF's online information; that election officials have diligently used citizen tips and amended voter rolls as a result; and that more citizens are registering and voting. *Id.* VRF has no such burden either at the pleading or trial stages. That is particularly true here, where the Secretary threatened VRF with prosecution if it made the data available to do the exact task the Secretary now demands VRF demonstrate. MTD, Ex. A. VRF pleads its plan and intent and showing how Pennsylvania's flouting of the NVRA is frustrating not only VRA's plans, but Congress's statutory intent.

VRF only seeks to share voter information made available under Pennsylvania law, not sensitive personal information like social security numbers, phone numbers, email addresses, or driver's license numbers. *Id.*, ¶¶43, 54. VRF posts no information of voters enrolled in states' protected voter programs.

VRF's role is essential: it has resources to acquire what could otherwise be prohibitively expensive data, and has manpower to convert the raw data into a format the public can use and understand. *Id.*, ¶¶49-50. VRF makes the data publicly available for free. *Id.*, ¶51.

**B.    The National Voter Registration Act's Public Inspection Provision**

Congress enacted the NVRA in 1993 to "establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," "enhance[ ] the participation of eligible citizens as voters in elections for Federal office," "protect the integrity of the electoral process," and "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(1)-(4). States must "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters…" 52 U.S.C. § 20507(a)(4)(A)-(B).

States must make records of their list maintenance activities publicly available:

> (i) Public disclosure of voter registration activities
>
> (1) Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.
>
> (2) The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each

> such person has responded to the notice as of the date that inspection of the
> records is made.

52 U.S.C. § 20507(i) (the "Public Inspection Provision").

Subsection (i)(2) shows that voter addresses and names are within the Provision's scope and don't delineate its outer boundaries. *See Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 941 (C.D. Ill. 2022)("Section 20507(i)(2) does not say that the examples found therein are the <u>only</u> examples of what can be a record or that other types of records are specifically excluded from the statute. Instead, the Public Disclosure Provision casts a wide net, mandating 'all records' be made publicly available."). *See also Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 337 (4th Cir. 2012); *Voter Reference Found., LLC, v. Torrez, et. al*, No. CIV 22-0222 JB/KK, 2024 WL 1347204, at *138 (D.N.M. Mar. 29, 2024).

### C.     Pennsylvania Law Regarding Voter Data

Pennsylvania purports to make certain voter data available if used for purposes related to elections, political activities, or law enforcement. 25 Pa.C.S. § 1404(a);(b)(3). The Secretary promulgated regulations for access to two types of lists, "street lists" and "public information lists." One of those regulations, 4 Pa. Code § 183.13 (entitled, "Street Lists") provides in pertinent part:

> (c) Street lists will be available for public inspection and copying at the
> Department and the commissions during business hours, subject to
> reasonable safeguards[.]
>
> […]
>
> (g) The street list may not be published on the Internet.

Comp., ¶25. Likewise, 4 Pa. Code § 183.14 ("Public Information Lists") states:

> (b) A commission and the Department will make copies of the public
> information lists available for public inspection during business hours,
> subject to reasonable safeguards, including:
>
> [ ... ]

4

> (k) The list may not be published on the Internet.

Comp., ¶26.

The Secretary also provides a Full Voter Export List ("FVE")—Pennsylvania's full voter

list—on the Department's website, which states:

> As provided by 25 Pa.C.S. Section 1404(b)(l) (relating to Public Information Lists),
> as well as the SURE Regulations at 4 Pa. Code Section l 84. l 4(b) (relating to Public
> Information Lists), the Department of State will provide the Full Voter Export List
> to requestors. This version of the Public Information List is a full export of all voters
> in the county and contains the following fields: voter ID number, name, sex, date
> of birth, date registered, status (i.e., active or inactive), date status last changed,
> party, residential address, mailing address, polling place, date last voted, all districts
> in which the voter votes (i.e., congressional, legislative, school district, etc.), voter
> history, and date the voter's record was last changed.

*Id.*, ¶28. Users click a link to purchase the FVE. *Id.*, ¶29. However, as a condition of access,

requesters must affirm as follows:

> I affirm that any information obtained from the records requested from the
> Department of State will not be used for commercial or other purposes, except
> purposes related to elections, political activities and law enforcement, as required
> by 25 Pa.C.S. sections 1207(b) & 1404(c)(2). ***I further affirm that I will not
> publish any of the above lists on the Internet, as such publication is prohibited
> by 4 Pa. Code sections 183.13 (g) & 183.14 (k).***
>
> I verify that this statement is true and correct. I understand that false statements
> made are subject to the penalties of 18 Pa.C.S. Section 4904, relating to unsworn
> falsification to authorities…

*Id.*, ¶30 (emphasis added). Requesters cannot acquire the FVE without agreeing to forego Internet

publication. *Id.*, ¶31. A false affirmation is a second-degree misdemeanor under 18 Pa.C.S. §

4904(a). *Id.*, ¶34. VRF collectively cites this affirmation, and the prohibitions in 4 Pa. Code §§

183.13 and 183.14, as the "Internet Sharing Ban."

