## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

VOTER REFERENCE
FOUNDATION, LLC,

      Plaintiff,

   v.

ALBERT SCHMIDT, in his official
capacity as Secretary of the
Commonwealth,

      Defendant.

No. 1:24-cv-294

Judge Christopher C. Conner

## REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS
## FILED BY DEFENDANT AL SCHMIDT

Erich T. Greiner (PA 331601)
Deputy Attorney General
Office of Attorney General
15th Floor, Strawberry Square
Harrisburg, PA 17120
(717) 783-6301
egreiner@attorneygeneral.gov

Amelia J. Goodrich (PA 327192)
Deputy Attorney General
Office of Attorney General
1251 Waterfront Place
Mezzanine Level
Pittsburgh, PA 15222
(412) 565-7680
agoodrich@attorneygeneral.gov

Michael J. Fischer (PA 322311)
Executive Deputy General Counsel
333 Market Street, 17th Floor
Harrisburg, PA 17101
(717) 831-2847
mjfischer@pa.gov

*Counsel for Defendant Al Schmidt*

**REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS**

Defendant Secretary of the Commonwealth Al Schmidt respectfully submits this reply brief in support of his motion to dismiss this case.

Pennsylvania makes copies of its full voter list available to those who request it, provided they pay $20, fill out a form, and agree to use the information only for certain specified purposes and not to post it on the internet.[1] Plaintiff Voter Reference Foundation takes issue with this last requirement, as it wishes to post data from the list on its website, to be accessed by anyone in the world with an internet connection. But nothing in VRF's complaint plausibly alleges that this modest restriction is unlawful under either the National Voter Registration Act or the First Amendment.

In its opposition brief, VRF does not assert that the statutory language of the NVRA conflicts with the internet restriction, nor could it. And its suggestion that the internet restriction frustrates the purposes of the NVRA has matters precisely backwards: protecting voter privacy furthers the goal of increased electoral participation, while the activities

---

[1] *See* https://www.pavoterservices.pa.gov/Pages/PurchasePAFullVoter Export.aspx?Langcode=en-US.

1

VRF claims to encourage—"crowdsourcing of list maintenance and accuracy checks," VRF Br. at 13—run afoul of the NVRA's mandate that state efforts to maintain accurate voter rolls must be "uniform" and "nondiscriminatory." 52 U.S.C. § 20507(b)(1).

Likewise, VRF cannot plausibly allege a violation of the First Amendment. No matter what it claims, VRF remains free to criticize the Secretary's list maintenance efforts on the internet or elsewhere. It simply may not post sensitive information about Pennsylvania's voters. Such a limitation does not implicate the First Amendment—and even if it did, it would be amply justified by the Commonwealth's strong interest in protecting the privacy of its voters.

VRF's complaint should be dismissed in its entirety.

## I.   The NVRA Does Not Preempt the Internet Restriction

Congress enacted the NVRA pursuant to its power under the Elections Clause. As the Secretary explained in his opening brief, Br. at 12, 14 n.9 (ECF 19), in Elections Clause cases, "the reasonable assumption is that the statutory text accurately communicates the scope of Congress's pre-emptive intent." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 14 (2013).

VRF does not dispute that the Elections Clause governs here, but nonetheless bases much of its argument on cases involving Supremacy Clause preemption. Likewise, in *Public Interest Legal Found., Inc. v. Bellows*, 92 F.4th 36 (1st Cir. 2024), relied on heavily by VRF, *see* VRF Br. at 10–11, the First Circuit erroneously stated, "The Supremacy Clause sits at the epicenter of *every* preemption question." 92 F.4th at 51 (cleaned up) (emphasis added).

In evaluating a claim of preemption under the Elections Clause, however, a court should "straightforwardly and naturally read the federal and state provisions in question as though part of a unitary system of federal election regulation but with federal law prevailing over state law where conflicts arise." *Fish v. Kobach*, 840 F.3d 710, 729 (10th Cir. 2016); *see also Inter Tribal Council*, 570 U.S. at 15 ("In sum, there is no compelling reason not to read Elections Clause legislation simply to mean what it says."). The analysis therefore begins—and ends—with the statutory text.

In response, VRF points out that the presumption against pre-emption does not apply in Elections Clause cases. This assertion is beside the point. Under the Elections Clause, the states and Congress both have

authority to prescribe rules for federal elections. So assessing whether a state law is preempted under the Elections Clause is a straightforward endeavor that simply requires reading the two provisions together and determining whether they conflict. Supremacy Clause cases, by contrast, typically present asserted conflicts between different types of laws entirely—such as a federal requirement regulating interstate commerce and a state tort law authorizing injured individuals to seek damages. *See, e.g.*, *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 326 (2011). In such cases, the preemption analysis is more complicated and requires assessing whether the "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of a federal law." *Id.* at 330 (cleaned up). Elections Clause cases require no such probing analysis and simply turn on whether the text conflicts.

