**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| VOTER REFERENCE FOUNDATION, LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>ALBERT SCHMIDT, in his official capacity as Secretary of the Commonwealth,<br><br>    Defendant. | No. 1:24-cv-294<br><br>Judge Christopher C. Conner |

**BRIEF IN SUPPORT OF SECRETARY SCHMIDT'S MOTION
FOR SUMMARY JUDGMENT**

Amelia J. Goodrich (PA 327192)
Deputy Attorney General
Office of Attorney General
1251 Waterfront Place
Mezzanine Level
Pittsburgh, PA 15222

Erich T. Greiner (PA 331601)
Deputy Attorney General
Office of Attorney General
15th Floor, Strawberry Square
Harrisburg, PA 17120

Michael J. Fischer (PA 322311)
Executive Deputy General Counsel
333 Market Street, 17th Floor
Harrisburg, PA 17101
(717) 831-2847
mjfischer@pa.gov

Kathleen A. Mullen (PA 84604)
Ian B. Everhart (PA 318947)
Pennsylvania Department of State
306 North Office Bldg.
401 North Street
Harrisburg, PA 17120

*Counsel for Defendant Al Schmidt*

**TABLE OF CONTENTS**

Table of Authorities...........................................................................................ii

Statement of Facts ..........................................................................................3

    I.     The National Voter Registration Act......................................3

    II.    Voter Registration and List Maintenance in
          Pennsylvania .........................................................................6

    III.   Voter Lists...............................................................................8

    IV.   Plaintiff Voter Reference Foundation...................................11

Procedural History ........................................................................................15

Questions Presented .....................................................................................18

Summary of Argument..................................................................................18

Argument.......................................................................................................19

    I.     The Internet Restriction Is Not Preempted by the
         NVRA.....................................................................................20

         A.     The Voter Lists Are Not Within the Scope of the
               NVRA's Disclosure Provision......................................20

         B.     Even if the NVRA Applies, It Does Not Conflict
               with the Internet Restriction......................................24

    II.    The Secretary's 2022 and 2023 Responses Did
         Not Violate the NVRA...........................................................30

    III.   The Internet Restriction Does Not Violate the
         First Amendment ..................................................................33

         A.     The Internet Restriction Does Not Restrict Core
               Political Speech ...........................................................33

         B.     The Internet Restriction Is Not Overbroad.................38

    IV.   VRF Is Not Entitled to a Declaratory Judgment .................39

Conclusion ....................................................................................................40

i

# TABLE OF AUTHORITIES

## Cases

*Allen v. DeBello*, 861 F.3d 433 (3d Cir. 2017) ........................................39

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ...........................................36

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).............................20

*In re Asbestos Prod. Liab. Litig.*, 837 F.3d 231 (3d Cir. 2016) ..............19

*In re Azek Bldg. Prods., Inc. Mktg. and Sales Prac. Litig.*,
  82 F. Supp. 3d 608 (D.N.J. 2015).......................................................40

*Buckley v. American Constitutional Law Foundation, Inc.*,
  525 U.S. 182 (1999).......................................................................34, 35

*Burdick v. Takushi*, 504 U.S. 428 (1992).................................................36

*City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789 (1984).......39

*City of Chicago v. Morales*, 527 U.S. 41 (1999)......................................38

*Dakotans for Health v. Noem*, 52 F.4th 381 (8th Cir. 2022)...................35

*Democratic Nat. Comm. v. Republican Nat. Comm.*,
  673 F.3d 192 (3d Cir. 2012) ...............................................................3

*Free Speech Coal., Inc. v. Att'y Gen. of U.S.*, 677 F.3d 519
  (3d Cir. 2012) ....................................................................................38

*Fusaro v. Howard*, 19 F.4th 357 (4th Cir. 2021) ...................................37

*Halsey v. Pfeiffer*, 750 F.3d 273 (3d Cir. 2014) .....................................20

*Hewlette-Bullard on behalf of J.H-B. v. Pocono Mtn. Sch.
  Dist.*, 522 F. Supp. 3d 78 (M.D. Pa. 2021) ........................................38

*Houchins v. KQED, Inc.*, 438 U.S. 1 (1978) ...........................................33

*L.A. Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32
  (1999)...............................................................................................33, 34

*Lebanon Farms Disposal, Inc. v. Cnty. of Lebanon*,
No. 1:CV-03-0682, 2004 WL 7338460 (M.D. Pa. July 9, 2004) ........... 22

*Mazo v. N.J. Sec'y of State*, 54 F.4th 124 (3d Cir. 2022) .................. 34, 36

*Pa. State Educ. Ass'n v. Commw. Dep't of Cmty. & Econ.
Dev.*, 148 A.3d 142 (Pa. 2016) ......................................................... 37

*Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320 (N.D. Ga.
2016) ................................................................................. 25, 29

*Pub. Int. Legal Found. v. Boockvar,*
No. 1:19-CV-622 (M.D. Pa. Dec. 19, 2019) ............................. 21, 23, 24

*Pub. Int. Legal Found., Inc. v. Bellows*,
92 F.4th 36 (1st Cir. 2024) ............................................................... 25

*P Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d
932 (C.D. Ill. 2022) ......................................................................... 25

*Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*,
996 F.3d 257 (4th Cir. 2021) ...................................................... 25, 29

*Robertson v. Allied Signal, Inc.*, 914 F.2d 360 (3d Cir. 1990) ................ 19

*Swoboda v. Pa. Dep't of State*,
304 A.3d 105 (Pa. Cmwlth. 2023) ............................................... 16, 31

*Swoboda v. Pa. Dep't of State*,
No. AP 2022-1069R (Pa. Open Records July 15, 2022) ................. 16, 31

*True the Vote v. Hosemann*,
43 F. Supp. 3d 693 (S.D. Miss. 2014) .............................................. 29

*United States v. Williams*,
553 U.S. 285 (2008) ......................................................................... 38

*Woolley v. Groft*, 653 F. Supp. 3d 171 (M.D. Pa. 2023) ........................ 39

