## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **VOTER REFERENCE FOUNDATION, LLC,** | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) **Civil Action: 1:24-CV-00294-CCC** |
| | ) |
| **ALBERT SCHMIDT**, in his official | ) Judge Christopher C. Conner |
| capacity as Secretary of the | ) |
| Commonwealth of Pennsylvania, | ) **ORAL ARGUMENT REQUESTED** |
| | ) |
| Defendant. | ) |
| | ) |

### PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF
### UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1

**GRAVES GARRETT GREIM LLC**
Edward D. Greim (MO 54034)*
Matthew R. Mueller (MO 70263)*
Jackson C. Tyler (MO 73115)*
* Admitted *Pro Hac Vice*
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 222-0534
edgreim@gravesgarrett.com
mmueller@gravesgarrett.com
jtyler@gravesgarrett.com

**BECKLEY & MADDEN, LLC**
Charles O. Beckley, II (PA 47564)
212 North Third Street, Suite 301
Harrisburg, PA 17101
Tel: (717) 233-7691
cbeckley@pa.net

*Attorneys for Plaintiff*
*Voter Reference Foundation, LLC*

Pursuant to Rule 56.1 of the Local Rules of Court for the Middle District of Pennsylvania, Plaintiff Voter Reference Foundation, LLC ("VRF") submits its responses to Defendant's Statement of Undisputed Material Facts (ECF No. 38) filed in support of his motion for summary judgment.

**The Parties.**[1]

1. Plaintiff Voter Reference Foundation, LLC ("VRF") is a nonprofit organized under Ohio law. VRF is a subsidiary of Restoration Action, Inc. ("Restoration"), a 501(c)(4) nonprofit social welfare organization. Compl. ¶ 8.

**RESPONSE:** Controverted. Paragraph 8 of Plaintiff's Complaint states that VRF is a subsidiary of "Restoration of America, a 501(c)(4) social welfare organization." VRF admits that it is a nonprofit organized under Ohio law. VRF denies that it is a subsidiary of Restoration Action, Inc. As disclosed in its corporate disclosure statement (**ECF No. 10**), VRF is a subsidiary of Restoration of America, Inc., which is a successor to Restoration Action, Inc.


2. Albert Schmidt is the Secretary of the Commonwealth of Pennsylvania, named as defendant here in his official capacity. Compl. ¶9.

---

[1] Defendant's headings are copied for convenience only. These headings are not statements of fact, are not supported by admissible record evidence as required by LR 56.1, and do not require a response.

**RESPONSE:** Uncontroverted that Albert Schmidt is the Secretary of the Commonwealth of Pennsylvania and its Chief Election Official designee under the National Voter Registration Act. **Def.'s Ex. A, Marks Dep. Tr. ("Marks Tr."), 19:5-12.** Further uncontroverted that Secretary Schmidt is named as a defendant in his official capacity only.

**Pennsylvania statutes and Regulations.**

3. The Pennsylvania Election Code and voter registration law assign primary responsibility for voter registration to each of Pennsylvania's 67 counties and their voter registration commissions. *See generally* 25 Pa. Cons. Stat. Part IV; Exh. A (Marks Dep. Tr.) 20–25.

**RESPONSE:** Controverted. Neither the cited statute nor the five pages of deposition testimony identified establish that Pennsylvania's counties and their voter registration commissions have "primary" responsibility for voter registration. The testimony referenced from the Secretary's 30(b)(6) representative states that individuals need not "exclusively go to their own county" to register to vote, **Marks Tr., 20:5-11**, that voters can submit an application online through the Department of State ("Department") rather than their own county, *id.,* **20:13-17**, that the Pennsylvania Department of Transportation is substantially involved in motor voter applications, *id.,* **20:24-21:16**, and that the counties all upload voter registration data

to the Secretary's Statewide Uniform Registry of Electors ("SURE") database, *id.,* **22:2-11**. The Secretary's representative further testified that both the Counties and the Department have a role in ensuring the accuracy of voter registration records. *Id.,* **23:10-24:18**. The Department also receives data from its participation in the Electronic Registration Information Center ("ERIC") which it distributes to the Counties. *Id.,* **24:7-25:16.** The testimony given by the Secretary's 30(b)(6) representative demonstrates that the Secretary, through the Department of State, plays a substantial role in voter registration, including the maintenance of the official voter list through SURE. *Id.*, **26:15-20** (testifying that SURE is the official voter roll of Pennsylvania). Defendant's vague reference to an entire chapter of Pennsylvania law likewise evidences the Secretary's substantial role in voter registration. *See, e.g.*, 25 Pa. Cons. Stat. § 1201 (outlining departmental responsibilities with respect to voter registration); §1222 (department responsible for developing and maintaining SURE database).

4. Voter registration applications are submitted to, and qualifications are adjudicated by, counties and their staff. 25 Pa. Cons. Stat. § 1322, Exh. A (Marks Dep. Tr.) 23.

**RESPONSE:** Controverted, in part. Section 1322 governs only in-person registration. The Secretary's 30(b)(6) representative testified that individuals may

register directly with the Secretary, including via an online registration option, **Marks Tr., 19:21-20:17**, which is not governed by the text of § 1322.

5. The Department of State has specific duties under the voter registration law, enumerated in the statute. 25 Pa. Cons. Stat. §§ 1201, 1222(a); *see generally* Exh. A (Marks Dep. Tr.) 20–25.

