# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **VOTER REFERENCE FOUNDATION, LLC,** | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) **Civil Action: 1:24-CV-00294-CCC** | |
| | ) | |
| **ALBERT SCHMIDT**, in his official capacity as Secretary of the Commonwealth of Pennsylvania, | ) Judge Christopher C. Conner | |
| | ) | |
| | ) | |
| | ) **ORAL ARGUMENT REQUESTED** | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S BRIEF IN OPPOSITION
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**GRAVES GARRETT GREIM LLC**
Edward D. Greim (MO 54034)*
Matthew R. Mueller (MO 70263)*
Jackson C. Tyler (MO 73115)*
*Admitted *Pro Hac Vice*
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 222-0534
edgreim@gravesgarrett.com
mmueller@gravesgarrett.com
jtyler@gravesgarrett.com

**BECKLEY & MADDEN, LLC**
Charles O. Beckley, II (PA 47564)
212 North Third Street, Suite 301
Harrisburg, PA 17101
Tel: (717) 233-7691
cbeckley@pa.net

*Attorneys for Plaintiff*
*Voter Reference Foundation, LLC*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .......................................................................... iv

INTRODUCTION ...................................................................................... 1

COUNTER STATEMENT OF FACTS ......................................................... 3

    I.    VRF & the Internet Sharing Ban ................................................... 3

    II.   The Department is substantially involved in voter list
        maintenance, including maintaining SURE ................................... 7

COUNTER STATEMENT OF PROCEDURAL HISTORY .............................. 8

COUNTER STATEMENT OF QUESTIONS INVOLVED ............................. 10

ARGUMENT .......................................................................................... 10

    I.    Summary judgment standard ...................................................... 11

    II.   The Secretary is not entitled to judgment on Count I because
        the Internet Sharing Ban is preempted by the NVRA ................... 11

        a.  Pennsylvania's FVE is a "record" which must be made
            available under the NVRA ................................................... 11

            i.  The Secretary's focus on cases involving redaction of
               certain data is misplaced. ........................................... 16

        b.  The Internet Sharing Ban is preempted by the NVRA ............. 17

    III.  The Secretary is not entitled to summary judgment on Counts II
        and III because he twice refused to produce the FVE to VRF
        unless it agreed to the preempted Internet Sharing Ban .............. 19

        a.  The Secretary unlawfully denied VRF's March 7, 2022
            Request ............................................................................ 20

b.  The Secretary unlawfully denied VRF's November 2, 2023 Request ................................................................21

IV.   The Secretary is not entitled to judgment on Count IV because the Ban violates the First Amendment ................................22

a.  The Ban restricts First Amendment-protected speech. ..............22

b.  The Ban must, but cannot, withstand strict scrutiny ..............25

c.  The Court should not apply *Anderson-Burdick*, but if it does, the Ban still fails to pass muster. ................................29

V.    The Secretary is not entitled to judgment on Count V because the Ban's overbreadth prohibits all online speech involving voter data ................................................................31

CONCLUSION & REQUESTED RELIEF ................................................33

CERTIFICATE OF WORD COUNT ....................................................35

CERTIFICATE OF SERVICE ........................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Celebrezze,*
460 U.S. 780 (1983) .......................................................................29

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
570 U.S. 1 (2013) .........................................................................17

*Bartnicki v. Vopper*,
532 U.S. 514 (2001) .................................................................2, 23

*Burdick v. Takushi*,
504 U.S. 428 (1992) ...................................................................29

*Camp Hill Borough Republican Ass'n v. Borough of Camp Hill*,
101 F.4th 266 (3d Cir. 2024) ......................................................27

*Citizens United v. FEC*,
558 U.S. 310 (2010) ...................................................................25

*Consol. Edison Co. of New York, Inc. v. Pub. Serv. Comm'n of New York*,
447 U.S. 530 (1980) ...................................................................26

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) ...................................................................17

*Dombrowski v. Pfister*,
380 U.S. 479 (1965) ...................................................................31

*Fusaro v. Cogan*,
930 F.3d 241 (4th Cir. 2019) ......................................................24

*L.A. Police Dep't v. United Reporting Pub. Corp.*,
528 U.S. 32 (1999) .....................................................................23

*Mazo v. New Jersey Secy of State*,
    54 F. 4th 124 (3d Cir. 2022) .......................................................... 23

*McCullen v. Coakley*,
    573 U.S. 464 (2014) ...................................................................... 28

*McIntyre v. Ohio Elections Comm'n*,
    514 U.S. 334 (1995) ...................................................................... 30

*Meyer v. Grant,*
    486 U.S. 414 (1988) ................................................................ 23, 25

*Pappas v. City of Lebanon*,
    331 F. Supp. 2d 311 (M.D. Pa. 2004) ........................................... 10

*Patel v. Garland*,
    596 U.S. 328 (2022) ...................................................................... 15

*Project Vote/Voting for Am. Inc., v. Long*,
    682 F.3d 331 (4th Cir. 2012) ........................................................ 13

*Pub. Int. Legal Found., Inc. v. Bellows*,
    92 F.4th 36 (1st Cir. 2024) ....................................... 13, 16, 18, 19

*Pub. Int. Legal Found. v. Chapman*,
    595 F. Supp. 3d 296 (M.D. Pa. 2022) ........................................... 13

*Pub. Int. Legal Found., Inc. v. Knapp*,
    2024 WL 4792051, Case No. 3:24-cv-1276-JFA, Slip Op.
    (D.S.C. September 18, 2024) ........................................................ 14

*Pub. Int. Legal Found., Inc. v. Matthews*,
    589 F. Supp. 3d 932 (C.D. Ill. 2022) ........................................ 13-16

*Reed v. Town of Gilbert, Ariz.*,
    576 U.S. 155 (2015) ...................................................................... 27

*Republican Party of Minnesota v. White*,
    536 U.S. 765 (2002) ...................................................................... 26

*Smith v. Daily Mail Pub. Co.*,
 443 U.S. 97 (1979) ................................................................ 22

*Snyder v. Phelps*,
 562 U.S. 443 (2011) .............................................................. 24

*Thomas v. Collins*,
 323 U.S. 516 (1945) .............................................................. 29

*Thomas v. Cumberland County*,
 749 F.3d 217 (3d Cir. 2014) ................................................. 10

*Turner Broadcasting Sys., Inc. v. FCC*,
 512 U.S. 622 (1994) .............................................................. 26

*United States v. Williams*,
 553 U.S. 285 (2008) .......................................................... 31, 32

*Virginia v. Hicks*,
 539 U.S. 113 (2003) .............................................................. 31

*Voter Reference Foundation, LLC v. Torrez,*
 2024 WL 1347204 (D.N.M. March 29, 2024) ............... 14, 18, 19