**D.    VRF's First Request for Voter Data is Denied**

To advance its goals outlined in Section A above, VRF requested the FVE from the

Department of State on March 7, 2022. Comp., ¶56. VRF declined to use the state-scripted form

because it would require VRF to forego posting the data online, which VRF intended, and believed it had a right, to do. *Id.*, ¶¶57-60. Because VRF wished to comply with those provisions governing access to the FVE that are consistent with the NVRA and the Constitution, it included an attestation signed by Gina Swoboda, its executive director, affirming that VRF would only use the FVE for statutorily permissible purposes relating to elections, political activities, and law enforcement as required by 25 Pa.C.S. § 1401, et seq., and 4 Pa. Code § 183.14. *Id.*, ¶59.

The Department denied VRF's request claiming it lacked the required affirmation. *Id.*, ¶¶62-63; Comp., Ex. C. It also claimed VRF had previously obtained the FVE "but violated the voter registration law and the Department's regulations by publishing the information obtained on the Internet, namely, [its] website," and stated that "[a]s a result of those actions, your request for voter registration information is denied." *Id.*, ¶65; Comp., Ex. C. The Department never contended—and the Secretary does not now contend—that VRF's proposed use of the FVE was for a prohibited purpose. Thus, the only basis for the denial was VRF's refusal to agree to the Internet Sharing Ban.

### E.    VRF Appeals the Denial to the Office of Open Records and the Pennsylvania Commonwealth Court

VRF appealed the denial of its request to both the Pennsylvania Office of Open Records and the Commonwealth Court. Comp., ¶ 66. The Commonwealth Court affirmed on October 20, 2023, but solely on state law grounds, holding that the Pennsylvania Voter Registration Act did not require the Department to produce the requested data without the signed affirmation foreswearing Internet publication. *Id.*, ¶67. The Commonwealth Court specifically refrained from addressing the claims raised here pertaining to the NVRA and the First Amendment. *Id.*

### F.     VRF's First NVRA Notice of Violation to the Secretary

On November 2, 2023, VRF notified the Secretary and Department of their NVRA violation for failing to provide data sought in VRF's March 7, 2022 request. *Id.*, ¶¶69-70; Comp., Ex. D. This notice also apprised the Secretary of VRF's position that the NVRA preempted the Internet Sharing Ban. *Id.*, ¶71.

### G.     VRF's Second Request for Voter Data is Denied

Also on November 2, VRF made a new request. It again sought, among other things, the FVE, *id.*, ¶73., this time *solely under the NVRA*. *Id.*, ¶74. The Secretary responded to both the November 2, 2023 NVRA Notice and this new NVRA Request by letter dated November 16, 2023. *Id.*, ¶76; Comp., Ex. F. The Secretary first argued that VRF's March 2022 request was not under the NVRA because VRF's request did not cite the "NVRA." *Id.*, ¶77.

The November 2023 NVRA request was "granted on the condition that VRF completes the affirmation required for obtaining this data pursuant to Pennsylvania law." *Id.*, ¶78. That affirmation, as explained above, requires foreswearing Internet publication. *Id.*, ¶¶30, 34.

VRF responded the next day with a Second NVRA Notice, apprising Defendant that it continued to violate the NVRA by not producing the requested documents (Comp. at ¶80; Ex. G); that the NVRA preempted the Internet Sharing Ban (*Id.*, ¶82; Ex. G); and that the "conditional grant" of access was effectively a denial (*Id.*, ¶83; Ex. G). The Secretary admits the sole basis for denying the second request was VRF's refusal to agree to the Internet Sharing Ban. MTD, p. 23.

## COUNTER STATEMENT OF ISSUES PRESENTED

1. Does the Complaint plausibly allege that the Internet Sharing Ban is conflict preempted by the NVRA?
2. Does the Complaint plausibly allege that the Secretary violated the NVRA by failing to produce voter data in response to VRF's March 2022 and November 2023 requests?
3. Does the Complaint plausibly allege that the Internet Sharing Ban restricts First Amendment protected speech?
4. Does the Complaint plausibly allege that the Internet Sharing Ban is overbroad?

## ARGUMENT

### I. Legal Standard: 12(b)(6) Motion to Dismiss

Rule 12(b)(6) provides for dismissal of complaints that fail to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). The court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (citation omitted). A claim is facially plausible when a plaintiff pleads facts "that allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### II.    The data requested by VRF, including the FVE, are records which must be made available pursuant to the NVRA's Public Inspection Provision.

The Secretary's brief never contests a key point: the data at issue are "records" disclosable under the NVRA's Public Inspection Provision. *See* MTD, p. 13. Still, it is worth restating *why* Congress requires Pennsylvania to make the FVE—its statewide voter list—publicly available. The FVE is the most comprehensive record of the "programs and activities"[2] Pennsylvania

---

[2] Plaintiff cited some references to superseded statutes which mandated list maintenance activities prior to the NVRA. But as Defendant notes, Pennsylvania still runs a plethora of "programs and activities" to fulfill its list maintenance function under the NVRA as outlined by the 2002 Registration Law. MTD, p. 19. That is what matters. Records that those programs and activities were conducted, including the FVE, must be made available under the NVRA.

undertakes to ensure the accuracy and currency of its voter rolls. Every court to consider the issue has held that a state's voter list—like the FVE—is a "record" subject to public inspection under the NVRA. *See Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36 (1st Cir. 2024)[3] (Maine's voter list is a "record" under NVRA); *Voter Reference Found., LLC, v. Torrez, et. al*, No. CIV 22-0222 JB/KK, 2024 WL 1347204, at *133 (D.N.M. Mar. 29, 2024); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 941 (C.D. Ill. 2022); *Jud. Watch, Inc. v. Lamone*, 399 F. Supp. 3d 425, 438-42 (D. Md. 2019); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 723 (S.D. Miss. 2014).