Here, VRF does not contend that the language of the NVRA conflicts with that of the internet restriction. Nor could it: the NVRA simply requires the Commonwealth to make certain materials "available for public inspection and, where available, photocopying." 52 U.S.C. § 20507(i). Assuming that the voter lists are covered by this section, the Commonwealth has indeed made them available for public inspection

4

and photocopying—subject to the modest requirement that those who wish to inspect or copy the lists to agree not to post them on the internet.[2]

A right to "inspect" and "copy" certain materials does not entail a right to post them on the internet. This is particularly true here, because statutory language is to be interpreted in accordance with its "plain meaning at the time of enactment." *Tanzin v. Tanvir*, 592 U.S. 43, 48 (2020) (citation omitted). And at the time of the NVRA's enactment, no reasonable listener would have interpreted a requirement to make something "available for public inspection and, where available, photocopying" to create a right to publish it on the internet, for the simple reason that the internet as we know it now did not then exist. The World Wide Web only entered the public domain on April 30, 1993, two days after the conference report on the NVRA was filed and less than one month before it was signed into law.[3] *See* Pub. L. No. 103-31 (May 20,

---

[2] The Secretary does not concede that the lists are covered under § 20507(i), but, for purposes of this motion, asserts that dismissal of Count One is appropriate either way.

[3] CERN, *A short history of the Web*, https://home.cern/science/computing/birth-web/short-history-web. The Court make take judicial notice of any "adjudicative fact if that fact is not subject to reasonable dispute." *Werner v. Werner*, 267 F.3d 288, 295 (3d Cir. 2001).

1993). No one in 1993 would have interpreted the NVRA's inspection provision to create a right to publish relevant material on the internet.

Because the language does not conflict, VRF cannot demonstrate that the NVRA and the Commonwealth's internet restriction do not "operate harmoniously in a single procedural scheme." *Gonzalez v. Arizona*, 677 F.3d 383, 394 (9th Cir. 2012), *aff'd sub nom. Inter Tribal Council*, 570 U.S. at 1. For purposes of the Elections Clause, no further analysis is required.

VRF nonetheless argues that the internet restriction is preempted because it is antithetical to the purposes of the NVRA. But the internet restriction furthers, rather than frustrates, the NVRA's full purposes. The overarching goal of the NVRA was to *expand* voter registration, not to impose burdens on the right to vote. In enacting the NVRA, Congress sought to "increase the number of eligible citizens who register to vote" and "enhance[] the participation of eligible citizens as voters." 52 U.S.C. § 20501(b)(1)–(2). Forcing registered voters to give up their privacy by having their names, addresses, and dates of birth posted on the internet for anyone to see would plainly discourage participation in the electoral process and directly undermine the NVRA's primary goals.

VRF largely ignores these goals, and instead justifies its argument by pointing to the two other purposes expressed by Congress:

> (3) to protect the integrity of the electoral process; and
> (4) to ensure that accurate and current voter registration rolls are maintained.

52 U.S.C. § 20501(b). But Congress did not merely assert these goals; rather, it was very clear on *how* states were to achieve them. A subsequent provision of the NVRA sets strict requirements for:

> Any State program or activity **to protect the integrity of the electoral process** by ensuring the **maintenance of an accurate and current voter registration roll** for elections for Federal office[.]

*Id.* § 20507(b)(emphasis added). Under this provision, such programs "shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965." *Id.* § 20507(b)(1). States are precluded from removing a voter from the rolls "by reason of the person's failure to vote" unless the state followed a specific process set forth in the statute. *Id.* § 20507(b)(2). That process mandates that states may not remove a registrant "on the ground that the registrant has changed residence" unless the registrant either consents or fails to vote in two successive federal elections after not

responding to a written notice by the state seeking confirmation of the voter's residence. *Id.* § 20507(d).