**Statutes**

25 Pa.C.S. § 1201 ................................................................................. 7

iii

25 Pa.C.S. § 1222 ........................................................................... 7

25 Pa.C.S.. § 1328 .......................................................................... 6

25 Pa.C.S. § 1403 ....................................................................... 8, 9

25 Pa.C.S. § 1404 ................................................................... 8, 9, 10

25 Pa.C.S. § 1901 ......................................................................... 28

52 U.S.C. § 20501 ...................................................................... 4, 26

52 U.S.C. § 20504 .......................................................................... 4

52 U.S.C. § 20505 .......................................................................... 5

52 U.S.C. § 20506 .......................................................................... 5

52 U.S.C. § 20507 ..................................................................... *passim*

52 U.S.C. § 20508 .......................................................................... 5

65 P.S. § 67.101 .......................................................................... 15

65 P.S. § 67.3101.1 ....................................................................... 31

National Voter Registration Act of 1993, P.L. No. 103–31 ...................... 3

**Regulations**

4 Pa. Code §183.13 ................................................................... 10, 11

4 Pa. Code § 184.14 ................................................................. 10, 11

**BRIEF IN SUPPORT OF SECRETARY SCHMIDT'S
MOTION FOR SUMMARY JUDGMENT**

Pennsylvania citizens should not have to give up their privacy to participate in the electoral process. While registering to vote necessarily requires submitting personal information to government officials, voters have a right to expect that their information will not be misused. To that end, the Pennsylvania General Assembly has chosen to make certain voter information available to those who request it, but limited the purposes for which that information can be used and mandated that requestors must agree to comply with those limitations. And the Department of State, exercising authority granted by the General Assembly, has issued regulations prohibiting the publication of personal voter information on the internet and requiring attestations to that effect.

Plaintiff Voter Reference Foundation seeks to obtain personal data of Pennsylvania voters without agreeing to this modest limitation. It intends to post that data on its publicly available website, purportedly for the purpose of allowing users of its site to review the data, identify errors, and contact election officials to correct those errors. But the record in this case offers scant evidence that individuals actually use the website for

1

this purpose or that voter rolls are improved, at all, as a result of the data's being made available on the internet. What the record does show is that voters who discover that VRF has made their personal information so widely available understandably feel threatened and vulnerable, and that these voters' interest in participating in the political process is chilled.

VRF contends that this state of affairs is mandated by both federal law and the U.S. Constitution. It is not. While the National Voter Registration Act (NVRA) requires states to make available for "inspection" and "photocopying" records relating to "programs and activities" they conduct for the purpose of keeping voter information current, it does not reach the information requested here—a file containing personal information of virtually every Pennsylvania voter. And the NVRA likewise does not prohibit states from imposing modest rules governing the use of the information they make available. It strains credulity to suggest that Congress, in enacting the NVRA more than thirty years ago, sought to mandate that the personal information of every voter be made widely available on the then-nascent internet.

2

Likewise, VRF's allegations that the First Amendment prohibits the Department's reasonable requirement fall short: the First Amendment is not implicated at all by a rule requiring individuals who wish to obtain sensitive information from the government to agree not to broadcast it on the internet. To the contrary, allowing personal voter information to be widely shared on the internet would undercut the First Amendment by chilling the rights of all of Pennsylvania's voters.

Because the Department's modest requirement violates neither the First Amendment nor the NVRA, VRF's claims fail as a matter of law. The motion for summary judgment filed by the Secretary of the Commonwealth should be granted.

## STATEMENT OF FACTS

### I.    The National Voter Registration Act

Congress enacted the National Voter Registration Act—commonly referred to as the NVRA or the Motor Voter Law, *see Democratic Nat. Comm. v. Republican Nat. Comm.*, 673 F.3d 192, 199 (3d Cir. 2012)—in 1993, for the primary purpose of reducing barriers to voter registration.[1]

---

[1] National Voter Registration Act of 1993, P.L. No. 103–31, 107 Stat. 77.

The law expressly found that "it is the duty of the Federal, State and local governments to promote the exercise of" the fundamental right to vote, but that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation … and disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. § 20501(a).

The stated purposes of the law included "establish[ing] procedures that will increase the number of eligible citizens who register to vote" as well as enabling governments at all levels to "enhance[] the participation of eligible citizens as voters in elections." *Id.* § 20501(b)(1) & (2). In addition, the Act sought to "protect the integrity of the electoral process" and to "ensure that accurate and current voter registration rolls are maintained." *Id.* § 20501(b)(3) & (4).

In furtherance of these goals, the NVRA mandated certain procedures to facilitate voter registration. Most notably, it required states to implement processes so that applications for driver's licenses also served as voter registration applications, unless the applicant chose not to register. *Id.* § 20504. It further designated certain state agencies as "voter registration agencies," which were required to take specified steps to

4

facilitate voter registration, and it also mandated that all states accept a standard federal registration application. *Id.* §§ 20505(a)(1), 20506 & 20508(a)(2).

The NVRA directed each state to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters" due to "the death of the registrant" or "a change in the residence of the registrant." *Id.* § 20507(a)(4). It required that such programs—as well as any other program conducted to ensure that the state's rolls were accurate and up-to-date—be conducted in a manner that is "uniform, nondiscriminatory, and in compliance with the Voting Rights Act," and that they "shall not result in the removal of the name of any person … by reason of the person's failure to vote" unless the state followed certain procedures set forth in the Act. *Id.* § 20507(b). Specifically, states were prohibited from removing a voter based on an apparent change in residence unless the voter either confirmed the move or failed to vote during a period encompassing two consecutive federal elections and also failed to respond to a notification mailed by the state. *Id.* § 20507(b)(2), (d).

5

Finally, the NVRA included a provision that required states to "maintain for at least two years" and "make available for public inspection and … photocopying … all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i). Such materials were required to include information identifying registered voters who had received the notifications mailed by states to determine whether the voter had moved under § 20507(d), as well as materials showing whether each recipient had responded to the notification. Specifically excluded from the obligation were records "to the extent [they] relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered." *Id.* § 20507(i).