**RESPONSE:** Controverted, in part. VRF admits that the cited statutes enumerate some duties of the Department regarding voter registration, but denies that those duties are an exhaustive list of the Department's or Secretary's duties and/or roles they have voluntarily undertaken with respect to voter registration. Further, controverted for the reasons stated in response to ¶3.

6. The Department maintains the Statewide Uniform Registry of Electors ("SURE" or "SURE System"), uploads third-party data to assist counties to identify errors and duplicates, and offers training and guidance to county staff who work with SURE. Exh. A (Marks Dep. Tr.) 14, 24, 45.

**RESPONSE:** Controverted, in part. VRF admits that the Department engages in the identified tasks, but denies that this is an exhaustive or complete representation of the Department's role relative to voter registration and list maintenance, generally, or its role specifically with respect to administering and maintain the

SURE database. The Secretary's representative testified about the Secretary's involvement in various voter registration and list maintenance activities conducted using the SURE database (at least in part), including:

- Conducting the National Change of Address program, **Marks Tr., 33:17-34:6; 48:15-49:3; 50:6-17;**
- Cancelling voter registrations and documenting the reason for cancellation, *id.*, **28:11-13; 28:23-29:1; 36:18-37:15; 37:24-38:9, 38:17-22;**
- Documenting voter history, *id.*, **29:2-12;**
- Updating voters who moved out of state, *id.*, **51:15-21 ; 52:5-8;**
- Updating voters who moved in state, *id.*, **50:19-51:3; 51:8-11;**
- Identifying duplicate registrations, *id.*, **52:13-23; 54:1-14;**
- Removing voters who died, *id.*, **29:13-30:1;**
- Tracking all changes made to a voter's registration status or profile, *id.*, **38:23-39:10; 39:11-15;**
- Updating the list based on information Pennsylvania receives from its participation in the Electronic Registration Information Center ("ERIC"), *id.*, **30:5-19; 24:7-14; 24:15-18;** and,
- Monitoring counties' progress on list maintenance activities, *id.*, **55:4-56:4.**

7. The Department's duties also include certain list maintenance-related responsibilities, including providing use of change of address information from the U.S. Postal Service and death certificate information from the Pa. Department of Health¸ to ensure the accuracy of the voter registration rolls, including through the eliminate of duplicate entries. 25 Pa. Cons. Stat. § 1901, Exh. A (Marks Dep. Tr.) 21, 32–57.

**RESPONSE:** Controverted, in part, for the reasons stated in response to ¶6.

8. Counties receive voter registration applications (paper or electronic) from prospective voters and make a determination on approval or rejection. A person's entry record in SURE becomes the authoritative record of his or her voter registration. Exh. A (Marks Dep. Tr.) 20–25.

**RESPONSE:** Controverted. The first sentence of this paragraph is not supported by admissible record evidence. *See* LR 56.1 ("Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements."). Further, none of the cited testimony on pages 20-25 of the referenced deposition supports the proposition asserted. The Secretary's representative did not testify that the entry in SURE is the "authoritative record" of a voter's registration.

9. Counties and the Department of State offer voter registration information to registered Pennsylvania voters upon proper application. These include Public Information Lists and Street Lists. *See* 4 Pa. Code §§ 183.13, 183.14; *see also* Exh. A (Marks Dep. Tr.) 76.

**RESPONSE:** Controverted, in part. The first sentence of this paragraph is not supported by admissible record evidence. *See* LR 56.1. Further, the cited testimony on page 76 of the deposition transcript does not support the proposition that either Counties or the Department make Public Information Lists or Street Lists available.

VRF does not contest that 4 Pa. Code §§ 183.13 and 183.14 require certain voter data to be made available to the public.

10. The Public Information List and Street List contain substantially the same information, but the Street List may be organized by residential address, suitable for door-to-door canvassing; the Full Voter Export contains additional data such as the voter ID number, date of registration, status (active or inactive), date of status change, voting history, telephone number, and date of last change to the record. 4 Pa. Code § 183.13(a)(1), Exh. A (Marks Dep. Tr.) 69–60, 67–68; *See* Exh. D.

**RESPONSE:** Uncontroverted.

11. Among other restrictions, the SURE Regulations contain a prohibition on publishing a Public Information List or Street List on the internet. 4 Pa. Code §§ 183.13(g), 183.14(k), Exh. A (Marks Dep. Tr.) 75.

**RESPONSE:** Controverted, in part. VRF admits that the Internet Sharing Ban at issue in this case arises from 4 Pa. Code § 183.14(k). But the Secretary's testimony made clear that some types of internet publication are acceptable, so long as the data is not published on "the worldwide web [with] anybody being able to just go on and see the data." **Marks Tr., 95:7-17.** For example, the Secretary's representative testified that a requestor could share voter data on a website, so long as the website

requires login credentials to view the data. *Id.*, **94:1-95:5.** And the Secretary does not believe that the Ban is violated when someone logs in to an online database housing the voter data. *Id.*, **95:18-96:14.** So while VRF does not contest that the Secretary believes that VRF's intended internet publication violated the Internet Sharing Ban, that Ban has exceptions known only to the Secretary.

12. The request form for the List includes an affirmation by the applicant that he or she will not publish any List so obtained on the internet. Exh. A (Marks Dep. Tr.) 84.