**Statutes**

18 Pa. C.S. § 2709.1 ................................................................ 28

25 Pa. C.S. § 3527 ................................................................... 28

5 U.S.C. § 552a, *et seq.* .......................................................... 28

18 U.S.C. § 2721, *et seq.* ......................................................... 28

52 U.S.C. § 20501 ............................................................ 7, 14, 19

52 U.S.C. § 20507 ............................................................. *passim*

52 U.S.C. § 20510 ............................................................... 20-22

**Regulations**

4 Pa. Code § 183.13 ................................................................................... 4, 24

4 Pa. Code § 183.14 ................................................................................... 4, 24

**Other Authorities**

*Implement*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/implement (last visited Jan. 6, 2025) ................. 15

# **INTRODUCTION**

Secretary Schmidt seeks summary judgment based on a fundamental misreading of the controlling statute, the National Voter Registration Act's "Public Disclosure Provision," 52 U.S.C. § 20507(i). It provides:

> Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters…

The Secretary insists this provision only requires the public disclosure of records which a state actually *uses* for voter list maintenance—in essence, the records "input" into relevant "programs and activities." SOS Brief (ECF 39), p. 21-23.  But his reading is divorced from the text of the statute, which requires disclosure of "*all* records *concerning*" list maintenance programs, including the output of those activities: the Full Voter Export.

The Secretary admits the fundamental purpose of the Public Disclosure Provision is to "allow[] for oversight of whether such programs complied with the requirements of the NVRA…", SOS Brief, p. 22, but suggests that Congress intended to limit that oversight to what the public can discern through a peephole, rather than opening the door to full scrutiny. Courts have uniformly rejected this narrow construction, noting the breadth of the language Congress chose and the importance of transparency in electoral processes. *See* Section II(a), *infra*.

The overwhelming majority of courts to examine the issue have agreed that a state's voter list must be disclosed and the record here overflows with evidence that the Full Voter Export ("FVE") is *the* authoritative record *concerning* Pennsylvania's list maintenance programs. The Secretary even admitted the NVRA's public oversight is best accomplished by requesting and reviewing the FVE, **Def's. Ex. A, Marks Deposition Transcript ("Marks"), 17:18-18:15; 49:4-20**, and did not contest that the FVE must be made available, but only insisted the Commonwealth could restrict its online publication. ***Id.*, 143:23-144:4**.

Because the FVE must be made available, the Internet Sharing Ban—a state-imposed restriction on a federal right—is preempted as it directly conflicts with, and undermines the purpose of, the Public Disclosure Provision. *See* Section II(b), *infra*. And the Secretary violated the NVRA by repeatedly denying VRF's requests for these records. *See* Section III, *infra*.

And because the NVRA requires the FVE be made available, VRF need not establish an independent right to *access* that list under the First Amendment before *speech* protections attach. We know this because the First Amendment protects, for example, information obtained unlawfully for which the publisher had *no lawful right of access*. *See Bartnicki v. Vopper*, 532 U.S. 514 (2001). If a state cannot prohibit the publication of unlawfully obtained material, it strains logic to suggest that it could prohibit the publication of information which federal law dictates *must*

be made publicly available. *See* Section IV, *infra*.  The Internet Sharing Ban fails under any level of scrutiny, *see* Section IV(a), *infra*., and is overbroad because it bans an entire medium of protected speech in a manner that fails to remedy the issue it purports to address. *See* Section V, *infra*.

For these reasons, the Secretary's motion must be denied. VRF's own motion (ECF No.34) should be granted.

## COUNTER STATEMENT OF FACTS

### I.    VRF & the Internet Sharing Ban

VRF aspires to post the voter rolls of each state online for free so concerned citizens can review the rolls, check it against their own knowledge of voters registered in their state, and contact state election officials if errors are identified. **Defs.' Ex. B, Swoboda Deposition ("Swoboda"), 14:17-20; 20:11-21:10**. VRF twice sought Pennsylvania's Full Voter Export ("FVE"), a list that includes voters' demographic information, vote history, and a log of changes to individual voters' records, among other data. SOS Brief, p. 9.

The Secretary admits that VRF's efforts to crowdsource the correction of errors in the voting rolls is a permissible use of voter data. **Marks, 64:17-65:3.** Notwithstanding that admission, VRF was refused access to the FVE because it would not agree to the "Internet Sharing Ban," a regulation promulgated by the Secretary prohibiting voter data from being published on the Internet. 4 Pa. Code §

183.14(k). The NVRA contains no Internet Sharing Ban, nor does it otherwise limit how information available under the Public Disclosure Provision may be used. But VRF cannot receive this federally mandated public data from Pennsylvania unless it agrees not to share it online. **Marks, 84:7-85:3;** SOS Brief, p. 11. Because of the conflict, the Ban is preempted.

The Secretary attempts to undermine the sincerity of VRF's efforts, contending that VRF does nothing to inform officials of errors in the voter rolls. The record proves him wrong. The Secretary concedes that VRF's intent is for users of its website to directly contact election officials if they identify errors. SOS Brief, p. 11. VRF encourages users to go directly to the officials responsible for list maintenance. If VRF inserted itself as middleman, it would create an unnecessary and inefficient extra step to facilitating roll maintenance. Further, when VRF *itself* identified issues with Pennsylvania's rolls related to the November 2020 election, it *did* contact the Department as part of its outreach before it initially published the Pennsylvania data. **Swoboda, 117:10-19.**

Next, the Secretary repeatedly accuses VRF of undermining voter privacy. But in doing so he ignores the fact that Pennsylvania law, independent of the NVRA, allows requestors to obtain voters' information directly from the Secretary. *See* 4 Pa. Code § 183.13(c) (street lists available for public inspection); 183.14(b) (public information lists available). He also ignores testimony regarding the Secretary's

awareness of third-party vendors who *sell* this same data to any client that can afford the asking price. **Marks, 93:6-20**. The Secretary has not promulgated regulations to prohibit the selling of this information, nor has he prohibited requestors from mailing, ***id.*, 98:7-100:13; 104:7-14**, or emailing it out at large. ***Id.*, 93:7-98:5; 105:15-107:9**. The Secretary even believes it is permissible to publish the same voter data on a website, so long as it is password-protected. ***id.*, 94:1-95:5**. If the goal of the Secretary's Ban is to preserve voter privacy, the Ban is substantially underinclusive.