The Secretary's entire argument—addressed below—is that despite Congressional insistence that states share such essential data with the voting public so that they can engage in speech and petition their own states to ensure NVRA compliance, Pennsylvania can interpose its own conditions on access. These conditions are severe. They include forcing recipients to surrender their federally-protected First Amendment rights to speak with the data online. Pennsylvania would have citizens disavow the very speech and petitioning Congress intended to foster by foreswearing Internet publication of the data. MTD, p. 21. As shown below, the Secretary's arguments cannot prevail.

---

[3] The Secretary cites *Bellows* to argue that the NVRA permits redaction of sensitive information but asks this Court to otherwise disregard the thoughtful analysis from that case that directly contradicts his positions here by assuming that the First Circuit ignored the U.S. Constitution in constructing its analysis. *See* MTD, p. 14, n. 9. Defendant's misguided argument is addressed below.

**III.  Pennsylvania's Internet Sharing Ban, the Secretary's sole reason for refusing to produce voter data, is preempted by the NVRA.**

Because the FVE must be made available pursuant to the Public Inspection Provision, Pennsylvania's attempts to ban the sharing of the FVE on the Internet is conflict-preempted by the NVRA. The Ban conflicts with, and frustrates the purposes of, federal law.

> **a.  The Internet Sharing Ban is preempted by the NVRA.**

Federal law may supersede state law through conflict preemption. This occurs when compliance with both state and federal regulations is impossible, *PLIVA, Inc. v. Mensing,* 564 U.S. 604 (2011), or when a challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of a federal law," *Williamson v. Mazda Motor of Am., Inc.,* 562 U.S. 323, 330 (2011) (internal quotation marks omitted). To date, two federal courts have considered whether state bans on publishing voter data online are preempted by the Public Inspection Provision. Both answered: "yes."

In *PILF v. Bellows*, the First Circuit held that Maine's internet ban was conflict preempted by the NVRA. The plaintiff, a nonprofit voting integrity organization, sued after Maine refused to produce its voter file. Maine relied on two bans: it banned disclosure to anyone not a "'political party, or an individual or organization engaged in so-called 'get out the vote' efforts directly related to a campaign or other activities directly related to a campaign;" and banned use "for any purpose that is not directly related to activities of a political party, 'get out the vote' efforts directly related to a campaign or other activities directly related to a campaign." *Bellows*, 92 F.4th at 43.

While summary judgment was pending, Maine added an Internet publication ban making it unlawful to, among other things:

> (2) Cause the voter information or any part of the voter information that identifies, or that could be used with other information to identify, a specific voter, including but not limited to a voter's name, residence address or street address, to be made accessible by the general public on the Internet or through other means.

*Id.* at 43-44. Plaintiff amended its NVRA claims to challenge the Internet ban. *Id.* at 44.

After concluding that Maine's voter list is a "record" under the Public Inspection Provision, the First Circuit held that the NVRA preempted the Internet ban. *Id.* at 54-56. It observed that the Public Inspection Provision's mandate that the data be "'ma[d]e available for <u>public inspection</u>' ... evinces Congress's belief that public inspection, and thus public release, of Voter File data is necessary to accomplish the objectives behind the NVRA." *Id.* at 54 (quoting 52 U.S.C. § 20507(i)(1)). "Indeed, the analysis and subsequent dissemination of Voter File data to the public is necessary if members of the public, or organizations such as PILF, are ever to identify, address, and fix irregularities in states' voter rolls by exercising their private right of action under the NVRA." *Id.* at 54 (citing *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d at 339).

The First Circuit rejected Maine's contentions—nearly identical to the Secretary's here—that banning internet publication furthers the NVRA's purposes by "'provid[ing] assurance to Mainers that registering to vote will not expose their personal data to [ ] inappropriate uses" as well as "safeguard[ing] Maine voters from ... invasions of privacy.'" *Id.* at 55. The First Circuit concluded that the correct balance between disclosure and privacy is the province of Congress, and that, "even if the [Internet] Publication Ban does further the NVRA's objective of enhancing the participation of eligible citizens as voters, it nonetheless creates an obstacle to the accomplishment and execution of the <u>full</u> purposes and objectives of Congress as stated in 52 U.S.C. § 20501(b)(1)-(4)." *Id.* at 55. Thus, the First Circuit held that Maine's ban on publishing its voter file online was preempted by the NVRA. It rejected Maine's nanny state defense.