The House Report stressed the importance of the statute's requirement that list maintenance activities be "uniform" and "nondiscriminatory":

> The purpose of this requirement is to prohibit selective or discriminatory purge programs. This requirement may not be avoided by a registrar conducting a purge program or activity ***based on lists provided by other parties where such lists were compiled as the result of a selective, non-uniform, or discriminatory program or activity.***

H.R. Rep. 103-9, at 15 (1993), *reprinted in* 1993 U.S.C.C.A.N. 105, 119 (emphasis added). Thus, while the NVRA's inspection provision invites scrutiny of states' efforts to maintain their voter rolls, it does so at least in part to ensure that states do not engage in arbitrary or discriminatory removal of voters. As the Secretary previously explained, Br. at 18, the NVRA does not permit the arbitrary removal of voters in the way that VRF seems to envision, and it likewise does not contemplate that third-party organizations and individuals will conduct list-maintenance activities. In fact, the report language quoted above makes clear that the statute *prohibits* list-maintenance activities of the type VRF claims posting the voter lists will facilitate. Therefore, despite its assertions to

the contrary, VRF does not *plausibly* allege that posting sensitive voter information on the internet will further the NVRA's goals by leading to more accurate voter rolls.

In *Bellows*, the First Circuit all but ignored this aspect of the NVRA, instead finding that "analysis and subsequent dissemination of Voter File data to the public is necessary if members of the public, or organizations … are ever to identify, address, and fix irregularities in states' voter rolls by exercising their private right of action under the NVRA." *Bellows*, 92 F.4th at 54. This assertion is wrong in two key respects. First, as discussed above, the NVRA largely *prohibits* states from relying on outside organizations and members of the public to "identify, address, and fix irregularities" in their voter rolls. And, second, the private right of action under the NVRA may only be exercised by "person[s] aggrieved" by a violation of the statute. 52 U.S.C. § 20510(b).

Finally, VRF's efforts to limit the scope of its preemption argument, VRF Br. at 13–16, only heighten its deficiencies. VRF argues that the Court need not worry about the reach of its preemption claim because the disclosure of "highly sensitive personal data" would undermine the purpose of the statute and is therefore not required. *See, e.g.*, VRF Br. at

9

15 n.4 (quoting *Project Vote/Voting for Am., Inc. v. Long*, 752 F. Supp. 2d 697, 711 (E.D. Va. 2010)) ("[A] person's SSN is precluded from disclosure, as disclosure of that information would undermine the purposes of the statute."). But for precisely the same reason, allowing the names, addresses, and dates of birth of all voters in Pennsylvania to be made available to internet users around the world also undermines the purpose of the statute. Nowhere does VRF explain how it can draw a meaningful distinction between an absolute prohibition on the *disclosure* of "highly sensitive personal data" and a restriction on the *publication* of data that, while less sensitive, still implicates important privacy interests.

Count One should be dismissed.

## II. The Department's Responses to VRF's Requests Did Not Violate the NVRA

VRF effectively concedes that its claims in Counts Two and Three— that the Secretary violated the NVRA in responding to its prior requests for voter lists—rest on the assertion that the internet restriction is preempted by the NVRA and violates the First Amendment. *See* VRF Br. at 17. Because there is no merit to those arguments, *see supra* pt. I (NVRA) & *infra* pt. III (First Amendment), VRF's assertion that the Secretary violated the NVRA in responding to VRF's 2022 and 2023

10

requests for the voter list also fails. As a result, Counts Two and Three should also be dismissed.

## III.  The Internet Restriction Does Not Violate the First Amendment

VRF concedes that the First Amendment gives it no right of access to the voter lists. *See* VRF Br. at 18. But it still claims that the internet restriction violates the First Amendment because, according to VRF, the NVRA gives it a right of access to the lists, and its right under the NVRA creates a First Amendment right to use the lists however it wishes.

VRF's attempt to bootstrap its NVRA claim into a First Amendment violation fails. It cannot argue that the government may not place reasonable restrictions on access to information. Governmental entities do so all the time, in a wide variety of contexts. Indeed, government could hardly function otherwise. The Executive Branch enforces restrictions on the use of classified information by those granted access to it; courts enforce protective orders in cases involving sensitive discovery information; and state agencies routinely impose restrictions on access to personal information (such as tax data) about individual citizens.