## II.   Voter Registration and List Maintenance in Pennsylvania

In Pennsylvania, elections are primarily run by county officials. Among their election-related responsibilities, counties are required to receive and process voter registration applications. 25 Pa.C.S. § 1328. Every voter in Pennsylvania must be registered to vote in any election.

6

The Department of State also performs certain tasks relating to elections and supports the counties in their efforts. For instance, the Department is required to implement and administer a statewide uniform registry of electors ("SURE system"). 25 Pa. Cons. Stat. §§ 1201, 1222. By law, the SURE system must be "a single, uniform integrated computer system" that "[c]ontain[s] a database of all registered electors." *Id.* § 1222(c)(1). Counties must be able to access the SURE system so that they can "add, modify and delete information in the system as is necessary and appropriate." *Id.* § 1222(c)(4).

Counties, with the assistance of the Department, are also required to perform certain "list maintenance" activities in order to ensure that their voter rolls are accurate and up to date, and to comply with the mandates of the NVRA and other applicable laws. *See* S.F. ¶¶ 5–7.[2] Among such efforts, counties are required to take steps to identify voters who have moved or have died. S.F. ¶ 7. Likewise, counties seek to identify duplicate registrations. S.F. ¶ 7. In conducting these activities, counties

---

[2] "S.F." refers to the Secretary's Statement of Undisputed Material Facts, submitted contemporaneously with the Secretary's motion. Exhibit references refer to the exhibits filed with that Statement.

7

must comply with the requirements of the NVRA—such as the restriction on when a voter can be removed from the rolls for having moved, *see supra*—as well as applicable state law requirements.

The Department assists the counties in their list-maintenance efforts in several ways. It provides them with instructional materials, referred to as "job aids," that give the counties guidance as to how they should conduct list maintenance. S.F. ¶ 7; Exh. C. The Department also uploads information into the SURE system that helps counties identify records that may require updating. S.F. ¶ 7. The uploaded materials identify voters who may have moved (either in-state or out-of-state) as well as potential duplicate registrations. S.F. ¶ 7. And the Department also serves as a conduit for other information, such as information provided by the Department of Health on deceased voters. S.F. ¶ 7.

## III.  Voter Lists

Pennsylvania's voter registration law also requires the counties and the Department to make available lists of registered voters, referred to in the law as "street lists" and "public information lists." 25 Pa. C.S. §§ 1403, 1404. The Department complies with its obligations in part by providing access to a dataset referred to as the full voter export list

8

("FVE"). S.F. ¶ 10. The FVE consists of records of all voters by county and contains the following fields: voter ID number, name, sex, date of birth, date registered, status (i.e., active or inactive), date status last changed, party, residential address, mailing address, polling place, date last voted, all districts in which the voter votes (i.e., congressional, legislative, school district, etc.), voter history, and the date the voter's record was last changed. S.F. ¶ 10.[3]

By law, the Secretary is empowered to "promulgate reasonable regulations governing access to" public information lists. 25 Pa. C.S. § 1404(b)(1).[4] In addition, access to public information lists is subject to certain limitations, including that "[n]o individual who inspects the list may use information contained in the list for purposes unrelated to

---

[3] The lists made available by the Department and counties are collectively referred to as the "voter lists."

[4] The requirements for street lists are slightly different. County officials and the Department are required to make street lists available for inspection "subject to reasonable safeguards and regulations." 25 Pa.C.S. § 1403(b). In addition, they are required to distribute the lists, upon request, to "officials concerned with the conduct of elections," as well as "political parties and political bodies" and "candidates," and they *may* choose to distribute the list "for a reasonable fee … to organized bodies of citizens." *Id.* § 1403(c) & (d).

9

elections, political activities or law enforcement." *Id.* § 1404(b)(3). In furtherance of this requirement, anyone requesting the list must provide identification and "must state in writing that any information obtained from the list will not be used for purposes unrelated to elections, political activities or law enforcement." *Id.*

In accordance with the grant of authority to the Secretary, the Department has issued regulations governing access to the public information and street lists. *See* 4 Pa. Code §§ 184.13 & 184.14. The regulations incorporate certain statutory restrictions, such as the NVRA's prohibition on identifying the registration agency through which a voter registered. *Id.* § 184.14(c)(2). They further set forth procedures by which certain categories of voters, including law enforcement officials as well as individuals who have protection from abuse orders, can request county registration commissions to protect the confidentiality of their home addresses. *Id.* § 183.14(4) & (5).[5]

---

[5] These categories include law enforcement officers, correctional employees, judicial officials, and state prosecutors, 4 Pa. Code § 183.14(c)(4), as well as those who have received protection from abuse orders or other protective orders or others who can demonstrate their

10

Finally, the regulations prohibit public information lists from being published on the internet. 4 Pa. Code § 183.14(k) (the "internet restriction").[6] S.F. ¶ 11. The Department therefore requires that anyone requesting the list must further affirm they will not publish it on the internet. S.F. ¶ 12.

## IV.    Plaintiff Voter Reference Foundation

VRF operates a website, VoteRef.com, which publishes personal information of voters contained in state voter registration databases. S.F. ¶ 38. That information can include names, addresses, birth years, party affiliations, and voting history information. S.F. ¶ 39. According to the testimony of its Executive Director, it does so "[s]o the public has oversight to ensure that proper list maintenance is being conducted." Exh. B at 52:21–53:10. Specifically, VRF envisions that users of its website will contact election officials to inform them of errors in the voter rolls. Exh. B at 56:7–18.

---

personal safety is endangered by revealing their home address. *Id.* § 183.14(c)(5).

[6] Regulations governing the Street Lists are located at 4 Pa. Code § 183.13, and are substantially the same, including the internet restriction at issue here.

Despite its goals, VRF itself does not take any steps to inform election officials of errors in voter registration information. S.F. ¶ 53. Nor does it make any effort to monitor whether users of its website are actually contacting election officials regarding errors they have identified. S.F. ¶ 54. And it likewise does not communicate with state or county election officials to determine whether users of the website have contacted them about errors. S.F. ¶ 55.