**RESPONSE:** Controverted, in part. Uncontroverted that the Secretary's form through which a requestor may request voter data under Pennsylvania law requires a requestor to agree to refrain from publishing a Public Information or Street List on the Internet, and that the request will not be fulfilled unless that affirmation is signed. **Marks, 84:7-85:3.** Controverted, however, as there is no evidence that the form referenced is required to make a voter data request, and the Secretary responded to requests from VRF that did not use the referenced form. Further controverted to the extent the Secretary's representative made clear that some types of internet publication are acceptable. *See* Response to ¶11.

13. All requesters seeking voter records for political or election purposes (as opposed to law enforcement purposes) are subject to the regulations' prohibition on internet publication, and all requesters must agree to the affirmation of non-publication; the Department makes no distinction in this regard based on the requester's identity or viewpoint. Marks. Dep. Tr. 66, 84.

**RESPONSE:** Controverted, in part. The cited transcript materials do not support the asserted fact that "[t]he Department makes no distinction in this regard based on the requester's identity or viewpoint." Uncontroverted that the Secretary's form through which a requestor may request voter data under Pennsylvania law requires a requestor to agree to refrain from publishing a Public Information or Street List on the Internet, and that the request will not be fulfilled unless that affirmation is signed. **Marks Tr., 84:7-85:3.** Further controverted to the extent the Secretary's representative made clear that some types of internet publication are acceptable. *See* Response to ¶11.

Otherwise, uncontroverted that Pennsylvania requires requestors to refrain from posting voter data on the internet, in some circumstances known only to the Commonwealth.

14. The lists prepared in accordance with the statute and regulations, and distributed to requesters, are not used by the Department or the counties for list

maintenance purposes; rather, the SURE system is used to identify records for list maintenance. Exh. A (Marks Dep. Tr.) 142.

**RESPONSE:** Controverted. The cited testimony on page 142 does not support the proposition asserted. That testimony states:

Q: Is it the Department's position that the full voter export is not a record that must be made available under the NVRA?

    Ms. Mullen: Objection.

A: I don't know that I would characterize it exactly that way. I mean I think it is—it may be a record that would be available under the NVRA, but it would still be our position that we can put reasonable safeguards on that.

I don't think there is anything in the NVRA that would prohibit us from doing that, and that's my, again, layman's opinion. It's a question of law, and it's the reason we're here, but it could be a record.

I don't know that the full voter export is necessarily—you know, the NVRA primarily when it talks about records its concerned with the implementation of over list maintenance programs.

I don't know that the full over export is a voter list maintenance program per se, but I'm not denying that the data or information contained in the full voter export may be responsive to an NVRA request.

Further, the Secretary's representative testified that the lists referenced are records of the Department's and counties' list maintenance activities. *See id.* The Secretary's representative further testified that if someone wanted to see if the Department or counties were properly engaging in list maintenance, requesting and

reviewing these lists is precisely how they would go about doing so. **Marks Tr., 49:4-20.**

Finally, the NVRA's Public Disclosure Provision requires states to publicly provide "*all records concerning* the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters…," 52 U.S.C. § 20507(i) (emphasis added), which is a broader category of documents than those "used by the Department or the counties for list maintenance purposes…"

**Prior VRF Requests and Litigation.**

15. VRF obtained the Full Voter Export List and published it on the internet.

**RESPONSE:** Controverted, in part. This statement of alleged uncontroverted material fact is not supported by admissible record evidence. *See* LR 56.1. Uncontroverted that VRF obtained the Full Voter Export list through a third-party vendor and, having never agreed to refrain from doing so, made that data available on its website, VoteRef.com, for a period of time. Further uncontroverted that after VRF was informed that the Secretary believed its particular method of posting the voter data online—but not some other unidentified methods of online posting— violated Pennsylvania law, VRF removed the data from its website. ***See* Def.'s Ex. B, Swoboda Dep. Tr. ("Swoboda Tr."), 78:6-22, 86:8-21.**

16. VRF also submitted several requests to the Department pursuant to the Right-to-Know ("RTK") Law, 65 P.S. §§ 67.101–67.3104) ("RTKL").

**RESPONSE:** Controverted, in part. This statement of alleged uncontroverted material fact is not supported by admissible record evidence. *See* LR 56.1. Further controverted because the statement fails to identify the request or requests to which it refers. Further controverted that VRF sent any requests relevant to this litigation which were submitted solely under Pennsylvania's Right to Know Law. ***See* Def.'s Exs. U, N, Q** (seeking data which must be made publicly available under the NVRA's Public Disclosure Provision).

17. VRF sought further review of one of the Department's determinations under the RTKL.

**RESPONSE:** Controverted, in part. This statement of alleged uncontroverted material fact is not supported by admissible record evidence. *See* LR 56.1. Further controverted because the statement fails to identify the request or requests to which it refers. Further controverted that VRF sent any requests relevant to this litigation which were submitted solely under Pennsylvania's Right to Know Law. ***See* Def.'s Exs. U, N, Q** (seeking voter registration data and history for all voters).

VRF admits that it sought administrative and judicial review of the Department's refusal to produce data in response to its March 7, 2022 request.