Next, the Secretary discredits VRF's efforts because he thinks VRF should do more to monitor and prevent misuse of the data—do more, that is, than the Department itself does, as it does not monitor how requestors use voter data. **Marks, 139:5-11**. VRF takes steps to ensure protected voters are never included in the data it posts, or, if the state does accidentally include protected voters, that they are removed upon confirmation of their protected status. **Swoboda, 27:7-10**. VRF redacts judges, marshals, and law enforcement officers. ***Id.*, 27:12-13**; **27:24-28:1**. And it frequently involves legal counsel for other requests. In reality, VRF does far more than the Department to monitor the use, and potential misuse, of voter data.

The Secretary similarly insinuates that VRF's posting leads to misuse of the data, giving a nod to voters' expectation "that their information will not be misused." SOS Brief, p. 1. But the Secretary's testimony explicitly admitted he has no evidence

that VRF or any other person has misused the data. **Marks, 139:14-18** (no knowledge of illegal use); **139:20** (no knowledge of commercial use); **140:8-10** (no knowledge of stalking or harassment). He follows this up by overstating his "evidence" that Pennsylvania voters cancelled their registration because of VRF's posting. SOS Brief, p. 2. But his representative likewise testified that he has no evidence that any voter did cancel their registration because of VRF. **Marks, 140:11-16**. His "proof" rests entirely on speculation from a few emails unhappy with VRF's activities—a few out of nearly 9 million registered voters in the state.

The Secretary's disingenuous assertions continue, as he claims that VRF has never taken legal action or reported a violation of its terms of service. But the testimony on this point could not be clearer: VRF has never reported a violation because *it has never become aware of any such violation*. *See* SOS SOF (ECF 38) at ¶58; **Swoboda, 45:14-18**. The Secretary testified he is unaware of anyone misusing the data, but relies on the same emails referenced above to suggest that individuals have experienced threats to their safety because of VRF. Not only are these sources classic hearsay, but they are directly contradicted by the Secretary's testimony regarding his lack of knowledge or evidence of any misuse of the data. *See* VRF Response to SOS SOF, ¶¶56-60.

Finally, the Secretary fixates on cherry-picked testimony from VRF's Executive Director, through which he implies that VRF's Terms of Service are

meaningless because a user might agree to the Terms without having first read them. SOS Brief, p. 13. But VRF's testimony on this point—testimony the Secretary omits—clearly states that if a user of the website clicks the "I Agree' button without having read and assented to the terms, that false representation itself would be a violation of the Terms, and the user would not have permission to use the Website. **Swoboda, 42:3-22**.

## II.    The Department is substantially involved in voter list maintenance, including maintaining SURE

The Secretary claims the NVRA's "primary purpose" is reducing barriers to voting. SOS Brief, p. 3. But the NVRA explicitly lists its four co-equal purposes:

> (1) to…increase the number of eligible citizens who register to vote…;
> (2) to…enhance[] the participation of eligible citizens as voters in elections for Federal office;
> (3) to protect the integrity of the electoral process; and
> (4) to ensure that accurate and current voter registration rolls are maintained.

52 U.S.C. § 20501(b). To advance these purposes, the NVRA mandates some list maintenance activities, but not an exclusive or exhaustive list. Though the Secretary continually attempts to distance himself from these activities by claiming they are the responsibility of Pennsylvania's counties, the record demonstrates the Department's substantial involvement in list maintenance activities and the maintenance of the SURE database, including at least:

- Conducting the National Change of Address program, **Marks, 33:17-34:6; 48:15-49:3; 50:6-17;**

7

- Cancelling voter registrations and documenting the reason for cancellation, *id.*, **28:11-13; 28:23-29:1; 36:18-37:15; 37:24-38:9, 38:17-22;**
- Documenting voter history, *id.*, **29:2-12;**
- Updating voters who moved out of state, *id.*, **51:15-21; 52:5-8;** or in state, *id.*, **50:19-51:3; 51:8-11;**
- Identifying duplicate registrations, *id.*, **52:13-23; 54:1-14;**
- Removing deceased voters, *id.*, **29:13-30:1;**
- Tracking all changes made to a voter's record, *id.*, **38:23-39:10; 39:11-15;**
- Incorporating updates from the Electronic Registration Information Center ("ERIC"), *id.*, **30:5-19; 24:7-14; 24:15-18;** and,
- Monitoring counties' list maintenance activities, *id.*, **55:4-56:4.**

The Secretary plays an active, hands-on role in ensuring that Pennsylvania's voter list is accurate and current.

## **COUNTER STATEMENT OF PROCEDURAL HISTORY**

VRF obtained Pennsylvania's voter list and published it for free online in late 2021. **Swoboda, 87:16-19; VRF Ex. C, Swoboda Dec. (ECF 35-4) at ¶9.** The Department then wrote to a VRF representative demanding that it remove the data, **SOS Ex. M,** which it did shortly thereafter. **Swoboda, 78:6-22, 86:8-21; Marks, 122:9-12.** Since then, VRF has attempted to obtain additional voter data to no avail.

VRF requested voter data from Pennsylvania on March 7, 2022. **SOS Ex. N.** VRF's agreed to use the data only for permissible purposes, but did not agree to the Secretary's Internet Sharing Ban because the Ban directly undermines VRF's mission, is preempted by the NVRA, and violates the First Amendment. *Id.* The Secretary believed that because VRF did not quote the NVRA to him in this request,

he was not obligated to fulfill his duties under the NVRA. *See* Section III(a), *infra*. VRF's request was denied because it would not agree to the Ban, and it did not cite the "NVRA." **SOS Ex. O.**

VRF sought recourse via an administrative appeal and in the Pennsylvania Commonwealth Court, both of which affirmed the Department's denial *solely under Pennsylvania's Right to Know Law*. Neither proceeding adjudicated VRF's NVRA or First Amendment claims.

After the Commonwealth Court proceeding, VRF and the Department exchanged a series of letters. On November 2, 2023, VRF sent the Secretary a notice that his denial of the March 7, 2022 request violated the NVRA. **SOS Ex. P.** That same day, VRF sent a separate letter requesting, among other things, the FVE, this time explicitly invoking the NVRA to remind the Secretary of his obligation to comply with federal law. **SOS Ex. Q.**

The Secretary responded to both letters in a single response on November 16, 2023. **SOS Ex. R.** The Secretary "conditionally granted" VRF's request, but only if it agreed to the Internet Sharing Ban. *Id.* The Secretary clearly understood VRF's position at the time of the November 16th letter, and knew that his response effectively denied VRF's request. VRF wrote the next day, informing the Secretary that the November 16th response also violated the NVRA, and that litigation would follow. **SOS Ex. S.**

## <u>COUNTER STATEMENT OF QUESTIONS INVOLVED</u>

1. Must Pennsylvania's voter list, including the FVE, be made available under the NVRA?

    *Yes.*

2. Does the Internet Sharing Ban, which prohibits online speech involving voter data and is used as a basis to deny access to that data, conflict with the NVRA?