In the second case, VRF sued the New Mexico Secretary of State and Attorney General challenging New Mexico's Internet ban. *See Voter Reference Found., LLC, v. Torrez, et. al*, No. CIV 22-0222 JB/KK, 2024 WL 1347204 (D.N.M. Mar. 29, 2024). The Court granted summary

judgment in VRF's favor on its NVRA access and preemption claims. The Court first held that New Mexico's voter list was a "record" which must be produced under the NVRA. It then concluded that New Mexico's ban on internet publication conflicted with the Public Inspection Provision and was preempted to the extent of that conflict: "read as though part of the same 'unitary system,' the NVRA's Public Inspection Provision and the Data Sharing Ban conflict with one another, and, …the former preempts the latter." *Id.* at **141-44. Again, the nanny state defense— that New Mexico needed to weaken Congress's mandate to protect citizens from themselves— failed.

The Internet Sharing Ban here, in all relevant respects identical to the bans in Maine and New Mexico, is likewise preempted.

Defendant grapples with neither case. Instead, he claims the Elections Clause, U.S. Const. art. I, § 4, cuts against preemption, arguing that "text alone" controls whether Elections Clause legislation preempts state law. MTD, p. 12. But this flips the relationship between the Elections Clause and preemption on its head. When the federal law in question was passed pursuant to the Elections Clause, the preemption doctrine's "presumption against pre-emption" is inapplicable. *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 13-15 (2013). That is because the Elections Clause "empowers Congress to 'make or alter' state election regulations," and, therefore, "[w]hen Congress legislates with respect to the 'Times, Places and Manner' of holding congressional elections, it *necessarily* displaces some element of a pre-existing legal regime erected by the States." *Id.* at 14. "Because the power the Elections Clause confers is none other than the power to pre-empt, the reasonable assumption is that the statutory text accurately communicates the scope of Congress's pre-emptive intent." *Id.*; *see also Harkless v. Brunner*, 545 F.3d 445, 455 (6th Cir. 2008) (The rule "that Congress must be explicit when it encroaches in areas

traditionally within a state's core governmental functions [ ] does not apply when Congress acts under the Elections Clause, as it did in enacting the NVRA.")

Finally, Defendant argues that, to overcome his motion to dismiss, VRF must affirmatively prove that its publication of voter lists does, in fact, promote voter registration and participation. MTD, p. 18. But under the NVRA preemption analysis, where Congress has already stated that public policy favors disclosure, transparency, and openness, proving the correctness of Congress's policy decision is never part of plaintiff's showing.

Even if it were, VRF plausibly alleges that crowdsourcing of list maintenance and accuracy checks will advance the NVRA's objectives: increased confidence and transparency will lead to more faith in the accuracy and integrity of voter lists and, therefore, of elections. Comp., ¶¶8, 42, 45. As the Fourth Circuit has noted in a widely-cited decision, there are "many benefits of public disclosure," and among them is the "self-evident" fact that "disclosure will assist the identification of both error and fraud in the preparation and maintenance of voter rolls," and that, "[w]ithout such transparency, public confidence in the essential workings of democracy will suffer." *Long*, 682 F.3d at 339. Defendant is free to disagree with the Fourth Circuit's holding and with VRF's fact-pleading that tracks it, but under Rule 12(b)(6), Defendant cannot manufacture its own un-pleaded and unsworn "facts" to argue that VRF's data analysis and speech will *discourage* participation and registration. *See* MTD, p. 16-17. The "self-evident" reasoning in *Long* should prevail, but if there is a genuine factual dispute, it should be examined in discovery and at trial.

> **b.    VRF's preemption claim is not "boundless," nor would it lead to the doomsday scenarios the Secretary prophesizes.**

Defendant's main attack on preemption argues policy, not law. The Secretary makes a classic slippery slope argument, claiming that VRF's preemption claim is "boundless" and would force disclosure of reams of highly sensitive personal data. MTD, p. 16, n.10.  VRF's Complaint

puts this argument to rest, as VRF pleads that it has neither sought nor planned to disclose such data. VRF requested specific lists already compiled by the Secretary which do not contain such sensitive information; it is the compilation and maintenance of those lists that matters for election integrity, and that is the limit of VRF's interest. *See* Comp., Exs. A; E. Once again, under Rule 12(b)(6), the Secretary is not entitled to his own facts.

Defendant's argument fails for another reason. VRF's NVRA preemption claim only applies to the extent that a restriction placed on the public inspection rights provided thereunder conflicts with, and frustrates the purposes of, the NVRA. Some information the state might collect, like social security numbers, email addresses, phone numbers, and driver's license numbers, are simply unnecessary for the types of list maintenance functions that VRF proposes, or those that the NVRA contemplates the public will undertake. (Indeed, other federal laws would prohibit disclosure of some of this data.) Precisely for those reasons, VRF has never sought these categories of "sensitive information," nor has it ever argued that the NVRA preempts restrictions on providing it. No one has argued or could argue that the NVRA provides *carte blanche* access to *all* information the state has about a voter.