The Supreme Court's decision in *Los Angeles Police Department v. United Reporting Publishing Corp.*, 528 U.S. 32 (1999), underscores this

point. There, the Court rejected a facial challenge to a California law that required requestors of information about arrestees to declare that they were using the information for one of several specific purposes. *Id.* at 34. Chief Justice Rehnquist, writing for seven Justices, declared, "For purposes of assessing the propriety of a facial invalidation, what we have before us is nothing more than a governmental denial of access to information in its possession. California could decide not to give out arrestee information at all without violating the First Amendment." *Id.* at 40. Concurring, Justice Ginsburg emphasized that the statute was "a restriction on access to government information, not … a restriction on protected speech." *Id.* at 42 (Ginsburg, J., concurring).[4]

The same is true here. VRF's claim that the NVRA gives it an unfettered right of access to the voter lists does not change the fact that this dispute involves "a restriction on access to government information," and not an attempt to "restrict speakers from conveying information they already possess." *Id.* VRF's real argument is that the internet restriction

---

[4] *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011), is not to the contrary. Unlike *United Reporting*, *Sorrell* involved "a restriction on access to information in private hands." *Id.* at 568. Here, VRF seeks information that the government possesses.

cannot be reconciled with the broad right of access it asserts the NVRA grants it. But this theory cannot support a claim under the First Amendment; it is simply a dressed-up version of its preemption claim.

*Schrader v. District Attorney of York County*, 74 F.4th 120 (3d Cir. 2023), is of no help to VRF. That case involved a threatened prosecution of a grandmother who wished to publish information she had lawfully obtained about her grandson's death, rather than a request to obtain information without agreeing to restrictions on its use. In *Schrader*, the court recognized that lesser restrictions—such as a protective order preventing the information from being shared with the grandmother in the first instance—would have achieved the statute's purpose. *Id.* at 127.

Even if the First Amendment were implicated, the internet restriction passes muster under the *Anderson-Burdick* test. VRF attempts to avoid the application of that test by arguing, in essence, that the internet restriction is "far removed from the mechanics of the electoral process." VRF Br. at 21. But the NVRA was enacted pursuant to Congress's authority to regulate the "Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const. art. I, § 4. So accepting VRF's argument as to its First Amendment claim is fatal

13

to its preemption claim, as it would render the NVRA's inspection provision unconstitutional under these facts.

Regardless, the internet restriction relates to the mechanics of elections. It was put in place to protect the privacy of registered voters so as not to discourage participation in the electoral process. The Third Circuit has recognized that the *Anderson-Burdick* test applies to "a wide range of electoral-process regulations," including regulation of "voter registration." *Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 140 (3d Cir. 2022).

Under the *Anderson-Burdick* test, the internet restriction passes muster. Pennsylvania's interest in promoting "free and equal" elections and in encouraging participation in the electoral process strongly outweigh any impact on speech caused by the internet restriction. *See* Pa. Const. art. I, § 5.

Finally, VRF's claim that the internet restriction is overbroad likewise fails. First, it rests on the flawed argument that VRF's claimed right of access under the NVRA creates a First Amendment right to publish data it does not currently possess. *See supra*. And it also misstates the scope of the restriction. The internet restriction does not impose "a complete ban on online speech involving voter data." VRF Br.

14

at 25. VRF is free to speak out online about Pennsylvania's list-maintenance efforts. It simply may not publish the data itself—a modest restriction that does not burden core political speech.

In fact, the need for the internet restriction is clear from VRF's assertion that "less restrictive solutions" exist, such as "requiring that recipients of the lists track who accesses the data and assist the state in locating any person who misuses it." VRF Br. at 25. VRF cannot claim that it has any means of enforcing the Commonwealth's limitation on the use of the voter lists when it makes the data available to anyone who clicks "accept." The suggestion that it could "assist the state in locating" an individual overseas who misuses voter data for nefarious purposes defies all reason—and shows why the Commonwealth imposed the internet restriction in the first place.

## CONCLUSION

For the reasons set forth above and in Defendant's opening brief, the motion to dismiss should be granted, and VRF's complaint should be dismissed in its entirety.

May 9, 2024                                   Respectfully submitted,


 /s Erich T. Greiner                            /s Michael J. Fischer
Erich T. Greiner (PA 331601)          Michael J. Fischer (PA 322311)
Deputy Attorney General               Executive Deputy General
Office of Attorney General            Counsel
15th Floor, Strawberry Square         333 Market Street, 17th Floor
Harrisburg, PA 17120                  Harrisburg, PA 17101
(717) 783-6301                        (717) 831-2847
egreiner@attorneygeneral.gov          mjfischer@pa.gov


Amelia J. Goodrich (PA 327192)
Deputy Attorney General
Office of Attorney General
1251 Waterfront Place
Mezzanine Level
Pittsburgh, PA 15222
(412) 565-7680
agoodrich@attorneygeneral.gov


*Counsel for Defendant Al Schmidt*

## CERTIFICATE OF SERVICE

I hereby certify that, on May 9, 2024, I filed the above document with the Court's CM/ECF system. Service will be accomplished on all counsel of record through the CM/ECF system.


Dated: May 9, 2024          */s Michael J. Fischer*
                            Michael J. Fischer