Upon first accessing the voteref.com website, a user is presented with the following pop-up box:



Exh. E. After clicking "I Agree," the user has access to all of the data posted on the website. S.F. ¶ 41. However, the website does not require a user to actually read the terms of service before clicking "I Agree." S.F. ¶ 41. Likewise, it does not track whether users of the site click on the link to those terms. S.F. ¶ 61.

VRF also takes no steps to monitor whether users of its website comply with its terms of service. S.F. ¶ 61. It has never taken legal action in response to a violation of its terms of service. S.F. ¶ 60. In fact, VRF's Executive Director testified that she had never been made aware of a violation of the terms of service. S.F. ¶ 58. She testified that, if VRF became aware of a violation of its terms of service, it would simply report it to the relevant state election agency and would not take any action on its own to enforce its terms of service. S.F. ¶ 56.

The record establishes that voters who discover that their data has been made available on the internet reach out to VRF or election officials to express their concern and frustration. Such voters often express fear for their safety. *See, e.g.,* Exh. J. For instance, one voter informed VRF that she "was the victim of online harassment from a man who found my information online and doxxed me using this website." Exh. F at 1919.

13

Yet, VRF's Executive Director testified that VRF did not take any action to investigate or otherwise respond to this email, beyond providing its generic response to voter complaints. Exh. B 103:21–105:24. In fact, with the exception of those voters who are protected under state law, VRF does not honor requests to remove a voter's data. S.F. ¶ 43.

Similarly, voters inform VRF of the risks their website creates, to no avail. One voter wrote, "[h]aving been part of identity fraud before, it is very disheartening to find out that a simple google search for my name can now give anyone my name, address, date of birth, and party affiliation." Exh. G at 361. This individual continued, "[y]our website however, makes it extremely easy for someone with technical expertise to scrub all of the data from your website anonymously and use it for whatever purpose they wish." *Id.* VRF does not remove voter data in response to such concerns, however. S.F. ¶ 43.

The net result is predictable: voters are less inclined to participate in the political process out of concerns for their privacy and safety. As one voter wrote: "This is why people do not register to vote. Because you take our names and addresses which are private and you broadcast them

14

across the entire world. Opening us up to all kinds of threats." Exh. J. at 201.

## PROCEDURAL HISTORY

In late 2021 or early 2022, the Department became aware of the fact that VRF had posted personal information about Pennsylvania voters on its website, in violation of the internet restriction. S.F. ¶ 22. The Department therefore wrote to VRF and demanded that it remove the information about Pennsylvania voters, which VRF did in January 2022. S.F. ¶ 22, Exh. B at 87:16–22; Exh. M (letter).

After removing the Pennsylvania voter information from its website, VRF filed a request pursuant to the Pennsylvania Right-to-Know Law, 65 P.S. §§ 67.101 *et seq.* ("RTKL"), on March 7, 2022, seeking a copy of the Full Voter Export list. S.F. ¶ 26; Exh. N. That request was made solely pursuant to the RTKL and did not mention the NVRA. S.F. ¶ 27. While VRF included an attestation that it would only use the FVE for statutorily permissible purposes, it made clear it would not agree to refrain from publishing Pennsylvania voter data on the internet. S.F. ¶ 28.

The Department denied the request on April 13, 2022, because of VRF's refusal to adhere to the internet restriction. S.F. ¶ 29; Exh. O. The

15

Department also noted in its denial that VRF had previously published Pennsylvania voter information on the internet, in violation of the internet restriction. S.F. ¶ 29.

VRF appealed the Department's denial to the Pennsylvania Office of Open Records and then to Pennsylvania Commonwealth Court, which affirmed the Department's decision on October 20, 2023. S.F. ¶ 30; *Swoboda v. Pa. Dep't of State*, No. AP 2022-1069R (Pa. Open Records July 15, 2022); *aff'd*, 304 A.3d 105, 116 (Pa. Cmwlth. 2023).

Shortly thereafter, on November 2, 2023, VRF sent the Secretary and Department a document entitled "Notice of Violation of the NVRA," claiming that the Department's denial of its March RTK Request was a violation of the NVRA—notwithstanding the fact that the March 2022 Request was solely made pursuant to the RTKL. S.F. ¶ 34; Exh. P. Also on November 2, 2023, VRF sent a separate letter containing a new request for the FVE, this time pursuant to the NVRA. S.F. ¶ 35 Exh. Q. The Secretary responded to both the Notice and the request on November 16, 2023, granting the request on the condition that VRF sign the affirmation required pursuant to Pennsylvania law. S.F. ¶ 36; Exh. R. VRF refused to do so and again wrote to the Secretary and Department on

16

November 17, 2023, contending that the Department continued to violate the NVRA. S.F. ¶ 37; Exh. S.

On February 19, 2024, VRF initiated this action. Its complaint raises six claims:

Count One alleges that the Department's requirement that anyone requesting the voting lists agree not to publish voters' information on the internet is preempted by the NVRA.

Counts Two and Three allege that the Department's responses to VRF's 2022 and 2023 requests for the voter files violated the NVRA.

Count Four alleges that the Voter Privacy Provision violates the First Amendment by banning "core political speech," while Count Five alleges that the requirement violates the First Amendment because it is impermissibly overbroad.

Finally, Count Six does not assert any new legal theories, but asks for a declaratory judgment based on the earlier alleged violations.