**FVE Request, Online Posting and Cease-and-Desist Letter.**

18. On or about February 3, 2021, Owen Wang, as a representative of Local Labs, requested the Pennsylvania Full Voter Export List ("List"). Exh. B (Swoboda Dep. Tr.) 80.

**RESPONSE:** Controverted, in part. The cited testimony does not support the alleged fact that Mr. Wang requested the Pennsylvania Full Voter Export List on the date alleged, as no date is identified in the cited testimony or referenced exhibits.

19. To obtain this list, Wang agreed to the Department's terms and conditions, including the following; "I further affirm that I will not publish any of the above lists on the internet, as such publication is prohibited by 4 Pa. Code sections 183.13 (g) & 183.14 (k)." Exh. A (Marks Dep. Tr.) 84.

**RESPONSE:** Controverted. The cited testimony states that as a general rule, a requestor cannot receive certain voter data without signing an affirmation. **Marks Tr., 84:19-24**. But Mr. Marks was not asked about, and did not provide testimony about, any request made by Mr. Wang or any affirmation signed by him. Nor was a signed affirmation produced in discovery or attached to the Secretary's motion.

20. Wang and Local Labs provided this list to VRF. Exh. B (Swoboda Dep. Tr.) 80.

**RESPONSE:** Uncontroverted that Local Labs provided the Full Voter Export to VRF.

21. On or about August 27, 2021, VRF subsequently published the List on its internet website, www.voteref.com. Exh. A (Marks Dep. Tr.) 108.

**RESPONSE:** Uncontroverted.

22. On or about January 21, 2022, the Department's then-Chief Counsel wrote to Doug Truax, president of Restoration, noting the online publication, and demanding that Restoration and VRF "take immediate action to remove all Pennsylvania-voter information from VoteRef.com and any other related websites under their custody or control." Exh. B (Swoboda Dep. Tr.) 85; Exh. M.

**RESPONSE:** Uncontroverted that on or about January 21, 2022, the Department's then-Chief Counsel wrote to Doug Truax as representative of Restoration Action and demanded that VRF remove the voter data from VoteRef.com. VRF further states that because of that letter, it removed the data from VoteRef.com. **Swoboda Tr., 78:6-22, 86:8-21.** The letter otherwise speaks for itself.

14

**Right-to-Know Law Request 2022-52.**

23. On or about January 20, 2022, VRF submitted a RTK Request seeking records relating to ballots, voter registration data, and voting history for each voter participating in the November 2020 presidential election. This request was docketed as Number 2022-052. *See* Exh. U.

**RESPONSE:** Controverted, in part. Uncontroverted that VRF submitted a request for voter data on January 20, 2022. Controverted that VRF's request, which sought data and records which must be made available under the National Voter Registration Act's Public Disclosure Provision, 52 U.S.C. § 20507(i), was made solely under Pennsylvania's Right to Know Law and not the NVRA. ***See* Def.'s Ex. U** (seeking voter registration data and history for all voters, which must be made available under 52 U.S.C. § 20507(i)).

24. By letter of February 28, 2022, the Department denied the RTK request based on the RTKL's instruction to defer to another body of substantive law governing the availability of records. 65 P.S. § 67.3101.1. Accordingly, the denial advised VRF that these records were available exclusively through the request procedures prescribed in 25 Pa. Cons. Stat. § 1401 and 4 Pa. Code § 183.14, by request with the Bureau of Commissions, Elections and Legislation ("BCEL"). *See* Exh. U.

**RESPONSE:** Controverted, in part. Uncontroverted that the Department denied VRF's voter data request on February 28, 2022. Further uncontroverted that this paragraph accurately recites the bases for that denial, though VRF does not concede that those were proper or lawful reasons to deny its request. The letter otherwise speaks for itself. Controverted that VRF's January 20, 2022 request was made solely under Pennsylvania's Right to Know Law for the reasons stated in response to ¶23.

25. This denial further noted that VRF had obtained the Full Voter Export from BCEL and—despite the online publication prohibition in the regulations (echoed in the requester's application)—posted it online. *See* Exh. U.

**RESPONSE:** Uncontroverted that this paragraph accurately recites one of the reasons given for the denial of VRF's January 2022 request. Controverted that this is a proper or lawful basis to deny VRF's request. The letter otherwise speaks for itself. Further controverted to the extent this paragraph implies VRF agreed to refrain from posting any data online. Further controverted to the extent the Secretary's representative made clear that some types of internet publication are acceptable. *See* Response to ¶11.

**Right-to-Know Law Request 2022-147.**

26. On or about March 7, 2022, Gina Swoboda, on behalf of VRF, submitted a RTK Request seeking a copy of the Full Voter Export List, including all information in public information lists. This RTK Request was docketed as Number 2022-147. *See* Exh. N.

**RESPONSE:** Controverted, in part. Uncontroverted that VRF submitted a request for voter data on March 7, 2022. Controverted that VRF's request was made solely under Pennsylvania's Right to Know Law for the reasons stated in response to ¶23.

27. This RTK Request referred only to the RTKL and made no reference to the NVRA. *See* Exh. N.

**RESPONSE:** Uncontroverted that the March 7, 2022 voter data request did not specifically use any "magic words" referencing the NVRA or citing the NVRA to remind the Secretary of his obligations thereunder. But controverted that VRF's request was made solely under Pennsylvania's Right to Know Law for the reasons stated in response to ¶23.