    *Yes.*

3. Did the Department violate the NVRA by twice refusing to provide records to VRF?

    *Yes.*

4. Does the Internet Sharing Ban violate the First Amendment as an overbroad and unduly burdensome restriction on speech evaluating state officials?

    *Yes.*

5. Has the Secretary demonstrated that he is entitled to summary judgment?

    *No.*

## <u>ARGUMENT</u>

### I.    **Summary judgment standard**

The Secretary must provide "affirmative evidence, beyond the allegations of the pleadings" establishing his entitlement to judgment as a matter of law, *Pappas v. City of Lebanon*, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004), viewing all evidence "in the light most favorable to [VRF]" and drawing "all reasonable inferences" in its favor. *Thomas v. Cumberland County*, 749 F.3d 217, 222 (3d Cir. 2014).

## II. The Secretary is not entitled to judgment on Count I because the Internet Sharing Ban is preempted by the NVRA.

### a. Pennsylvania's FVE is a "record" which must be made available under the NVRA

The NVRA requires states to make reasonable efforts to maintain the accuracy of their voter rolls, 52 U.S.C. § 20507(a)(4), and to make documents related to list maintenance publicly available:

> Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters…

52 U.S.C § 20507(i)(1).

In discovery, the Secretary did not seriously contest that the FVE must be made available under the NVRA. **Marks, 143:23-144:4** (DOS would provide FVE in response to NVRA request); *id.*, **42:25-43:10** (admitting SURE is used to conduct list maintenance); **SOS Ex. R** (conditionally providing FVE in response to NVRA request). The Secretary even admitted that if someone wanted to evaluate whether Pennsylvania was properly conducting list maintenance, requesting and analyzing the list is exactly what they should do. **Marks, 17:18-18:15; 49:4-20.**

Now, the Secretary reverses course, saying the FVE is not even within the scope of the Public Disclosure Provision, because the FVE is a *product* of list maintenance and is not itself used *for* list maintenance. The Secretary contends that

the Public Disclosure Provision only covers those documents *actually used* to conduct list maintenance. *See* SOS Brief, p. 22-23 ("The Lists requested by VRF are simply *not used in* the implementation of those programs at all… Here, the issue is simply whether the requested materials *are used in* list maintenance efforts at all.") (emphasis added).

This is wrong and has been directly rejected by courts that address the issue.

The Public Disclosure Provision is not limited to those documents a state actually uses or relies upon in carrying out its list maintenance programs, but encompasses "*all*" documents "*concerning*" list maintenance. This certainly includes the records states actually use, but goes far beyond that, including the results of those list maintenance activities:

> Take, for example, the math equation '2+2=4.' The process by which the output, the number 4, is derived is addition. The inputs are the numbered terms '2' and '2.' The activity is the expression '2+2.' If there were a statute mandating, for the purpose of ensuring the accuracy of the results of math equations, the public disclosure of all records involved in the production of math equations, such a statute would certainly mandate the publication of the final product of '4.' If not, how would one verify that the addition involved in the expression of the equation is functioning correctly? Were only the terms, '2' and '2,' and the activity itself, the addition operator, mandated to be published, and not the result of '4,' there would be no way of knowing whether the activity, the full '2+2' expression, were functioning correctly in each instance. That the Public Disclosure Provision here mandates "all records" be made public "for the purpose of ensuring the accuracy and currency of" the statewide voter registration list similarly must mandate the production of both the activities involved in the list's maintenance and the list itself. Otherwise, the phrase "for the purpose of ensuring

the accuracy and currency" is rendered a nullity, as the accuracy and currency cannot be ensured without the list itself.

*Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 941 (C.D. Ill. 2022).

This Court described the language of the Public Disclosure Provision as "expansive," holding that records contained in SURE—like the FVE—must be disclosed:

> NVRA requires states to disclose "all records" related to any effort by the state to ensure "the accuracy and currency" of voter registration lists. *See* 52 U.S.C. § 20507(i)(1). As we explained in our decision on the Commonwealth's motion to dismiss, "[t]he word 'all' is expansive." (See Doc. 23 at 11 (citing *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 336 (4th Cir. 2012))). Congress intended NVRA's disclosure obligations to reach a broad array of "programs and activities." *See* 52 U.S.C. § 20507(i)(1)[]. The Commonwealth's use of the SURE database to maintain the accuracy and currency of county voting registration lists brings the records held in that database within the universe of disclosable records under NVRA. *See* 52 U.S.C. § 20507(i)(1).

*Pub. Int. Legal Found. v. Chapman*, 595 F. Supp. 3d 296, 306 (M.D. Pa. 2022).[1] In the appeal from that case, the Department of Justice—tasked with enforcing the NVRA—filed an amicus brief expressly disagreeing with the Secretary's interpretation. **VRF Ex. P, DOJ Third Circuit Amicus**.

In fact, every court to examine whether state voter rolls are subject to disclosure has answered affirmatively. *See, e.g., Pub. Int. Legal Found., Inc. v. Bellows,* 92 F.4th 36 (1st Cir. 2024) (Maine voter list available under NVRA); *Pub.*

---

[1] *Chapman* is currently on appeal to the Third Circuit.

*Int. Legal Found., Inc. v. Knapp*, 2024 WL 4792051, Case No. 3:24-cv-1276-JFA, Slip Op. at *9 (D.S.C. September 18, 2024) ("weight of authority surrounding the NVRA supports [the] conclusion" that South Carolina's voter database is an NVRA record)*; Matthews*, 589 F. Supp. 3d at 940 (voter list is "record"). Tellingly, VRF just prevailed under nearly identical facts and theories in New Mexico. *See Voter Reference Foundation, LLC v. Torrez,* 2024 WL 1347204 (D.N.M. March 29, 2024) ("*Torrez*") (New Mexico must make voter data available under NVRA and internet publication ban preempted).

This makes sense. Whether "voter registration rolls" are "accurate and current," 52 U.S.C. § 20501(b)(4), can only be determined by examining records related to all the bases on which a voter's record changes. At the same time, public inspection of records related to those changes—whatever the reason for them—ensures that States are engaging in uniform and nondiscriminatory list-maintenance practices. *See* 52 U.S.C. § 20507(b)(1). Identifying errors in States' voter registration systems promotes a smoother registration process, which is vital to "enhanc[ing]" voter "participation," while also "protect[ing] the integrity of the electoral process" by ensuring that ineligible individuals are excluded from the rolls. *See* 52 U.S.C. § 20501(b)(2)-(3).