In this regard, the Secretary's heavy reliance on cases regarding the redaction of sensitive personal information like social security numbers, phone numbers, and email addresses is misplaced and even proves the opposite point. *See* MTD, p. 14-15, 20-21 (collecting cases). Citing five cases, the Secretary argues that the NVRA leaves room to consider "privacy concerns" and protections for "confidential sensitive information." But cases considering whether certain "highly sensitive information" should be redacted deal with qualitatively different categories of information than what VRF seeks. *See Project Vote*, 682 F.3d at 339 (redacting Social Security Numbers); *True the Vote*, 43 F. Supp.3d at 734 (redacting telephone numbers and Social Security

Numbers); *Project Vote, Inc. v. Kemp*, 208 F.Supp.3d 1320 (N.D. Ga. 2016) (redacting telephone numbers, Social Security Numbers, portions of emails); *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 267 (4th Cir. 2021) (noting that information subject to redaction can include personal information of those subject to criminal investigations and those citizens initially identified as potentially failing to meet citizenship requirement for voter registration but ultimately exonerated). VRF has never requested these categories of information. And none of the cases discussing the intersection between privacy concerns and the Public Inspection Provision say that privacy concerns warrant withholding *all* information about a voter; they apply to only the most sensitive types of information.[4]

The Secretary veers further off course by insinuating that VRF's preemption claim would eviscerate Pennsylvania law prohibiting tampering with the list itself. *See* MTD, p. 14 (citing 25 Pa. C.S. § 1404(b)). Again, any theory of conflict preemption under the NVRA requires an actual conflict with, or frustration of, the NVRA's purposes. Monitoring and preserving the integrity and accuracy of the list does not require giving the public the ability to tamper with the list. Similarly, someone seeking the data under the NVRA for a commercial purpose could likewise be denied, as commercial solicitations or other uses would not further the NVRA's purpose, nor do restrictions on those uses frustrate the NVRA's purposes. And, once again, VRF has never pleaded that it wishes to engage in such activities, or argued that either such restriction is preempted.

---

[4] Regarding social security numbers in particular, Judge Smith notes in *Project Vote/Voting for Am., Inc. v. Long* that "[t]here is no indication in the statute that entire voter registration applications should be kept confidential," but nevertheless held that "a person's SSN is precluded from disclosure, as disclosure of that information would undermine the purposes of the statute." 752 F. Supp. 2d 697, 711 (E.D. Va. 2010).

15

Defendant's slippery slope arguments are no substitute for the legal analysis required to support an implied preemption claim. Where there is no conflict, there is no preemption.

**IV.     The Secretary violated the NVRA by failing to produce the FVE to VRF.**

VRF notified the Secretary on two occasions that he was in violation of the NVRA by failing to produce the FVE to VRF. Comp., ¶¶68-84. The Secretary does not contest that he received the statutorily required notices. MTD, p. 4-5. Nor does he argue that the purposes for which VRF planned to use the data fell outside of the permissible election related or political purposes. Instead, he argues that he was under no obligation to provide the requested records until he received a promise from VRF that the data would not be shared via the Internet.

> **a.     The Secretary's failure to produce the records requested in VRF's 2022 request violated the NVRA's Public Inspection Provision.**

The Secretary argues that his refusal to produce the FVE in response to VRF's 2022 request is not an NVRA violation because (1) the request did not include the term "NVRA" and so the NVRA did not apply, and (2) regardless, the Secretary had a right to refuse to produce the data unless VRF agreed not to publish it online. MTD, p. 22-23.

No court of which Plaintiff is aware has ever read a "magic words" requirement into the NVRA which conditions a state's compliance on the requester's invoking the statute by name. Rather, the NVRA's prescribed method for informing a state's chief election official that a requestor believes them to have violated the NVRA *is to send a notice saying just that. See* 52 U.S.C. § 20510(b). The requestor's notice identifies the alleged violation and must provide the state with somewhere between 0-90 days to address the issue, based on the date of the next federal election. § 20510(b)(2)-(3). The state does not have to "read the requestor's mind" when the statute requires a notice identifying the precise violation alleged.

The notice is the latest point that triggers the state's awareness of, and timeline to comply with, the NVRA. Here, the Secretary not only received the required notice on November 3, 2023; he also received notice of the alleged violation, and that VRF considered its request to have been made under the NVRA, as early as August 15, 2022 when VRF raised these very issues in the Commonwealth Court. *See Swoboda v. Pennsylvania Dep't of State (Office of Open Records)*, 304 A.3d 105, 110 (Pa. Cmwlth. 2023) Though the Secretary claims the adequacy of his response was vindicated there, MTD, p. 29, that is flatly untrue. The Commonwealth Court considered only state law procedural questions and refused to consider VRF's NVRA arguments. *Id*. at 113.

As to the Secretary's second asserted excuse for noncompliance, because the Internet Sharing Ban is preempted by the NVRA and is incongruent with the First Amendment, it cannot provide a legitimate basis for denying an NVRA records request made under the Public Inspection Provision. The Secretary's failure to provide the FVE in response to the 2022 request thus constitutes a violation of Pennsylvania's obligations under the Public Inspection Provision.

> **b.    The Secretary's failure to produce the records requested in VRF's 2023 request violated the NVRA's Public Inspection Provision.**

The Secretary makes no notice or "magic words" attack on VRF's 2023 NVRA request for the FVE. Instead, he argues he "conditionally" granted VRF access, so long as it agreed to abide by the Internet Sharing Ban. MTD, p.23-24. True. But the validity of the Ban is the crux of this dispute, and the Secretary was well aware by the time he responded to the 2023 request that VRF was challenging the Ban and could not agree to it. He effectively denied VRF's request.