## QUESTIONS PRESENTED

1. Can VRF establish that Pennsylvania's restriction on posting personal voter information on the internet violates the NVRA? *Suggested Answer: No*

2. Did the Department violate the NVRA in its responses to VRF's 2022 and 2023 requests for the Full Voter Export? *Suggested Answer: No*

3. Can VRF establish that the prohibition on publishing personal voter information on the internet violates the First Amendment, either because it restricts core political speech or is overbroad? *Suggested Answer: No*

4. Is the Secretary entitled to summary judgment on VRF's request for a declaratory judgment? *Suggested Answer: Yes*

## SUMMARY OF ARGUMENT

Summary judgement should be granted on all counts of the complaint. First, VRF's claim that the NVRA preempts the internet restriction fails, because the NVRA does not require disclosure of the voter information at issue here, and, even if it did, it does not prohibit reasonable regulations governing the use of such sensitive information. And, second, because the internet restriction is not preempted, the Department's prior responses to VRF that simply sought to enforce that restriction likewise did not violate the NVRA. Third, the internet restriction does not run afoul of the First Amendment. There is no general

18

right of access to information in the government's possession and, even if there were, the minor burden of the internet restriction is amply justified by the Commonwealth's strong interest in ensuring that its citizens are not chilled in the exercise of their right to vote by concerns about the misuse of their personal information. And, finally, because VRF's substantive claims all fail on the merits, its request for a declaratory judgment should be denied.

## ARGUMENT

A moving party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. For purposes of summary judgment, "a dispute about a material fact is 'genuine' only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *In re Asbestos Prod. Liab. Litig. (No. VI)*, 837 F.3d 231, 235 (3d Cir. 2016) (cleaned up). While reasonable inferences must be made in favor of the nonmoving party, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.2 (3d Cir. 1990). Furthermore, "[i]nferences

19

must flow directly from admissible evidence." *Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

Under this standard, summary judgment should be granted in the Secretary's favor on each of the six counts of the complaint.

## I.    The Internet Restriction Is Not Preempted by the NVRA

The Secretary is entitled to summary judgment on VRF's claim that the internet restriction is preempted by the NVRA. As an initial matter, the materials covered by the internet restriction—the voter lists VRF has sought—do not fall within the scope of the NVRA's disclosure provision at all, because they do not "concern[] the implementation" of the Commonwealth's list-maintenance programs. But even if that were not the case, the internet restriction does not conflict with the plain language of the NVRA, and therefore is not preempted by it. Moreover, the internet restriction furthers—rather than undermines—the express purpose of the NVRA.

### A.    The Voter Lists Are Not Within the Scope of the NVRA's Disclosure Provision

To fall within the NVRA's disclosure provision, a document must relate to the "implementation" of "programs and activities" that are

20

conducted to "ensur[e] the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i). Pursuant to federal and state law, counties in Pennsylvania, with assistance and guidance from the Department, carry out certain activities to ensure the accuracy of their voter rolls. *See supra*; S.F. ¶¶ 3–8. Such activities include efforts to identify voters who have moved, as well as voters who are deceased. S.F. ¶ 7. *See also* Memorandum, *Pub. Int. Legal Found. v. Boockvar*, No. 1:19-CV-622, ECF No. 23, at 9–13 (M.D. Pa. Dec. 19, 2019) ("*PILF*") (discussing different removal programs) (attached hereto).

There is no evidence in the record that the voter lists themselves play any role in the implementation of these programs. S.F. ¶ 14. The Department's Deputy Secretary testified at length about the list maintenance programs carried out by counties, and not once did he state that counties specifically use the voter lists in implementing these programs. S.F. ¶¶ 7, 14. Rather, those efforts utilize information entered into the SURE system by the Department to identify voters who may have moved, as well as other sources of information, like the data on fatalities that the Department of Health provides.

21

It is not enough for VRF to assert that the voter lists have some tangential connection to a county's list maintenance efforts, or that some of the information on the lists reflects changes made through those efforts. The disclosure provision only applies to documents relating to the "implementation" of such efforts. 52 U.S.C. § 20507(i). And, "in common usage of the word, something is 'implemented' only at the time it is initially given practical effect or commenced, such as when a plan first goes into effect." *Lebanon Farms Disposal, Inc. v. Cnty. of Lebanon*, No. 1:CV-03-0682, 2004 WL 7338460, at *12 (M.D. Pa. July 9, 2004). The lists requested by VRF are simply not used in the implementation of those programs at all.

Congress could have written the disclosure provision to require states to make available "all records relating to voter registration." But it did not, and instead limited the provision's scope to documents relating to the implementation of programs intended to ensure that voter rolls are accurate and current. Its focus was thus on allowing for oversight of whether such programs complied with the requirements of the NVRA— including the requirement that such programs be "uniform [and] nondiscriminatory" and that voters not be removed the rolls based on a change

22

of address unless they did not vote for an extended period of time and failed to respond to a mailing from the state. The NVRA's specific requirement that states make available records relating to these mailings underscores where Congress's concerns lay. VRF would rewrite the statute to impose a more expansive obligation on states than Congress intended.

The question at issue in this case is thus different from that addressed by this Court in *PILF*.[7] In *PILF*, the dispute concerned which types of list maintenance programs were implicated by the disclosure provision, and this Court found that it reached efforts to identify non-citizens who were registered to vote. *See PILF* at 9. Here, the issue is simply whether the requested materials are used in list maintenance efforts at all. VRF's interpretation lacks any limiting principle and would turn the disclosure provision into a right of access to all registration materials, rather than materials relating to list-maintenance "programs and activities." Congress did not intend such a result.

---

[7] *See supra at* 21.

23

### B.    Even if the NVRA Applies, It Does Not Conflict with the Internet Restriction

Even if the voter lists falls within the scope of the NVRA's disclosure provision, there is no conflict between the requirements of that section and the internet restriction. As a result, VRF's claim that the NVRA preempts the internet restriction fails.

#### 1.    *The Internet Restriction Is Consistent with the Text of the NVRA*

The NVRA provides that states must, subject to certain exceptions, "maintain for at least 2 years and . . . make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i). The record shows that the Department fully complies with this requirement. S.F. ¶¶ 9–10. No evidence suggests otherwise.

This Court previously recognized that "the Disclosure Provision does not guarantee unfettered access to confidential sensitive information." *PILF* at 14 n.3. Other courts have likewise held that the NVRA allows for the redaction of sensitive personal information. *See, e.g., Pub.*

24

*Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024);[8] *Pub.*

*Int. Legal Found., Inc. v. N. Carolina State Bd. of Elections*, 996 F.3d 257,

267 (4th Cir. 2021); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp.