28. The RTK Request indicated that VRF agreed to certain restrictions on the use of voter information, but that it did not agree to refrain from publishing the list on the internet. *See* Exh. N.

**RESPONSE:** Uncontroverted that VRF's March 7, 2022 request indicated that it could not agree to refrain from posting the requested data on the internet, but otherwise agreed via affirmation to refrain from using the requested records for commercial or other prohibited purposes, except purposes related to elections, political activities, and law enforcement. **Def.'s Ex. N at p. 9** (affirmation of G. Swoboda). Controverted that VRF's request was made solely under Pennsylvania's Right to Know Law for the reasons stated in response to ¶23.

29. By letter of April 13, 2022, the Department denied the RTK Request. The response again cited 65 P.S. § 67.3101.1, 25 Pa. Cons. Stat. § 1401 and 4 Pa. Code § 183.14, and observed that VRF had previously published voter information on the internet. *See* Exh. O.

**RESPONSE:** Uncontroverted that the Department denied VRF's March 7, 2022 request by letter dated April 13, 2022. Further uncontroverted that this paragraph accurately recites the reasons for denial stated in the April 13, 2022 letter. Controverted that this is a proper or lawful basis to deny VRF's request. The letter

otherwise speaks for itself. Controverted that VRF's request was made solely under Pennsylvania's Right to Know Law for the reasons stated in response to ¶23.

30. On or about May 5, 2022, VRF appealed the Department's determination.

**RESPONSE:** Uncontroverted.

31. The Pennsylvania Office of Open Records ("OOR") issued a Final Determination Upon Reconsideration ("Final Determination"), affirming the Department's denial, writing that the Department had properly applied the RTKL's provisions. *Swoboda v. Pa. Dep't of State*, No. AP 2022-1069R (Pa. Office of Open Records July 15, 2022).

**RESPONSE:** Uncontroverted that the OOR affirmed the Department's denial of VRF's March 7, 2022 request under the Pennsylvania Right to Know Law's administrative appeals procedure only. The OOR did not adjudicate or review VRF's NVRA or First Amendment claims at issue here. VRF also does not controvert footnote 1 to paragraph 31.

32. VRF sought further appellate review of the OOR decision. Petition for Review, *Swoboda v. Pa. Dep't of State (Off. of Open Recs.)*, No. 857 CD 2022 (Pa. Commw. Ct. filed Aug. 15, 2022).

**RESPONSE:** Uncontroverted.

33. Upon review, the Pennsylvania Commonwealth Court affirmed the OOR's Final Determination. *Swoboda v. Pa. Dep't of State (Off. of Open Recs.)*, 304 A.3d 105, 114 (Pa. Commw. Ct. 2023).

**RESPONSE:** Uncontroverted that the Pennsylvania Commonwealth Court affirmed the OOR's Final Determination under the Pennsylvania Right to Know Law only. The Commonwealth Court did not adjudicate or review VRF's NVRA or First Amendment claims at issue here.

34. Shortly following the Commonwealth Court decision, VRF sent the Department, on November 2, 2023, a "Notice of Violation of the NVRA." *See* Exh. P.

**RESPONSE:** Uncontroverted.

35. The same day, VRF wrote to the Department to request voter data pursuant to NVRA. *See* Exh. Q.

**RESPONSE:** Uncontroverted.

36. The Department replied to both pieces of correspondence on November 16, 2023, noting that the notice of NVRA violation was submitted contemporaneously with VRF's initial request under the NVRA; the Department's reply also noted that VRF's request for access to the voter data was granted in full, conditioned only on VRF's agreement to the terms (including non-internet publication). *See* Exh. R.

**RESPONSE:** Uncontroverted that this paragraph accurately reflects the Department's position as conveyed in the November 16, 2023 correspondence to VRF. The letter otherwise speaks for itself. Controverted that VRF's request was made solely under Pennsylvania's Right to Know Law for the reasons stated in response to ¶23. Uncontroverted that the Department offered to provide the requested data to VRF, but only if it agreed to refrain from publishing that data online, despite the Department's awareness that VRF requested the data for precisely that reason, effectively denying its request.

Further controverted to the extent the testimony of the Secretary's representative made clear that some types of internet publication are acceptable. *See* Response to ¶11. The Secretary did not inquire regarding the manner in which VRF intended to publish the data, or consider whether such methods would be viewed as permissible under the Secretary's interpretation of the law.

21

37. VRF responded on November 17, 2023, disputing any requirement to invoke NVRA by name, and noting that it remained unwilling to refrain from posting voter data on the internet. *See* Exh. S.

**RESPONSE:** Uncontroverted that VRF responded to the Department's November 16, 2023 correspondence on November 17, 2023. VRF's correspondence speaks for itself, including its legal objections to the Secretary's attempts to compel its silence in exchange for the data it requested. ***See* Def.'s Ex. S.**

**VRF's Practices, and the Features of the VRF Website.**

38. VRF maintains the website www.voteref.com, on which it publishes voter registration data for several states (including formerly, but not presently, Pennsylvania). Exh. B (Swoboda Dep. Tr.) 21, 86.