The Secretary's focus on the word "implementation" is misplaced. *See* SOS Brief, p. 22 (arguing use of term "implementation" limits scope of disclosure to

records of commencement of list maintenance). Similar to its synonym "regarding," the term "concerning" used "'in a legal context generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters *relating to* that subject.'" *Patel v. Garland*, 596 U.S. 328, 339 (2022) (emphasis added) (quotation omitted). To "implement" means to "carry out" or to "accomplish." *Implement*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/implement (last visited Jan. 6, 2025). Thus, for the Public Disclosure Provision to encompass the FVE, it must relate to the carrying out of Pennsylvania's voter list registration and maintenance activities. It unquestionably does, as addressed above.

The exceptions under (i)(1) do not limit the broad scope of disclosure. *See* SOS Brief, p. 23 (arguing (i)(2) limits broad language of (i)(1)). Section (i)(1) only excludes two types of records from its reach: those that "relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered." 52 U.S.C. § 20507(i)(1). The records VRF requests do not implicate either exception.

Nor do the specific disclosure requirements in section 20507(i)(2) affect the scope of (i)(1). In *Matthews*, the defendants similarly argued that § 20507(i)(2) narrowed the definition of "all records." 589 F.Supp.3d at 941. The court rejected this argument: "the Public Disclosure Provision casts a wide net, mandating 'all

records' be made publicly available. Such expansive language 'sets a floor, not a ceiling.'" *Id.* (*quoting Long*, 682 F.3d at 337) (rejecting same argument).

Given its contents, including voter data and a log of changes made to that data, the FVE is inextricably intertwined with Pennsylvania's list maintenance, and is, in fact, the result of those list maintenance activities. It is *a* "record," and perhaps *the best* record of Pennsylvania's list maintenance programs and activities. It must be disclosed under the NVRA.

### i. The Secretary's focus on cases involving redaction of certain data is misplaced.

Other courts have held that states may redact particularly sensitive personal information contained in records made available under the NVRA. The Secretary takes this to mean that because some sensitive information can be redacted, and redacting is effectively "withholding" information, he can, by extension, withhold the entire voter list. SOS Brief, pp. 25-26.

The cases he cites disagree. Specifically, *Bellows* and *Matthews*, mandated that Maine and Illinois, respectively, make their voter lists available under the NVRA. The "redaction" discussed in those cases was limited. In *Bellows*, that included "uniquely or highly sensitive personal information," with the court citing to cases discussing full birth dates, social security numbers, and personal information of those subject to criminal investigations. 92 F.4th at 56. In *Matthews*, the court suggested that Illinois could redact telephone numbers, Social Security

Numbers, street numbers of home addresses, birthdates, and identifiable portions of email addresses. 589 F. Supp.3d at 944. But neither case suggested that a state could withhold the rest of the data contained in its voter list, including name, political party, vote history, changes to the vote record, etc. And Pennsylvania has not tried to draw a similar distinction by withholding only the most sensitive information. Instead, the Secretary ignores that VRF is not even seeking this "highly sensitive" information, opting to withhold *everything*.

### b.  The Internet Sharing Ban is preempted by the NVRA

Pennsylvania's Internet Sharing Ban—the sole basis for its refusal to provide voter data to VRF—is preempted because it acts as an obstacle to the NVRA's Public Disclosure Provision.

Obstacle preemption is one form of implied preemption under the Supremacy Clause. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (state law preempted when it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"). Notably, no presumption against preemption applies to the NVRA, *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 14 (2013).

The Ban frustrates at least two of the NVRA's main objectives: (i) preserving the integrity of elections; and (ii) maintaining accurate rolls. The Public Disclosure Provision "assist[s] the identification of both error and fraud in the preparation and

maintenance of voter rolls." *Long,* 682 F.3d at 339. Prohibitions on citizen-to-citizen speech sharing voter data, which make it more difficult to identify error and fraud, directly contradict and create improper obstacles to Congress's stated objectives.

The only two cases to consider whether a state can prohibit the online publication of its voter list both held such prohibitions are preempted by the NVRA. *See Bellows,* 92 F.4th 36 (1st Cir. 2024); *Torrez,* 2024 WL 1347204 (D.N.M. March 29, 2024). Consistent with VRF's position here, the Department of Justice filed an amicus brief in the *Bellows* case supporting the plaintiff's position that Maine's voter list must be made available and that attempts to ban its online publication were preempted. **VRF Ex. Q, DOJ First Circuit Amicus**.

VRF is unaware of any authority to the contrary.

Discussing the Public Disclosure Provision, the First Circuit noted:

Such a provision evinces Congress's belief that public inspection, and thus public release, of Voter File data is necessary to accomplish the objectives behind the NVRA. Indeed, the analysis and subsequent dissemination of Voter File data to the public is necessary if members of the public, or organizations such as PILF, are ever to identify, address, and fix irregularities in states' voter rolls by exercising their private right of action under the NVRA.

*Bellows,* 92 F.4th at 54. The First Circuit rejected the argument—echoed by the Secretary here—that the ban furthered the NVRA's purpose of maximizing voter participation by protecting privacy: "even if the Publication Ban does further the NVRA's objective of enhancing the participation of eligible citizens as voters, it

nonetheless creates an obstacle to the accomplishment and execution of the full purposes and objectives of Congress as stated in 52 U.S.C. § 20501(b)(1)-(4)." *Id.* at 55. Congress already weighed the privacy risks posed by public disclosure against the interest favoring the same, with other federal laws protecting voters' privacy interests. *Id.*; *see also Torrez* 2024 WL 1347204 at *144 (agreeing with *Bellows* and noting New Mexico's "[b]an largely deprives individuals and entities of the ability to engage with disclosed records in such a way that facilitates identification of voter registration-related irregularities and thereby severely limits the extent to which the Public Inspection Provision can contribute meaningfully to furthering the NVRA's objectives.").

Pennsylvania's Internet Sharing Ban is no different. It directly undermines the principles of public disclosure and scrutiny essential to the NVRA. Prohibiting the sharing of voter data online is antithetical to the NVRA's purposes, stands as an obstacle to its objectives, and is preempted.

**III.    The Secretary is not entitled to summary judgment on Counts II and III because he twice refused to produce the FVE to VRF unless it agreed to the preempted Internet Sharing Ban**

As addressed above, the Public Disclosure Provision requires states to make their voter lists publicly available, including Pennsylvania's FVE. *See* Section II(a), *supra*. VRF made two requests for Pennsylvania voter data, including the FVE. **SOS Exs. N, Q.** The Secretary refused to fulfill those requests, twice hiding behind the

Internet Sharing Ban, and twice violating the NVRA. He is not entitled to summary judgment ratifying his unlawful acts.