For the same reasons outlined above, because the Internet Sharing Ban (a) is preempted by the NVRA's Public Inspection Provision and (b) independently violates the First Amendment, it could provide no legitimate basis for denying the 2023 request. The Secretary's failure to provide the FVE in response to the 2023 request again violated the Public Inspection Provision.

**V.      The Internet Sharing Ban also violates the First Amendment.**

The Secretary's contentions regarding VRF's First Amendment claims are twofold. First, he argues that without a First Amendment right to *access* the FVE, there can be no First Amendment rights implicated by restrictions or prohibitions on speech involving the FVE. MTD, p. 24-25. Second, he argues that even if the First Amendment is implicated by the Internet Sharing Ban, the correct framework to apply is *Anderson-Burdick*, which the Ban survives. *Id.*, p. 26-32.

> **a.      Because federal law requires states to make their voter lists available, the subsequent dissemination of the lists is protected by the First Amendment.**

The whole of the Secretary's argument against VRF's First Amendment claim flows from his assertion that "the First Amendment does not create a right of access to information in the possession of the government." MTD, p. 30. But this argument is untethered to VRF's Complaint, as VRF does not claim that it has a *First Amendment* right to the FVE. Rather, VRF's right to obtain the FVE flows from the NVRA itself. *See* Sections II & III, above. Thus, this *is* a case where, contrary to the Secretary's assertion, "the government is prohibiting a speaker from conveying information that the speaker already possesses," *L.A. Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 40 (1999) (Ginsburg, J., concurring), or at least, has the right to possess under federal statute. The only reason VRF does not already possess the information it wishes to convey is because the Secretary is unlawfully withholding it precisely to prevent VRF's speech.

Courts, including the Supreme Court, have afforded First Amendment protection to the publication of information to which there was no First Amendment right of access, or even information that was obtained unlawfully. *See Bartnicki v. Vopper*, 532 U.S. 514, 526-28 (2001). It would be illogical for the First Amendment to protect the dissemination of unlawfully obtained

information, but not information which Congress has expressly said must be made publicly available, like the FVE.

Recent, binding Third Circuit precedent supports this conclusion. In *Schrader v. Dist. Att'y of York Cnty.*, 74 F.4th 120, 126 (3d Cir. 2023), the Third Circuit held that provisions of Pennsylvania's Child Protective Services Law which made it a crime to "willfully release[ ] or permit[ ] the release of any information contained in the Statewide [child-abuse] database ... to persons or agencies not permitted ... to receive that information," 23 Pa. C.S. § 6349(b), violated the First Amendment. In that case, the grandmother of a deceased child wished to publish documents generated in the course of Youth Services' investigation to publicize the agency's failures and to advocate for the innocence of the defendant charged in connection with the child's death. *Id.* at 123-4. The grandmother sued seeking an injunction from being prosecuted if she carried through with publishing the information, arguing that the sharing ban in § 6349(b) was unconstitutional.

The Third Circuit agreed. It first found that the ban was content based, and thus subject to strict scrutiny. *Id.* at 126-7. Citing *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015), the Third Circuit held that the ban was content based because it used the source of the information—the statewide database—as a proxy for the subject matter that triggered the prohibition on speech. *Id.* The Court applied strict scrutiny, and the ban failed to pass muster. *Id.*

Independently of the ban's content-based nature, the Third Circuit held that the ban violated the First Amendment because if one "lawfully obtains truthful information about a matter of public significance[,] then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." *Id.* at 127-8 (citing *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 103 (1979)). Noting that the *Daily Mail* test applies even

when a content-neutral state law seeks to punish a publisher who is not part of the press, *id.* at 128, the Third Circuit held that the plaintiff had a First Amendment right to speak because she (1) obtained the information lawfully, (2) the information she sought to publish was authentic, and (3) the information was "a matter of paramount public import." *Id.*

VRF's planned speech likewise satisfies these three conditions: (1) the NVRA makes the information available to VRF, (2) VRF only seeks to publish the very information the state provides, which it assumes is authentic, and (3) elections and voter list maintenance are matters of public import. Notably, in *Schrader*, there was no discussion of, or argument for, a First Amendment right to access. Nevertheless, the Third Circuit applied First Amendment scrutiny in striking down the prohibition on these two independent bases.

Additionally, the Internet Sharing Ban here is a direct restriction on speech itself, not on access to the data. Both regulatory restrictions in 183.13 and 183.14 proscribe speech: "the [] list may not be published on the Internet." That Pennsylvania uses those direct restrictions on speech to deny access to the underlying data does not insulate the restrictions from First Amendment scrutiny, particularly when the most likely use of that data is to examine and, perhaps, criticize the list maintenance efforts of the very person preventing that potential criticism: the Secretary.