3d 932, 942 (C.D. Ill. 2022); *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d

1320, 1345 (N.D. Ga. 2016).

Redaction is the *withholding* of information; here, the Department

does not seek to withhold anything—it simply seeks to avoid having vot-

ers' personal information available on the internet, where it can be ac-

cessed by anyone for any purpose. Nothing in the NVRA, which was en-

acted well before access to the internet was widespread, conflicts with

this requirement.

---

[8] *Bellows* went on to hold that a provision under Maine law that prohibited making voter information "accessible by the general public on the Internet or through other means" was preempted by the NVRA. *See* 92 F. 4th at 54 (discussing Me. Rev. Stat. Ann. tit. 21-A, § 196-A(1)(J)(2)). The analysis of that decision should not control here. For one thing, the *Bellows* court grounded much of its discussion in cases analyzing preemption claims under the Supremacy Clause, without considering whether the logic of those decisions necessarily applied in the Elections Clause context. *See* 92 F. 4th at 51–56. Further, it simply assumed that "public inspection" of relevant materials necessarily equated to "public release" of those same materials, without considering the key differences between the two concepts and the clear governing statutory language. *Id.* at 54–55.

25

2.    *The Internet Restriction Furthers, Rather than Frustrates, the Purposes of the NVRA*

This conclusion is further underscored by looking to the statutory purposes of the NVRA. Requiring states to allow any requestor to re-publish covered personal voter information on the internet, without limitation, would frustrate those purposes.

In enacting the NVRA, Congress specifically found that "the right of citizens of the United States to vote is a fundamental right" and that "it is the duty of the Federal, State, and local governments to promote the exercise of that right." 52 U.S.C. § 20501(a)(1)–(2). The first two stated goals of the statute both focus on increasing voter participation: Congress sought "to establish procedures that *will increase the number of eligible citizens who register to vote* in elections for Federal office" and to "make it possible for Federal, State, and local governments to implement [the statute] in a manner that *enhances the participation of eligible citizens as voters* in elections for Federal office." *Id.* § 20501(b)(1)–(2) (emphasis added).

Under VRF's reading of the NVRA, any citizen who chooses to register to vote must accept that her personal information, including her

26

name, address, date of birth, sex, political party, and voting history, among other information, will be subject to posting on the internet for the entire world to access.[9] Putting potential voters to such a choice discourages voter participation, as the record shows. S.F. ¶ 46; *see also* Exh. V at 322, 377–79. The internet restriction was adopted to prevent voters from having to sacrifice protection against the widespread disclosure of their personal information—and the increased risk of identify theft and other harms that could result—in order to exercise their fundamental rights. By registering to vote, citizens do not consent to the widespread dissemination through the internet of their personal information. To suggest that a statute Congress enacted well before the internet became a household word, and for the express purpose of *increasing* voter registration, nevertheless *requires* all voters to face these risks, is absurd.

---

[9] Whether VRF intends to omit some of this personal information (such as day and month of birth) from what it posts on the internet is irrelevant to the legal question. VRF's preemption claim is boundless, and nothing in its complaint suggests that it could be legally precluded from putting all of the information it receives on the internet.

Likewise, nothing in the record suggests that VRF's activities further the statute's other two stated goals: "to protect the integrity of the electoral process" and "to ensure that accurate and current voter registration rolls are maintained." VRF does not make any effort to monitor whether users of its website actually identify and report errors, and whether states act on those reports. S.F. ¶¶ 52, 54, 55. In fact, it is doubtful that states could do so consistent with the NVRA or state law, both of which set forth specific processes and strict requirements governing the removal of voters from the rolls. *See* 25 Pa.C.S. § 1901. Neither state nor federal law authorizes counties to remove voters based solely on claims made by individuals who reviewed the voter file on a website.[10]

The Department's regulations were promulgated to institute safeguards to protect voter registration information from potential misuse. Publication of the FVE on the Internet would expose every registered

---

[10] Notably, the U.S. Department of Justice recently published guidelines on voter registration list maintenance making clear that "[t]he prohibitions of the NVRA extend to any list maintenance activity based on third-party submissions." *See* Exh. T, U.S. Dept. of Justice, *Voter Registration List Maintenance: Guidance under Section 8 of the National Voter Registration Act, 52 U.S.C. § 20507* at 3 (Sept. 2024), *at* https://www.justice.gov/crt/media/1366561/dl

voter in Pennsylvania to an increased risk of identity theft and the misuse of their private information, and would have a chilling effect on voter registration, in direct contravention of the purposes and intent of the NVRA. The record proves as much, as Pennsylvania voters reached out to complain to VRF as well as the Department about having their personal information exposed during the brief time that it was previously available. *See* Exhs. F–L.

Indeed, courts interpreting the NVRA's public inspection provision have recognized that it does not foreclose consideration of privacy concerns. *See Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d at 264, 267 (recognizing that the district court had the ability to redact certain "uniquely sensitive information"); *Project Vote, Inc. v. Kemp*, 208 F. Supp. at 1345 (concluding that birth dates, partial phone numbers and social security numbers should be redacted and stating "it is illogical that in enacting the NVRA, Congress intended to erode Federal and State law protecting against the disclosure of private, personal information."); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 729 (S.D. Miss. 2014) (concluding that the NVRA does not require automatic public disclosure of registrants' birthdates and noting that finding otherwise

29

"would create a gaping hole in the statutory landscape whereby personal, otherwise protected information would lose its protection once a citizen registered to vote.").

Neither the Pennsylvania voter registration law nor the Department's regulations prohibit VRF from obtaining the records it seeks. They simply set reasonable terms as to accessibility of such records. VRF has refused to abide by these terms and, in fact, has previously violated them. But nothing in the NVRA gives VRF the right to disregard Pennsylvania's reasonable voter protections.

## II.    The Secretary's 2022 and 2023 Responses Did Not Violate the NVRA

The Secretary is entitled to summary judgment on Counts II and III of the complaint, which allege that the Department previously violated the NVRA on two separate occasions, in each case by failing to provide VRF with the FVE because VRF refused to agree to the internet restriction.