**RESPONSE:** Uncontroverted that VRF publishes certain publicly available voter registration data for over 30 states on its website. **Swoboda Tr., 23:10-13; Swoboda Dec. (ECF No. 35-4) at ¶4.** Further uncontroverted that this includes some voter registration data, but does not include social security numbers, voter ID numbers, telephone numbers, and email addresses, even if those data points are provided by a state. **Swoboda Tr., 28:11-24.**

39. The information contained on the website can include names, addresses, birth years, party affiliations, and voting history information.

**RESPONSE:** Controverted, in part. This statement of alleged uncontroverted material fact is not supported by admissible record evidence. *See* LR 56.1. Further controverted to the extent this paragraph speaks in generalities or speculates as to what data might be posted for a particular state. Finally, controverted to the extent it implies that any voter data for Pennsylvania is posted on VoteRef.com.

Uncontroverted that the information posted on VoteRef.com, which is the same information provided directly by a particular state's Chief Election Official, includes biographical and vote history information to enable users of the Website to search the data for errors. ***See* Swoboda Dec. (ECF No. 35-4), ¶16.** But VRF does not post sensitive personal information, like email addresses or social security numbers, even if that information is for some reason provided by a state election official. ***Id.***

40. Upon accessing the website, it displays a pop-up window, advising users "VoteRef.com is for election-related, noncommercial use and for users based in the United States only. Before accessing the site, please read our Terms of Service and agree you will abide by them by clicking on the Accept button below." Exh. B (Swoboda Dep. Tr.) 40.

**RESPONSE:** Controverted that this paragraph accurately states the information displayed to a user upon accessing VoteRef.com. Further controverted to the extent the cited testimony fails to establish when the referenced terms of service were used on the website, whether they were used at the time the Pennsylvania data was available, or whether they are currently in use. The entire current pop-up, which the Secretary correctly cites in his brief (ECF No. 39, p.12) and of which the Court may take judicial notice, states:



41. Users are unable to proceed to use the site without clicking the button marked "I Agree." They may proceed, however, even if they have not actually read the terms. Exh. B (Swoboda Dep. Tr.) 42–43. The website lists an email address to contact VRF: info@voterreferencefoundation.com. Exh. B (Swoboda Dep. Tr.) 89.

**RESPONSE:** Controverted. This paragraph misrepresents the cited testimony. VRF's representative testified that if a user of the website clicks the "I Agree" button without having read and assented to the Terms of Service, that would be a violation of the Terms of Service.

> Q: What happens if a user clicks the I agree button without clicking on the terms of service first?
>
> A: I think if you click I agree, you have agreed that you have read the terms of service. So I am frontloading that you must have agreed. You're saying that you agree that you have read the terms of service when you click I agree. So If someone is clicking I Agree and they haven't read the terms of service, then yeah, they're violating this agreement when they're going in.
>
> Q: But just to be clear, the website allows you to clock I agree and access data without having clicked on the terms of service first?
>
> A: I've never done that. If you say so.
>
> Q: Well, I'm just asking about how the website is set up.
>
> A: Oh, I see what you're saying. Yeah, conceivably a person could violate the agreement and click I agree and actually not be agreeing.

**Swoboda Tr., 42:3-22**. The user would not have permission to use the Website in a manner that violates the Terms of Service and, thus, would not have permission to proceed to use the website having not read and assented to the Terms.

Uncontroverted that the website lists an email address to contact VRF: info@voterreferencefoundation.com

42. VRF has received communications through this email address, including numerous messages from voters whose information appears on the VRF website, requesting to be removed. *See, e.g.,* Exh. B (Swoboda Dep. Tr.) 103–105.

**RESPONSE:** Controverted. The cited testimony discusses a single email from May 26, 2022 (after the Pennsylvania data had already been removed from VoteRef.com) from an undisclosed individual asking to have their information removed from the website. There is no evidence in the record concerning the truthfulness of the statements made in this email. The cited testimony also does not support the asserted statement that VRF has received "numerous messages from voters…requesting to be removed."

43. VRF claims that it removes voters from its website only if a voter qualifies for confidential or protected status under state law. Exh. B (Swoboda Dep. Tr.) 30.

**RESPONSE:** Controverted. The cited testimony states that VRF does not remove every voter that requests to be removed, but instead removes those voters who are eligible for redaction in their state. **Swoboda Tr., 30:1-7**. VRF's representative also testified that "we have a legal team that reviews every single e-mail that we get for redaction." *Id.* **at 30:10-12.** VRF's representative further testified that protected status is one of the reasons a voter's information might be removed from the Website, particularly because a protected voter's data should not

have been included in the publicly available data set in the first place. *Id.*, **29:4-25**

("And I have people monitor that e-mail box every single day, 365 days a year to

make sure that we're rapidly removing them if, in fact, they are protected and they

were somehow in the file we got from the state. And we tell them to send us the

information so that we can remove them right away."). Information is also removed

if the voter demonstrates they are a judge or law enforcement officials, *id.*, **31:5-11**,

or if they establish that the publication of the information poses a threat to their

safety. *Id.*, **35:5-9.**


44. VRF developed a document that guides VRF staff on how to redact a

voter's record once confidential status is approved. Exh. B (Swoboda Dep. Tr.) 30–

33.

**RESPONSE:** Controverted, in part. Uncontroverted that the referenced

document instructs VRF staff on how to redact a voter, that is, to remove the voter's

information from the website. Controverted that VRF "approves" a voter's

confidential status, as VRF plays no role in adjudicating whether someone is eligible

to participate in a protected voter program, but instead defers to their actual

participation in said program. *See* Response to ¶43.