### a. The Secretary unlawfully denied VRF's March 7, 2022 Request

On March 7, 2022, VRF requested the FVE. **SOS Ex. N**. The Department denied VRF's request stating the records "are only available upon completion of an affirmation that the information will only be used for purposes relating to elections, political activities, and law enforcement…". **SOS Ex. O.** But VRF's March 7th Request met that requirement: it included an affirmation agreeing to the various conditions outlined on the Department's website. **SOS Ex. N.** It only omitted the agreement that the information would not be posted on the Internet. *Id.* Thus, at the time it denied VRF's request, the Department had the very affirmation whose absence it cited to deny access. *Id.*

The Department next claimed VRF "violated the voter registration law and the Department's regulations by publishing the information obtained on the Internet, namely, [its] website," and stated that "[a]s a result of those actions, your request for voter registration information is denied." **SOS Ex. O.** The letter did not cite VRF's refusal to agree to the Internet Sharing Ban as a reason for denial. *Id.* On November 2, 2023, VRF sent the Secretary a notice under 52 U.S.C. § 20510(b) informing him that his refusal to fulfill the March 7th request violated the NVRA. **SOS Ex. P.**

The Secretary argues that this request was not "an NVRA request" because it did not invoke any magic words referencing the NVRA. SOS Brief, p. 31. The Public Disclosure Provision does not require a requestor to use any magic words to remind a state election official of his duties. Rather, the obligation to produce is triggered by a request for records covered by the Public Disclosure Provision. In fact, the only notice contemplated by the NVRA is the notice from the aggrieved party to the state official identifying the alleged violation. 52 U.S.C. § 20510(b). Thus, even if the Secretary could feign ignorance before, he knew at least as early as November 2, 2023, that VRF intended its request to be made under the NVRA. **SOS Ex. P**. The Secretary refused to correct his violation in the 90 days given him by the NVRA.

The FVE must be made available under the NVRA, *see* Section II(a), *supra*, and the Internet Sharing Ban, the sole basis for denying VRF's request, is preempted. *See* Section II(b), *supra*. The Secretary had no lawful reason to deny VRF's March 7 request, and doing so violated the NVRA, 52 U.S.C. § 20507(i).

### b.  The Secretary unlawfully denied VRF's November 2, 2023 Request

On November 2, 2023, VRF sent the Secretary a second NVRA request. **SOS Ex. Q.** Like the prior request, VRF affirmed the data would be used only for permissible purposes, but did not agree to refrain from posting the data online. ***Id.*** The Secretary "granted" the request "on the condition that VRF completes the affirmation required for obtaining this data pursuant to Pennsylvania law,"

effectively denying the request. **SOS Ex. R.** VRF sent the Secretary notice under 52 U.S.C. § 20510(b) that his denial of the November 2nd request violated the NVRA. **SOS Ex. S.**

The requested data, including the FVE, must be made available under the NVRA, *see* Section II(a), *supra*, and the Internet Sharing Ban, the sole basis for denying VRF's request, is preempted. *See* Section II(b), *supra*. The Secretary had no lawful reason to deny VRF's request. The November 2023 denial violated the NVRA, 52 U.S.C. § 20507(i).

## IV. The Secretary is not entitled to judgment on Count IV because the Ban violates the First Amendment

### a. The Ban restricts First Amendment-protected speech.

The Secretary claims victory on VRF's First Amendment claims because he does not believe the First Amendment gives VRF access to Pennsylvania voter data. SOS Brief, p. 33. But VRF does not claim, and need not demonstrate, a right of *access* under the First Amendment to prevail on its speech claims because, as established above, the NVRA requires the lists be made available.

The First Amendment curtails a state's ability to prohibit the publication of lawfully obtained information, or even information unlawfully obtained through a third party. *See Smith v. Daily Mail Pub. Co.*, 443 U.S. 97 (1979) (invalidating state statute imposing criminal sanctions for publishing juvenile offender's name because "[o]ur recent decisions demonstrate that state action to punish the publication of

truthful information seldom can satisfy constitutional standards."); *Bartnicki v. Vopper*, 532 U.S. 514 (2001) (reasoning that publication of unlawfully intercepted phone call was protected speech because "[i]n these cases, privacy concerns give way when balanced against the interest in publishing matters of public importance ... One of the costs associated with participating in public affairs is an attendant loss of privacy."). Thus, this *is* closer to the cases "in which the government is prohibiting a speaker from conveying information that the speaker already possesses," *L.A. Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 43–44 (1999), or, at least, information it should have if the Secretary complied with federal law. But using that intended speech as a workaround to refuse to provide the information to VRF, then arguing that VRF has no rights because it was denied access to that information, is a perverse loophole allowing the Secretary to silence potential critics.

The Secretary contends that VRF's proposed speech is not protected, because "core political speech" must involve "interactive communication concerning political change." SOS Brief, p. 34 (*citing Mazo v. New Jersey Secy of State*, 54 F. 4th 124, 142 (3d Cir. 2022) (quotation omitted). It's hard to imagine what speech could more aptly fit this description than a non-profit organization making data transparent so that citizens can review it, discuss it, and petition their state officials to make changes, if necessary. *See Meyer v. Grant,* 486 U.S. 414, 421 (1988) (efforts

to seek "political change," even if it does not involve overtly persuading a citizen that one's views are correct, is core political speech).

"The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quotation omitted). Speech about and including voter data is protected. As noted by the Fourth Circuit:

> First, the List is closely tied to political speech, which generally receives the strongest First Amendment protection… the List is a valuable tool for political speech… And, in addition to the List's obvious practical utility to political expression, § 3-506 all but ensures that the List will be used to further such speech. More specifically, § 3-506(c) makes it a misdemeanor to use the list 'for any purpose not related to the electoral process.' Thus, the text of § 3-506 reinforces the connection between the List and political speech. In these circumstances, we are obliged to hesitate before placing such a regulation beyond judicial scrutiny…

*Fusaro v. Cogan*, 930 F.3d 241, 250 (4th Cir. 2019) (citations omitted).

Pennsylvania routinely makes voter data available to political parties and campaigns for inherently political means and even conditions access to the voter data on the data being used for election and election campaign purposes—necessarily political objectives. 4 Pa. Code §§ 183.13, 183.14. Further, Pennsylvania makes voter data available to companies who then sell that data to ideologically aligned clients. **Marks, 93:6-20; 92:8-15; 99:17-100:13.** For this reason, and as discussed above, the Secretary's straw man argument—that the Ban actually *protects* core political speech by advancing voter privacy—is misleading because the same data

24

can be obtained directly from the Secretary and shared in any number of ways, including mail, email, and password protected websites.