VRF's speech sharing voter data online along with analysis and criticism of the Secretary's list maintenance efforts are both protected by the First Amendment. Speech about and including voter data, including individually identifiable data, is protected:

> … three important considerations compel our conclusion that § 3-506 implicates interests that are protected by the First Amendment. First, the List is closely tied to political speech, which generally receives the strongest First Amendment protection… the List is a valuable tool for political speech… And, in addition to the List's obvious practical utility to political expression, § 3-506 all but ensures that the List will be used to further such speech. More specifically, § 3-506(c) makes it a misdemeanor to use the list 'for any purpose not related to the electoral process.' Thus, the text of § 3-506 reinforces the connection between the

> List and political speech. In these circumstances, we are obliged to hesitate before placing such a regulation beyond judicial scrutiny…

*Fusaro v. Cogan*, 930 F.3d 241, 250 (4th Cir. 2019) (citations omitted). Simply, because Congress decided to make the data within the FVE publicly available, the Secretary may "not condition access to [that data] on any basis whatsoever." *Id*. at 255.

Because VRF has a statutory right, independent of the First Amendment, to receive the FVE, it need not show that it also has a First Amendment right to the list in order to receive First Amendment protections for speech involving that information.

### b.   *Anderson-Burdick* **is not applicable; strict scrutiny applies.**

The Supreme Court created a balancing test in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992), in which First Amendment challenges to state election laws are subjected to a balancing test which considers the specific burdens placed upon the rights of the plaintiff challenging a state election law compared to the state's regulatory interests in upholding the regulation. Severe burdens are subject to strict scrutiny, while minimal burdens may be upheld if they are reasonable and nondiscriminatory.

However, "[t]he fact that an election law burdens a fundamental right is necessary but not sufficient to trigger *Anderson-Burdick*; the law also must regulate 'the mechanics of the electoral process.'" *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995). The restrictions at issue here do not regulate the mechanics of the electoral process: *how, where, or when* people vote. Broadening the scope, they do not regulate who votes. Broadening still further, they do not even regulate how the list of who votes, or who voted, is compiled. Nor do they regulate how voter list maintenance is performed—far removed from the mechanics of the electoral process. Rather, they prohibit activity in a completely different realm: (a) *pure speech* regarding (b) *how officials keep*

*records* of (c) *how people voted* (d) when *they voted in the past*. Thus, *Anderson-Burdick* is wholly inapplicable. Strict scrutiny applies.

Even if the Court applied *Anderson-Burdick*, the burden on VRF's (and others') First Amendment rights is severe. The Internet Sharing Ban is a wholesale prohibition over the most common, cheap, and effective communication tool in the modern era: the Internet. *See* Comp., ¶87, 123, 132. To entirely foreclose speech via this medium is a severe burden regardless of the topic, but especially so when the speech being banned constitutes and relates to core political speech. *Id.*, ¶ 127.

VRF's pleaded facts establish the violation. Detecting errors requires citizens to compare the state's official data with their own personal knowledge regarding friends, neighbors, relatives, and community events. Comp., ¶104. Citizens are much more effective, and their knowledge grows exponentially, when they can share their analyses- and the underlying data- with each other. *Id.* In contrast, if each citizen must operate in a silo that involves only that individual's isolated communications with a government election administrator's office, then citizens cannot effectively combine their knowledge, experience, and analysis to effect change; they will be relegated to occasionally providing their own confidential "tips" directly to a bureaucrat. *Id.*

Thus, even if the Court applies *Anderson-Burdick*, VRF's claim turns on a factual inquiry into the nature of the state's interest in upholding the Ban compared to the severe burdens it imposes on VRF's and others' speech rights.

        c.        **Regardless of which test applies, the First Amendment claims are inappropriate to resolve at the motion to dismiss stage.**

Finally, regardless of which test applies, a Rule 12(b)(6) motion is the wrong vehicle for applying it. First Amendment cases that require the application of any meaningful level of scrutiny (*e.g.*, strict scrutiny, *Anderson-Burdick*, etc.) require the Court to weigh evidence regarding the

state's interests against the speech rights of the plaintiff, which are often described as "fact intensive inquiries." *See, e.g., Mi Familia Vota v. Fontes*, No. CV-22-00509-PHX-SRB, 2023 WL 8183070, at *14 (D. Ariz. Feb. 16, 2023) ("Plaintiffs correctly note that because *Anderson-Burdick* claims are particularly fact-sensitive, dismissal under Rule 12(b)(6) is disfavored."); *Soltysik v. Padilla*, 910 F.3d 438, 447, 450 (9th Cir. 2018) (reversing "premature" dismissal "without any factual record ... [whether the state's] justifications outweigh the constitutional burdens"); *Mecinas v. Hobbs*, 30 F.4th 890, 905 (9th Cir. 2022) (injury under *Anderson-Burdick* present[s] factual questions that cannot be resolved on a motion to dismiss).

Additionally, under either test, the burdens of production and persuasion shift to the Defendant, making them particularly ill-suited to resolve in the state's favor on a motion to dismiss. *See Republican Party of Minnesota v. White*, 536 U.S. 765, 774–75, 122 S. Ct. 2528, 2534 (2002) (strict scrutiny places burden on state to prove narrowing tailoring and a compelling state interest); *Benezet Consulting, LLC v. Boockvar*, 433 F. Supp. 3d 670, 684–85 (M.D. Pa. 2020) (strict scrutiny requires government to rebut presumption of invalidity); *Rogers v. Corbett*, 468 F.3d 188, 194 (3d Cir. 2006) (explaining *Anderson-Burdick* "weighing process).