### A.    The Department's Response to VRF's 2022 Request Did Not Violate the NVRA

On March 7, 2022, VRF's Executive Director submitted a request under Pennsylvania's Right-to-Know law (RTKL) for the FVE, using the

30

"Standard Right-to-Know Law Request Form" issued by the Pennsylvania Office of Open Records. S.F. ¶ 26; Exh. N. The request attached a document attesting that she would not use the data in the FVE for prohibited purpose, but she specifically refused to agree not to post it on the internet.

The Department processed the request pursuant to its procedures for responding to RTKL requests. By its terms, the RTKL "shall not apply" if its provisions "regarding access to records conflict with any other Federal or State law." 65 P.S. § 67.3101.1. Because access to the FVE is governed by a separate state law, the Department denied the request on April 13, 2022. S.F. ¶ 29; Exh. O. VRF appealed the denial to the Office of Open Records; both that tribunal and the Commonwealth Court affirmed the Department's decision. *Swoboda v. Pa. Dep't of State*, No. AP 2022-1069R (Pa. Open Records July 15, 2022); *aff'd*, 304 A.3d 105, 116 (Pa. Cmwlth. 2023). VRF declined to seek further appellate review.

VRF submitted the 2022 Request pursuant to the RTKL, at no time invoking the NVRA. The Department responded to the RTKL request pursuant to the provisions of that statute. The correctness of the Department's response was vindicated in court. VRF cannot establish that the

31

Department violated the NVRA when it treated its RTKL request as a RTKL request. The Secretary should be granted summary judgment as to Count II.

**B.    The Department's Response to VRF's 2023 Request Did Not Violate the NVRA**

Similarly, VRF cannot establish that the Department's response to VRF's letter of November 2, 2023, violated the NVRA. S.F. ¶¶ 35, 36. In its response, the Department simply reiterated the process for obtaining a copy of the FVE, including the requirement that VRF agree not to post the information on the internet. S.F. ¶ 36; Exh. R. VRF refused to do so, and the Secretary was therefore unable to provide VRF with the requested list. S.F. ¶¶ 36, 37.

VRF's claim that the Secretary violated the NVRA by not providing the list even though it refused to agree not to publish voter information on the internet rests entirely on its argument that internet restriction is preempted. Because there is no conflict between the internet restriction and the NVRA, *see supra*, the Secretary's request that VRF agree to the internet restriction before receiving the FVE was likewise fully

32

consistent with the NVRA. Thus, the Secretary is entitled to summary judgment on this count.

## III.  The Internet Restriction Does Not Violate the First Amendment

The Secretary is likewise entitled to summary judgment on Counts IV and V, which allege that the internet restriction violates the First Amendment.

### A.    The Internet Restriction Does Not Restrict Core Political Speech

VRF first alleges, in Count IV, that the internet restriction bans core political speech. It does no such thing.

1.  The First Amendment does not guarantee a right of access to information in the possession of the government. *Houchins v. KQED, Inc.*, 438 U.S. 1, 14 (1978). States may restrict access to public information—such as by establishing certain criteria for granting access—so long as the criteria applied are not "illegitimate." *L.A. Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 43–44 (1999) (Ginsburg, J., concurring).

This is therefore "not a case in which the government is prohibiting a speaker from conveying information that the speaker already

possesses." *United Reporting*, 528 U.S. at 40. Rather, VRF seeks access to information in the Department's possession, and refuses to agree not to publish the information on the Internet before receiving the information. The First Amendment does not give it any right to such information, and therefore the internet restriction simply does not implicate the First Amendment at all.

2.   Even if the First Amendment were to apply, the internet restriction does not implicate "core political speech." Rather, the "speech" involved is strictly personal information—names, addresses, and other details—about individuals who have registered to vote in Pennsylvania.

As the Third Circuit has recognized, the "lodestar" of core political speech is "'interactive communication concerning political change.'" *Mazo v. New Jersey Sec'y of State*, 54 F.4th 124, 142 (3d Cir. 2022) (quoting *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 186 (1999)). The "speech" VRF wishes to engage in is not "interactive," nor does it "concern[] political change." In *Mazo*, the Third Circuit held that a regulation governing the slogans used by candidates on the ballot did not implicate "core political speech," despite the indisputably expressive nature of such slogans. *Id.* at 146. Here, the "speech" at issue,

34

personal data, is not expressive at all, and is thus further removed from the concept of "core political speech" than was that at issue in *Mazo*.

In fact, the internet restriction serves to *protect* core political speech in an important way. It protects the speech of *voters*, by ensuring that the act of registering to vote does not subject an individual to having their personal information published on the internet. This concern is very real and well-founded, as the correspondence from voters to VRF and to the Department demonstrates.

By way of example, the Supreme Court and other courts have held that the First Amendment can be implicated by requiring the disclosure of personal information of paid petition circulators. *See, e.g.*, *Buckley*, 525 U.S. at 197–204. Relying on *Buckley*, the Eight Circuit recognized that "[b]eing forced to publicly disclose one's phone number, email address, and residential address in order to exercise the right to circulate a petition—even as a paid circulator—is chilling in today's world." *Dakotans for Health v. Noem*, 52 F.4th 381, 392 (8th Cir. 2022). VRF's position is even more extreme, as it would chill the right of every voter to participate in our democracy.

35

3.  If the First Amendment were to apply at all—and, as explained above, it does not—the internet restriction is plainly constitutional. The *Anderson-Burdick* balancing test governs the analysis of First Amendment claims challenging election-related rules, such as VRF's here. Under this test, which grows out of two U.S. Supreme Court decisions, the court must consider the specific burdens placed upon the rights of the plaintiff challenging a regulation and determine whether they are "severe" or not. *Mazo*, 54 F.4th at 145 (citing *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983), and *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). "Severe" restrictions are to be tested according to the measure of strict scrutiny, but restrictions that are "reasonable [and] nondiscriminatory," are permitted if they are justified by "the State's important regulatory interests." *Mazo*, 54 F.4th at 145 (cleaned up).