Further controverted to the extent this paragraph insinuates that participation

in a protected voter program is the only basis for redaction. Information is also

removed if the voter demonstrates they are a judge or law enforcement officials, *id.*, **31:5-11**, or if they establish that the publication of the information poses a threat to their safety. *id.*, **35:5-9.**

45. When citizens inquire about having their voter registration information removed, VRF advises them that the information is public, and that they should contact state authorities to apply for confidential or protected voter status. *See, e.g.,* Exh. I, Exh. V.

**RESPONSE:** Controverted, in part, for the reasons stated in response to ¶43. The referenced exhibits reflect emails in which VRF responds to a removal request by informing the sender that the information posted is available through public records requests, but that if they believe they are entitled to a protected or confidential status, they may wish to contact their election official. **Defs. Ex. I, V**. The email also provides contact information for the Pennsylvania Voter Information department. *Id.*

46. Some of the voters requesting to be removed from VRF's website, upon learning that VRF would not remove them, advised of their intention to cancel their voter registrations rather than have their address posted and searchable online. *See, e.g.,* Exh. V at 322, 377–79.

**RESPONSE:** Objection. This statement of fact is inadmissible hearsay and is not supported by admissible record evidence. *See* LR 56.1. The referenced emails do not prove that any voter canceled their voter registration because of VRF's prior posting of voter data.

Further, controverted. Ex. V at 322 references an email from an individual that claims they do not want to become a protected voter and would rather cancel their voter registration than do so. Ex. V at 377 includes a question from a voter asking "Will you delete my personal information from your web site when I cancel my voter registration?" This inquiry fails to establish that the person has or intends to cancel their registration.

Further, controverted. Even after having access to the referenced emails, the Secretary's representative explicitly testified that he has no evidence that any voter canceled their voter registration as a result of VRF's prior posting of Pennsylvania voter data. **Marks Tr., 140:11-16.**

47. VRF does not rely on a voter's actual participation in confidential voter programs, but instead, through counsel, conducts its own assessment of a voter's entitlement to participate in such a program. Exh. B (Swoboda Dep. Tr.) 31.

**RESPONSE:** Controverted because the cited testimony does not support the proposition asserted. Further controverted for the reasons stated in response to ¶43.

48. In addition to eligibility for, and participation in, a state confidential voter program, VRF will redact voters from the website at the discretion of VRF staff; grounds for redaction include employment as a judge or marshal or law enforcement. *See, e.g.,* Exh. B (Swoboda Dep. Tr.) 31.

**RESPONSE:** Controverted. VRF does not adjudicate a voter's eligibility for participation in a protected or confidential voter program, but simply removes a voter if they show documentation establishing that they participate in said program. *See* Response to ¶43.

49. In addition to entitlement to participation, or actual participation, in a state confidential voter program, VRF also "escalates" any request for removal "where the person says they are in danger." Exh. B (Swoboda Dep. Tr.) 114.

**RESPONSE:** Controverted. VRF does not adjudicate a voter's eligibility for participation in a protected or confidential voter program, but simply removes a voter if they show documentation establishing that they participate in said program. *See* Response to ¶43.

Uncontroverted that VRF involves its legal counsel to "escalate" situations in which a voter claims that the posting of their information is putting them in danger.

50. This "escalat[ion]" consists of referral to legal review. Exh. B (Swoboda Dep. Tr.) 114.

**RESPONSE:** Uncontroverted that the specific "escalation" referred to by Ms. Swoboda in the cited testimony on page 114 refers to involving legal counsel to review situations in which a voter claims to be in danger due to the posting of their information online.

51. VRF does interact with state election officials where its analysis indicates discrepancies between total votes counted and the combined vote histories for individual voters. Exh. B (Swoboda Dep. Tr.) 117.

**RESPONSE:** Controverted. This statement does not accurately reflect Ms. Swoboda's testimony from page 117 of her deposition. Ms. Swoboda testified that VRF notifies "the election official of a discrepancy between the total ballots cast according to the canvas results and the total voter's credits where they vote." Defendant's characterization misstates the testimony, including the two data points being compared.

Otherwise uncontroverted that when VRF identifies issues with voter roll maintenance, including but not limited to discrepancies between the total ballots cast and the total voter's credits where they vote, VRF contacts state election officials to discuss and remedy those issues.

52. VRF takes no steps to directly assist in the maintenance of voter registration rolls. Exh. B (Swoboda Dep. Tr.) 117.

**RESPONSE:** Objection. The term "directly assist" is vague and undefined. Further, controverted. VRF expends time and resources to enable review of state voter registration rolls and the identification of errors, encouraging individuals to contact state election officials if errors are identified. **Swoboda Tr., 20:16-21:10.** Further, controverted as the immediately preceding statement of fact alleges VRF's direct involvement in communicating with state election officials on list maintenance issues. Further, VRF's representative testified that VRF identified an issue with records related to the November 2020 election and notified the Commonwealth about that in its initial outreach before it published the voter data. *Id.*, **117:10-19.**

To the extent this statement contends that VRF should itself engage in list maintenance by updating and maintaining voter registration data, VRF understands that Pennsylvania and federal law likely prohibits it from doing so if such actions involve direct changes or updates to the SURE database.