The Secretary's unreasonably narrow characterization of VRF's planned speech as "sharing personal data," p. 35, completely ignores the context of what VRF is trying to accomplish, context the Secretary elsewhere acknowledges. SOS Brief, p. 11. Because voter data and speech about it cannot be divorced from its wholly political nature, it is protected by the First Amendment.

### b. The Ban must, but cannot, withstand strict scrutiny

Speech sharing voter data, particularly when used in the manner contemplated by VRF, sits at the zenith of First Amendment protection. Yet the Internet Sharing Ban makes it more difficult, more expensive, and essentially impossible for VRF to disseminate meaningful information regarding Pennsylvania's elections, including the Commonwealth's efforts and success in maintaining accurate and up-to-date voter rolls. Because the Ban directly restricts constitutionally protected, core political speech, it cannot stand unless it survives strict scrutiny.

> Laws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest…Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints.

*Citizens United v. FEC*, 558 U.S. 310, 340-41 (2010) (internal quotations and citations omitted). *See also Meyer*, 486 U.S. at 425 (where state imposes a

substantial burden on core political speech, scrutiny is "well nigh insurmountable").

The Secretary must demonstrate that the Ban furthers a compelling state interest and

is narrowly tailored. *See Republican Party of Minnesota v. White*, 536 U.S. 765,

774–75 (2002).

An interest is compelling only if it addresses an actual problem—"[m]ere

speculation of harm does not constitute a compelling state interest." *Consol. Edison

Co. of New York, Inc. v. Pub. Serv. Comm'n of New York,* 447 U.S. 530, 543

(1980); *see also Turner Broadcasting Sys., Inc. v. FCC,* 512 U.S. 622, 644 (1994)

(plurality) ("[The government] must demonstrate that the recited harms are real, not

merely conjectural, and that the regulation will in fact alleviate these harms in a

direct and material way."). The Secretary has not, and cannot, meet his burden.

The Secretary asserts one potential interest: voter privacy. But in crafting the

Public Disclosure Provision, Congress clearly established a policy favoring

transparency, even at the expense of privacy:

> We do not think appellants' privacy concerns unfounded. By requiring
> public disclosure of personal information,[] Section 8(i)(1) may
> conceivably inhibit voter registration in some instances. However, this
> potential shortcoming must be balanced against the many benefits of
> public disclosure. It is self-evident that disclosure will assist the
> identification of both error and fraud in the preparation and
> maintenance of voter rolls. State officials labor under a duty of
> accountability to the public in ensuring that voter lists include eligible
> voters and exclude ineligible ones in the most accurate manner possible.
> Without such transparency, public confidence in the essential workings
> of democracy will suffer.

*Long*, 682 F.3d at 339-40 (footnote omitted).

Not only has Congress already resolved the policy debate in favor of transparency, but the Secretary cannot present any concrete evidence that VRF's past posting of voter data or, by extension, its plans to post voter data in the future, have caused any tangible harm to voters' privacy. *See* pp. 5-6, *supra* (discussing Secretary's lack of evidence of misuse of data). Additionally, VRF takes substantial steps to protect the data it posts, including requiring agreement with the site's terms of service, **Swoboda, 40:17-41:8**, blocking IP addresses from certain geographic regions, ***id.*, 46:25-47:14**, and preventing data scraping, ***id.*, 94:12-19; 96:15-19**

Even if voter privacy was a compelling interest, the Ban would "fail as hopelessly underinclusive," *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 171 (2015), because the Secretary admits that a requestor could obtain the same data and mail it, **Marks, 98:7-100:13; 104:7-14**, or email it, ***id.*, 93:7-98:5; 105:15-107:9**, to everyone in the state, or even post it on a website so long as a login is required. ***Id.*, 94:1-95:5**.

The Internet Sharing Ban also fails strict scrutiny because the Secretary has not established that it is narrowly tailored. In fact, the Secretary does not contend the Ban is tailored at all. Narrow tailoring requires using the "least restrictive means among available, effective alternatives." *Camp Hill Borough Republican Ass'n v. Borough of Camp Hill*, 101 F.4th 266, 271 (3d Cir. 2024). "The government may

27

attempt to suppress speech not only because it disagrees with the message being expressed, but also for mere convenience. Where certain speech is associated with particular problems, silencing the speech is sometimes the path of least resistance. But by demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily sacrificing speech for efficiency.'" *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (internal citations and quotations omitted).

The Internet Sharing Ban is not narrowly tailored because Pennsylvania and federal law already protect voter privacy, where necessary, and the Ban is not the least restrictive means of doing so. Pennsylvania has two different protected voter programs voters may utilize to protect the privacy of their information, **Marks, 72:10-73:2**, and VRF does not post data for protected voters. **Swoboda, 24:24-25:4; 27:7-10; 94:12-19**. Pennsylvania could expand those programs if it is concerned about voter privacy. Relatedly, Pennsylvania laws prohibiting harassment, stalking, and election interference address concerns regarding misusing the data. *See* 18 Pa.C.S. § 2709 (criminalizing harassment); 18 Pa. C.S. § 2709.1 (stalking); 25 Pa. C.S. § 3527 (election interference). And federal protections exist to maintain the privacy of sensitive data, when necessary. *See, e.g.*, Privacy Act, 5 U.S.C. § 552a, *et seq.*; Drivers Privacy Protection Act, 18 U.S.C. § 2721, *et seq.* Pennsylvania has

done nothing to show that these more narrowly-tailored protections are ineffective to address its privacy concerns.

For the reasons stated above and herein, the Internet Sharing Ban violates VRF's First Amendment rights and cannot survive strict scrutiny:

> The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind. . . . In this field, every person must be his own watchman for truth, because the forefathers did not trust any government to separate the true from the false for us."

*Thomas v. Collins*, 323 U.S. 516, 545 (1945) (Jackson, J. concurring).

### c. The Court should not apply *Anderson-Burdick*, but if it does, the Ban still fails to pass muster.

The Secretary insists that VRF's speech is not important enough to justify the application of strict scrutiny, and the Court should instead judge the Internet Sharing Ban under the *Anderson-Burdick* framework.

In *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992), the Supreme Court created a standard in which First Amendment challenges to state election laws are subjected to a balancing test which weighs the burdens placed upon the plaintiff's rights against the state's regulatory interests in upholding the regulation. Severe burdens are subject to strict scrutiny, while minimal burdens may be upheld if they are reasonable and nondiscriminatory.