Whether the Court agrees with VRF that it should apply strict scrutiny or the Secretary's argument for *Anderson-Burdick* review, the fact-intensive nature of the First Amendment inquiry is unsuited for a Rule 12(b)(6) motion.

### d.    Pennsylvania's total ban on Internet Speech involving voter data is overbroad.

Finally, the Secretary argues that VRF's overbreadth claim fails because (1) there is no general First Amendment right to access government information; and (2) the Commonwealth's limitations on the sharing of voter data online are clear. MTD, p. 32.

"The Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002). "[T]he overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). The concern that an overbroad statute deters protected speech is especially strong where, as here, the statute imposes criminal sanctions, *Virginia v. Hicks*, 539 U.S. 113, 119 (2003), and the severity of criminal sanctions may cause speakers, including Plaintiff, to remain silent rather than communicate even arguably unlawful speech. *See, e.g., Dombrowski v. Pfister*, 380 U.S. 479, 494 (1965).

"The first step in overbreadth analysis is to construe the challenged statute." *United States v. Williams*, 553 U.S. 285, 293 (2008). Here, the challenged restrictions are clear: street lists and public information lists, including the FVE, cannot be posted online. 4 Pa. Code §§ 183.13-183.14.

The Court must then consider whether the Internet Sharing Ban proscribes "a substantial amount of protected expressive activity" judged relative to any plainly legitimate purpose served by the Ban. *Williams*, 553 U.S. at 297. This analysis is akin to the narrow tailoring analysis under strict scrutiny, asking whether the state interests could be accomplished by less burdensome means. In addition, though duly enacted laws are ordinarily presumed constitutional, when a law infringes on the exercise of First Amendment rights, its proponent bears the burden of establishing its constitutionality, *see, e.g., ACORN v. City of Frontenac,* 714 F.2d 813, 817 (8th Cir. 1983); *Rosen v. Port of Portland,* 641 F.2d 1243, 1246 (9th Cir. 1981), once again rendering this claim improper for resolution on a motion to dismiss.

The Secretary proffers just one potential state interest to support the ban: voter privacy. First, as addressed above, Congress already resolved the question of whether this is a legitimate or

compelling interest by enacting the NVRA and its Public Inspection Provision, choosing transparency over privacy. This is not the forum to revisit Congress's policy decision, nor is it Pennsylvania's right to carve out its own exceptions to federal law.

Second, the route the Secretary attempts to take to navigate this concern—a complete ban on online speech involving voter data—prohibits *all* speech as a prophylactic to prevent the few if any demonstrable instances in which speech about voter data maintenance can be shown to have harmed a voter. This over-inclusivity is shadowed by under-inclusivity: the ban does not actually prevent any individual from obtaining the data and using it for a nefarious purpose. Thousands of individuals today who never themselves execute the state's proposed affirmations receive the data from political parties and other sources. Comp., ¶125. Many less restrictive solutions would create a tighter fit, preserving VRF's and others' First Amendment rights while actually preventing unintended uses of the data—such as requiring that recipients of the lists track who accesses the data, and assist the state in locating any person who misuses it. In short, this is the quintessential overbreadth problem: using a machete when a problem—if it can be established—calls for a scalpel.

VRF's First Amendment claims are well-pleaded and should advance to discovery and trial.

## CONCLUSION

For these reasons, Defendant's motion to dismiss (ECF NO. 19) should be denied.

Dated: April 25, 2024                    Respectfully submitted,


                                         **GRAVES GARRETT GREIM LLC**
                                         */s/ Edward D. Greim*
                                         Edward D. Greim (MO 54034)*
                                         Matthew R. Mueller (MO 70263)*
                                         Jackson C. Tyler (MO 73115)*
                                         *Admitted Pro Hac Vice*
                                         1100 Main Street, Suite 2700
                                         Kansas City, Missouri 64105
                                         Tel.: (816) 256-3181
                                         Fax: (816) 222-0534
                                         edgreim@gravesgarrett.com
                                         mmueller@gravesgarrett.com
                                         jtyler@gravesgarrett.com

                                         **BECKLEY & MADDEN, LLC**
                                         Charles O. Beckley, II (PA 47564)
                                         212 North Third Street, Suite 30 I
                                         Harrisburg, PA 17101
                                         Tel: (717) 233-7691
                                         Email: cbeckley@pa.net

                                         *Attorneys for Plaintiff*

## <u>CERTIFICATE OF WORD COUNT</u>

Pursuant to Local Rule 7.8(b), I certify that the above brief contains 7,999 words. In making this certificate, I have relied on Microsoft Word's word-count feature.

_/s/ Edward D. Greim_____
Attorney for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

This certifies that, on April 25, 2024, the foregoing was served on Defendant's counsel of record using the Court's CM/ECF system:

Michael Fisher
mjfischer@pa.gov

Erich Greiner
egreiner@attorneygeneral.gov

Amelia Goodrich
agoodrich@attorneygeneral.gov

_/s/ Edward D. Greim_____
Attorney for Plaintiff