The internet restriction applies to all requesters and the Department applies it even-handedly, which VRF does not contest. S.F. ¶ 13. VRF cannot represent that it is uniquely or especially burdened by this rule. Any burden it faces is minimal. *Mazo*, 54 F.4th at 146 (holding that the burden is minimal when "(a) the requirement is nondiscriminatory and applies equally to all candidates . . . (b) the requirement leaves open

36

ample and adequate alternatives . . . and (c) [there is no] evidence of any specific burden on either themselves or any other candidate.").

By contrast, the Department has strong interests in protecting voter privacy and in ensuring that voters are not discouraged from participating in the political process. The complaints that both VRF and the Department itself has received underscore the legitimacy of this interest. *See Fusaro v. Howard*, 19 F.4th 357, 369 (4th Cir. 2021); *see also Pa. State Educ. Ass'n v. Commw. Dep't of Cmty. & Econ. Dev.*, 148 A.3d 142, 158 (Pa. 2016) (finding inherent right of privacy in residential addresses under state constitution). In *Fusaro*, the Fourth Circuit upheld a Maryland requirement that, like Pennsylvania's voter registration law, limited the use of voter information to electoral purposes, finding that it was justified by the State's "interest in protecting the health of Maryland's electoral process by safeguarding Maryland registered voters from harassment and abuse, protecting the privacy of personal information, and encouraging both voter registration and participation" *Fusaro*, 19 F.4th at 369. The same logic applies with equal force here.

For these reasons, even if the internet restriction implicates the First Amendment, it easily satisfies the *Anderson-Burdick* test.

37

## B.    The Internet Restriction Is Not Overbroad

Count V of the complaint, which alleges that the internet restriction violates the First Amendment under the overbreadth doctrine, similarly fails. Like Count IV, it rests on the premise that the internet restriction operates as a ban on speech. But it is not: rather, it simply requires requestors to agree to reasonable restrictions before accessing sensitive voter information. As a result, it does not implicate the First Amendment at all.

Moreover, a statute is overly broad under the First Amendment and therefore facially invalid only "if the impermissible applications of the law are substantial when judged in relation to the statute's plainly legitimate sweep." *Hewlette-Bullard on behalf of J.H-B. v. Pocono Mtn. Sch. Dist.*, 522 F. Supp. 3d 78, 96 (M.D. Pa. 2021) (*quoting City of Chicago v. Morales*, 527 U.S. 41, 52 (1999)). Accordingly, "it is not enough for a plaintiff to point to one impermissible application of the law." *Id.* (*citing Free Speech Coal., Inc. v. Att'y Gen. of U.S.*, 677 F.3d 519, 537 (3d Cir. 2012)). Rather, a plaintiff must show the law is "*substantially* overbroad." *United States v. Williams*, 553 U.S. 285, 303 (2008). That is, the provision must create a real risk that it will "will significantly compromise recognized

First Amendment protections of parties not before the Court." *City Coun-cil of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984).

VRF cannot identify any impermissible applications of the internet restriction, much less enough such applications to render the require-ment "substantially overbroad." The internet restriction applies to any-one who seeks copies of the voter lists, and the Department administers it evenhandedly. S.F. ¶ 13. It is likewise content and viewpoint neutral. S.F. ¶ 13. And it serves the Commonwealth's strong interest in protecting the privacy of its voters and in ensuring that its citizens are not chilled from exercising their right to vote.

## IV.    VRF Is Not Entitled to a Declaratory Judgment

Finally, summary judgment should be granted on Count VI, which seeks a declaratory judgment that the internet restriction violates the NVRA and the First Amendment. The Declaratory Judgment Act (DJA) "does not … provide an independent basis for subject-matter jurisdiction; it merely defines a remedy." *Allen v. DeBello*, 861 F.3d 433, 444 (3d Cir. 2017). The DJA is simply "a procedural vehicle that creates a form of re-lief; it does not create a cause of action courts may be compelled to en-force.'" *Woolley v. Groft*, 653 F. Supp. 3d 171, 179 (M.D. Pa. 2023) (quoting

*In re Azek Bldg. Prods., Inc. Mktg. and Sales Prac. Litig.*, 82 F. Supp. 3d 608, 624-25 (D.N.J. 2015)). Here, because VRF's substantive claims fail, it has no entitlement to a declaratory judgment, and the Secretary's motion should be granted as to Count VI.

## CONCLUSION

For the reasons set forth above, the Secretary's motion for summary judgment should be granted and judgment should be entered in his favor on all counts.

December 6, 2024                    Respectfully submitted,


/s *Amelia J. Goodrich*                    /s *Michael J. Fischer*
Amelia J. Goodrich (PA 327192)       Michael J. Fischer (PA 322311)
Deputy Attorney General              Executive Deputy General Counsel
Office of Attorney General           333 Market Street, 17th Floor
1251 Waterfront Place                Harrisburg, PA 17101
Mezzanine Level                      (717) 831-2847
Pittsburgh, PA 15222                 mjfischer@pa.gov
(412) 565-7680
agoodrich@attorneygeneral.gov        Kathleen A. Mullen (PA 84604)
                                     Ian B. Everhart (PA 318947)
Erich T. Greiner (PA 331601)         Pennsylvania Department of State
Deputy Attorney General              306 North Office Bldg.
Office of Attorney General           401 North Street
15th Floor, Strawberry Square        Harrisburg, PA 17120
Harrisburg, PA 17120


*Counsel for Defendant Al Schmidt*

40

## CERTIFICATE OF WORD COUNT

I certify that the above brief contains 7754 words. In making this

certificate, I have relied on Microsoft Word's word-count feature.

Dated: December 6, 2024                 /s Michael J. Fischer
                                        Michael J. Fischer

## CERTIFICATE OF SERVICE

I hereby certify that I filed the above document using the Court's CM/ECF system. Service will be accomplished on all counsel of record through the CM/ECF system.

Dated: December 6, 2024       */s Michael J. Fischer*
                              Michael J. Fischer