53. VRF has received occasional emails from website users reporting that they identified erroneous voter registration data; VRF refers such users to contact state election authorities. Exh. B (Swoboda Dep. Tr.) 56–57.

**RESPONSE:** Uncontroverted that VRF encourages users to report errors in voter registration data to the state election officials charged with maintaining the accuracy and currency of that information and, when someone reaches out to VRF saying they identified an error, VRF provides the relevant election official's contact information. **Swoboda Tr., 57:3-6.**

54. VRF does not monitor how many reports are made to state election authorities from users of its website. Exh. B (Swoboda Dep. Tr.) 57.

**RESPONSE:** Uncontroverted.

55. VRF does not contact state or county authorities to inquire how many VRF website users, if any, have contacted them regarding inaccuracies in voter registration data. Exh. B (Swoboda Dep. Tr.) 57.

**RESPONSE:** Uncontroverted.

56. While users must agree to VRF's terms and conditions of VRF's website, VRF would in the first instance refer a violation of its terms to a state election official. Exh. B (Swoboda Dep. Tr.) 43–45.

**RESPONSE:** Controverted. This statement of fact is purely speculative because VRF's representative testified that it has never become aware of a user violating the terms of service.

> Q: So if a user were to violate that agreement, what action would VRF take?
>
> A: If I came into knowledge that someone had violated that agreement, I would report it to the election official of the state. I would just notify them, hey, we've become aware that someone's using this for noncommercial- for commercial or nonelection-related purposes. That hasn't happened the three and a half years so far. But if it did happen, that's what I would do.
>
> Q: So you've never reported anybody to a state election official for violating that requirement?
>
> A: I have never been informed of anybody violating that requirement.

**Swoboda Tr., 45:4-13.** Otherwise, uncontroverted that if VRF became aware of misuse of the website, it would at least inform the relevant state election official(s).

57. VRF would advise counsel of any violation and defer to counsel for further steps. Exh. B (Swoboda Dep. Tr.) 43–45.

**RESPONSE:** Controverted. No testimony on pages 43-45 of the cited deposition relates to VRF advising counsel of a purported violation or deferring to advice of counsel.

58. VRF has never become aware of any violations of its terms of service. Exh. B (Swoboda Dep. Tr.) 43–46.

**RESPONSE:** Uncontroverted.

59. VRF has never taken any action in response to a violation of its terms of service. Exh. B (Swoboda Dep. Tr.) 43–46.

**RESPONSE:** Controverted. This paragraph does not cite the specific testimony that purportedly supports the alleged statement of uncontroverted fact. VRF's representative's testimony, including that testimony on pages 43-46, was that VRF *has never become aware of any violation* of its terms of service, as alleged in the immediately preceding statement of fact. **Swoboda Tr., 45:14-18** ("Q: So you've never reported anybody to a state election official for violating that requirement? A. I have never been informed of anybody violating that requirement."); **46:9-11** ("Q: But again, that's never happened; correct? A: Correct."). So, while literally true that VRF has never taken any action in response to a violation of the terms, this statement is misleading because VRF has never become aware of any such violation. Therefore, controverted to the extent this statement is meant to insinuate that VRF has become aware of a violation and failed to take action to remedy it.

60. Beyond requiring the user to click "accept," VRF does not monitor its users for compliance with the terms of service. Exh. B (Swoboda Dep. Tr.) 46.

**RESPONSE:** Controverted. Though this paragraph does not cite the specific testimony that purportedly supports the alleged statement of fact, VRF's representative's testimony on page 46 of her deposition states:

Q: Does VRF do anything to monitor whether users are complying with the terms of service beyond require acceptance of the terms?

A: I would have no way to do that. I'm unaware if any election official could do that, or us. I don't think it's possible or conceivable that you could monitor all the people who can request public records to see what, if anything, they're doing with them. I think you have to - if you're an election official or if you're us, you have to get an agreement and then, you know, if you become aware of it, then at that point I guess you would take action.

Further controverted to the extent this implies that VRF has a duty to monitor compliance. The Secretary's representative testified that neither the Secretary nor the Department monitors how requestors use the voter data provided to them. **Marks Tr., 139:5-11**. Controverted to the extent this statement implies that VRF has a greater duty to monitor compliance than that observed by the Commonwealth's election officials.

Respectfully submitted this 10th day of January, 2025.

**GRAVES GARRETT GREIM LLC**

*/s/ Edward D. Greim*

Edward D. Greim (MO 54034)*
Matthew R. Mueller (MO 70263)*
Jackson C. Tyler (MO 73115)*
* Admitted *Pro Hac Vice*
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 222-0534
edgreim@gravesgarrett.com
mmueller@gravesgarrett.com
jtyler@gravesgarrett.com

**BECKLEY & MADDEN, LLC**

Charles O. Beckley, II (PA 47564)
212 North Third Street, Suite 301
Harrisburg, PA 17101
Tel: (717) 233-7691
cbeckley@pa.net




*Attorneys for Plaintiff*
*Voter Reference Foundation, LLC*


## CERTIFICATE OF SERVICE

I certify that, on January 10, 2025, I filed the above document with the Court's

CM/ECF system. Service will be accomplished on all counsel of record through the

CM/ECF system.

*/s/ Edward D. Greim*

Edward D. Greim
Attorney for Plaintiff

37