However, "[t]he fact that an election law burdens a fundamental right is necessary but not sufficient to trigger *Anderson-Burdick*; the law also must regulate

'the mechanics of the electoral process.'" *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995). The Internet Sharing Ban does not regulate the mechanics of the electoral process: *how, where, or when* people vote. It does not regulate who votes, or even how voter records are compiled. Nor does it regulate how voter list maintenance is performed—far removed from the mechanics of the electoral process. Rather, the Ban prohibits activity in a completely different realm: (a) *pure speech* regarding (b) *how officials keep records* of (c) *how people voted* (d) when *they voted in the past*. *Anderson-Burdick* is wholly inapplicable. Strict scrutiny applies.

Even if the Court applied *Anderson-Burdick*, the burden on VRF's (and others') First Amendment rights is severe. The Internet Sharing Ban is a wholesale prohibition on the most common, cheap, and effective communication tool in the modern era: the Internet. To entirely foreclose speech via this medium is a severe burden regardless of the topic, but especially so when the speech being banned specifically relates to evaluating a government function, and petitioning that government if errors are identified.

VRF—and citizens wishing to associate with it—cannot engage in this speech, and cannot advance its mission, because of the Ban. Instead, each concerned citizen must operate individually without sharing information, preventing them from effectively combining their knowledge, experience, and analysis to effect change.

Because the burden is severe, even *Anderson-Burdick* leads to the application of strict scrutiny. And for the reasons stated above, the Ban cannot stand.

## V.    The Secretary is not entitled to judgment on Count V because the Ban's overbreadth prohibits all online speech involving voter data

The Parties agree that the Internet Sharing Ban prohibits the sharing of any voter data on the Internet, at least in the manner VRF proposes. The Ban stands at odds with the NVRA, which deliberately prioritizes the Public Disclosure Provision and the transparency it brings. The Ban instead prevents citizens from analyzing— and perhaps criticizing—the maintenance of Pennsylvania voter rolls. In doing so, the Ban prohibits substantially more protected speech than is necessary to advance any compelling government interest. For this reason, the Ban is overbroad and cannot stand.

The concern that an overbroad statute deters protected speech is especially strong where, as here, the statute imposes criminal sanctions. *See Virginia v. Hicks*, 539 U.S. 113, 119 (2003). Criminal sanctions may cause speakers, like VRF, to remain silent rather than communicate even arguably unlawful words, ideas, and images. *See, e.g.*, *Dombrowski v. Pfister*, 380 U.S. 479, 494 (1965).

"The first step in overbreadth analysis is to construe the challenged statute." *United States v. Williams*, 553 U.S. 285, 293 (2008). The Parties agree the Ban prohibits the publication of voter data on the Internet, regardless of whether the publication is for an otherwise permissible purpose. **Marks, 64:17-65:3**.

Second, the Court must consider whether the Internet Sharing Ban proscribes "a substantial amount of protected expressive activity" judged relative to any plainly legitimate purpose served by the Ban. *Williams*, 553 U.S. at 297. The Ban is an absolute prohibition on the online sharing of voter data between a requester and any other person, regardless of whether the sharing is for an otherwise permissible governmental or election related purpose. Given its direct conflict with federal statutory and constitutional law, the Ban has no valid applications to weigh against its invalid applications.

The Secretary defends the Ban, saying it must stand because it applies equally to everyone. SOS Brief, p. 39. But a speech silencing regulation is not saved merely because it equally suppresses all voices, particularly when the speech being suppressed is directed at evaluating the performance of state officials in protecting the right to vote.

To the contrary, a complete ban on online speech that shares voter data, even if that sharing is done to evaluate and critique whether a state official is fulfilling a vital government function, is far broader than any legitimate sweep of a statute dedicated to protecting voter privacy, or prohibiting commercial and nefarious uses. For one, the Ban does not actually advance voter privacy. The Secretary concedes that the same data can be sold to third parties, **Marks, 92:8-15; 94:1-11**, emailed or mailed to anyone at will, ***id.*, 93:7-98:5; 105:15-107:9; 98:7-100:13; 104:7-14**, or

published on a website so long as it is password protected. ***Id.*, 94:1-95:5**. If privacy was the goal, why limit the restriction only to the dissemination of this information on the Internet, while allowing it to freely flow through other means?

Additionally, the Secretary admits that he does not monitor how requestors use the data once they have it. **Marks, 139:5-11**. If the Secretary was concerned about how requestors use data and ensuring that it was not used for improper purposes, he could take steps to monitor use, rather than making the easiest, cheapest, and most effective means of disseminating the information unlawful.

The Ban's overbreadth has caused VRF and others like it to refrain from engaging in protected speech critical of the Secretary out of fear of prosecution. The Secretary fails to demonstrate that the Ban actually accomplishes what he says it does (i.e., protecting voter privacy) or that less severe means could not be used to protect those interests.

For all these reasons, the Secretary is not entitled to summary judgment on VRF's overbreadth claim.

## <u>CONCLUSION & REQUESTED RELIEF</u>

The Secretary overstates his factual support and ignores substantial evidence undermining his arguments. Even if the facts were as he wished, he is wrong on the law, particularly his blatant misreading of the NVRA's Public Disclosure Provision. For these reasons, the Secretary has not demonstrated entitlement to judgment in his

favor, and VRF respectfully requests the Court deny his Motion while granting VRF's own Motion.

Further, VRF respectfully requests oral arguments on the Parties' cross-motions for summary judgment pursuant to Local Rule 7.9.

Respectfully submitted this 10th day of January, 2025.

**GRAVES GARRETT GREIM LLC**
*/s/ Edward D. Greim*
Edward D. Greim (MO 54034)*
Matthew R. Mueller (MO 70263)*
Jackson C. Tyler (MO 73115)*
* Admitted *Pro Hac Vice*
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
edgreim@gravesgarrett.com
mmueller@gravesgarrett.com
jtyler@gravesgarrett.com

**BECKLEY & MADDEN, LLC**
Charles O. Beckley, II (PA 47564)
212 North Third Street, Suite 301
Harrisburg, PA 17101
Tel: (717) 233-7691
cbeckley@pa.net

*Attorneys for Plaintiff*
*Voter Reference Foundation, LLC*

**<u>CERTIFICATE OF WORD COUNT</u>**

Pursuant to the Court's order dated October 28, 2024 (ECF 33), "[t]he Parties may file supporting and opposing briefs not to exceed 8,000 words, exclusive of any statement of uncontroverted facts or response to the other party's statement of uncontroverted facts." I certify that this brief contains 7,992 words as calculated by the word count feature of Microsoft Word, which was used to prepare this brief.

*/s/ Edward D. Greim*
Attorney for Plaintiff

**<u>CERTIFICATE OF SERVICE</u>**

I certify that, on January 10, 2024, I filed the above document with the Court's CM/ECF system. Service will be accomplished on all counsel of record through the CM/ECF system.

*/s/ Edward D. Greim*
Attorney for Plaintiff