**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| VOTER REFERENCE FOUNDATION, LLC, | |
| Plaintiff, | |
| v. | No. 1:24-cv-294 |
| | Judge Christopher C. Conner |
| ALBERT SCHMIDT, in his official capacity as Secretary of the Commonwealth, | |
| Defendant. | |

**BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT**

Amelia J. Goodrich (PA 327192)
Deputy Attorney General
Office of Attorney General
1251 Waterfront Place
Mezzanine Level
Pittsburgh, PA 15222

Erich T. Greiner (PA 331601)
Deputy Attorney General
Office of Attorney General
15th Floor, Strawberry Square
Harrisburg, PA 17120

Michael J. Fischer (PA 322311)
Executive Deputy General Counsel
333 Market Street, 17th Floor
Harrisburg, PA 17101
(717) 831-2847
mjfischer@pa.gov

Kathleen A. Mullen (PA 84604)
Ian B. Everhart (PA 318947)
Pennsylvania Department of State
306 North Office Bldg.
401 North Street
Harrisburg, PA 17120

*Counsel for Defendant Al Schmidt*

# TABLE OF CONTENTS

Table of Authorities..................................................................................ii

Statement of Facts ..................................................................................3

    I.     The National Voter Registration Act......................................3

    II.    Voter Registration and List Maintenance in
          Pennsylvania ...................................................................6

    III.   Voter Lists ..........................................................................8

    IV.   Plaintiff Voter Reference Foundation...................................10

Procedural History ..................................................................................14

Questions Presented.................................................................................17

Summary of Argument.............................................................................17

Argument..................................................................................................18

    I.     The Internet Restriction Is Not Preempted by the
          NVRA...............................................................................18

         A.    The Voter Lists Are Not Within the Scope of the
              NVRA's Disclosure Provision.....................................19

         B.    The Internet Restriction Does Not Conflict with
              the NVRA .................................................................22

    II.    The Secretary's 2022 and 2023 Responses Did Not
          Violate the NVRA.............................................................29

    III.   Protecting Voter Privacy Does Not Violate the First
          Amendment .......................................................................31

         A.    Pennsylvania Does Not Restrict Core Political
              Speech.......................................................................31

         B.    There Is No Right of Access to Information in
              the Government's Possession.....................................34

         C.    The Internet Restriction Is Justified by
              Pennsylvania's Interest in Protecting Its
              Electoral Process.......................................................35

         D.    The Internet Restriction Is Not Overbroad.................39

    IV.   VRF Is Not Entitled to an Injunction .................................40

Conclusion ...............................................................................................42

# TABLE OF AUTHORITIES

**Cases**

*Ariz. v. Inter Tribal Council of Ariz., Inc.,* 570 U.S. 1 (2013) ….……... 23

*Buckley v. American Constitutional Law Foundation, Inc.,*
525 U.S. 182 (1999) ......................................................................... 32, 33

*City Council of L.A. v. Taxpayers for Vincent,* 466 U.S. 789 (1984) ....... 39

*City of Chicago v. Morales,* 527 U.S. 41 (1999) ...................................... 39

*Dakotans for Health v. Noem,* 52 F.4th 381 (8th Cir. 2022) ................. 33

*Democratic Nat. Comm. v. Republican Nat. Comm.,*
673 F.3d 192 (3d Cir. 2012) ................................................................ 3

*eBay Inc. v. MercExchange, LLC,* 547 U.S. 388 (2006) ….……….……… 40

*Free Speech Coal., Inc. v. Att'y Gen. of U.S.,* 677 F.3d 519
(3d Cir. 2012) ..................................................................................... 39

*Fusaro v. Cogan,* 930 F.3d 241, (4th Cir. 2019) ….…….…….…….. 33, 34

*Fusaro v. Howard,* 19 F.4th 357 (4th Cir. 2021) ........................ 33, 34, 35

*Hewlette-Bullard on behalf of J.H-B. v. Pocono Mtn. Sch.
Dist.,* 522 F. Supp. 3d 78 (M.D. Pa. 2021) .......................................... 39

*Houchins v. KQED, Inc.,* 438 U.S. 1 (1978) ........................................... 34

*L.A. Police Dep't v. United Reporting Pub. Corp.,* 528 U.S. 32
(1999) .................................................................................................. 34

*Lebanon Farms Disposal, Inc. v. Cnty. of Lebanon,*
No. 1:CV-03-0682, 2004 WL 7338460 (M.D. Pa. July 9, 2004) .......... 19

*Macchione v. Coordinator Adm'r in Washington, D.C.,* 591 F. Appx. 48
(3d Cir. 2014) ……………………………………………….……….. 40-41

*Mazo v. N.J. Sec'y of State,* 54 F.4th 124 (3d Cir. 2022) .................. 33, 36

*NAACP v. Alabama*, 357 U.S. 449 (1958) ...............................................33

*Pa. State Educ. Ass'n v. Commw. Dep't of Cmty. & Econ. Dev.*, 148 A.3d 142 (Pa. 2016) ......................................37

*Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320 (N.D. Ga. 2016) ...................................................................28

*Pub. Int. Legal Found. v. Bellows*, 92 F.4th 36 (1st Cir. 2024 ...................................................................... 23

*Pub. Int. Legal Found. v. Chapman*, 595 F. Supp. 3d 296 (M.D. Pa. 2022) ............................................................. 21

*Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257 (4th Cir. 2021) ......................................28

*Swoboda v. Pa. Dep't of State*, 304 A.3d 105 (Pa. Cmwlth. 2023) ............................... 16, 29

*Swoboda v. Pa. Dep't of State*, No. AP 2022-1069R (Pa. Open Records July 15, 2022) ................. 16, 29

*TD Bank N.A. v. Hill*, 928 F.3d 259 (3d Cir. 2019) ........................... 40

*True the Vote v. Hosemann*, 43 F. Supp. 3d 693 (S.D. Miss. 2014) ...............................28

*United States v. Williams*, 553 U.S. 285 (2008) ..................................................39

*Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323 (2011) ............ 24

**Constitutional Provisions**

U.S. Const. art. I, § 4, cl. 1 .......................................... 26

**Statutes**

25 Pa.C.S. § 1201 .........................................................7

iii

25 Pa.C.S. § 1222 .............................................................................7

25 Pa.C.S. § 1328 .............................................................................7

25 Pa.C.S. § 1403 ..........................................................................8, 9

25 Pa.C.S. § 1404 .....................................................................8, 9, 10

25 Pa.C.S. § 1901 ...........................................................................27

52 U.S.C. § 20501 .........................................................................4, 25

52 U.S.C. § 20504 .............................................................................5

52 U.S.C. § 20505 .............................................................................5

52 U.S.C. § 20506 .............................................................................5

52 U.S.C. § 20507 ........................................................................ *passim*

52 U.S.C. § 20508 .............................................................................5

65 P.S. § 67.101 ...............................................................................15

65 P.S. § 67.3101.1 .........................................................................29

National Voter Registration Act of 1993, P.L. No. 103–31 ......................4

## Regulations

4 Pa. Code § 184.13 .........................................................................10

4 Pa. Code § 184.14 .........................................................................10

## Rules

Fed. R. Civ. P. 56 ............................................................................ 18

## BRIEF IN OPPOSITION TO PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT

Pennsylvania makes voter lists available to individuals and organizations who request them, provided they agree to modest limitations on their use. Among those is a requirement that personal information about voters cannot be published on the internet. Plaintiff VRF, however, refuses to comply with the requirement because it seeks to post that data on its publicly available website, purportedly for the purpose of allowing users of its site to review the data, identify errors, and contact election officials to correct those errors.

The record in this case shows that VRF's justification for refusing to comply with this modest requirement rings hollow. There is no evidence that individuals access VRF's website to identify errors in state voter rolls and report them to election officials. In fact, VRF has not identified a single instance in which a user of its website was able to correct an error in a state's records, and it concedes it makes no effort to track whether individuals who access its website attempt to do so. Given that such activities are "the very reason for its existence," VRF Br. at 31, its apathy in this regard is surprising.

On the other hand, the record does establish that voters who find out that VRF has posted their personal information on the internet can feel threatened and vulnerable, and often complain to VRF. Such complaints are so routine that VRF has prepared a variety of form responses to them. Yet VRF refuses to remove voters' personal information, except under certain narrow circumstances. The result is that some citizens decide that protecting their privacy requires choosing not to participate in the electoral process.

Neither the National Voter Registration Act nor the First Amendment requires citizens to surrender their privacy to participate in the electoral process. While the NVRA requires states to make available for "inspection" and "photocopying" records relating to "programs and activities" they conduct for the purpose of keeping voter information current, it does not reach the information requested here—a file containing personal information of virtually every Pennsylvania voter. And it does not prohibit states from imposing modest rules governing the use of the information they make available. It strains credulity to suggest that Congress, in enacting the NVRA more than thirty years ago, sought to

mandate that the personal information of every voter be made widely available on the then-nascent internet.

Likewise, the First Amendment is not implicated by a rule requiring individuals who wish to obtain sensitive information from the government to agree not to broadcast it on the internet. To the contrary, allowing personal voter information to be widely shared on the internet would undercut the First Amendment by chilling the rights of all Pennsylvania voters.

The Department's modest requirement that those who obtain personal information about Pennsylvania voters agree not to publish such information on the internet violates neither the First Amendment nor the NVRA. VRF's claims to the contrary fail, and its motion for summary judgment should be denied in its entirety.

## STATEMENT OF FACTS

### I. The National Voter Registration Act

Congress enacted the National Voter Registration Act—commonly referred to as the NVRA or the Motor Voter Law, *see Democratic Nat. Comm. v. Republican Nat. Comm.*, 673 F.3d 192, 199 (3d Cir. 2012)—in

1993, for the primary purpose of reducing barriers to voter registration.[1] The law found that "it is the duty of the Federal, State and local governments to promote the exercise of" the fundamental right to vote, but that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation … and disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. § 20501(a).

The stated purposes of the law included "establish[ing] procedures [to] increase the number of eligible citizens who register to vote" and enabling governments to "enhance[] the participation of eligible citizens as voters in elections." *Id.* § 20501(b)(1) & (2). The Act further sought to "protect the integrity of the electoral process" and "ensure that accurate and current voter registration rolls are maintained." *Id.* § 20501(b)(3) & (4).

In furtherance of these goals, the NVRA mandated certain procedures to facilitate voter registration. Most notably, it required states to implement processes so that applications for driver's licenses also served

---

[1] National Voter Registration Act of 1993, P.L. No. 103–31, 107 Stat. 77.

as voter registration applications, unless the applicant chose not to register. *Id.* § 20504. It further designated certain state agencies as "voter registration agencies," which were required to take steps to facilitate voter registration, and it mandated that all states accept a standard federal registration application. *Id.* §§ 20505(a)(1), 20506 & 20508(a)(2).

The NVRA directed each state to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters" due to "the death of the registrant" or "a change in the residence of the registrant." *Id.* § 20507(a)(4). It required that such programs—as well as any other program conducted to ensure that the state's rolls were accurate and up-to-date—be conducted in a manner that is "uniform, nondiscriminatory, and in compliance with the Voting Rights Act," and that they "shall not result in the removal of the name of any person … by reason of the person's failure to vote" unless the state followed certain procedures set forth in the Act. *Id.* § 20507(b). Specifically, states were prohibited from removing a voter based on an apparent change in residence unless the voter either confirmed the move or, after not responding to a notification from the state, failed to vote

5

during a period encompassing two consecutive federal elections. *Id.* § 20507(b)(2), (d).

Finally, the NVRA included a provision that required states to "maintain for at least two years" and "make available for public inspection and … photocopying … all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i). Such materials were required to include information identifying registered voters who had received the notifications mailed by states to determine whether the voter had moved under § 20507(d), as well as materials showing whether each recipient had responded to the notification. *Id.* § 20507(i)(2). Specifically excluded from the obligation were records "to the extent [they] relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered." *Id.* § 20507(i)(1).

## II. Voter Registration and List Maintenance in Pennsylvania

In Pennsylvania, elections are primarily run by county officials. Among other responsibilities, counties are required to receive and process

registration applications. 25 Pa.C.S. § 1328. Every voter in Pennsylvania must be registered to vote in any election.

The Department of State performs certain tasks relating to elections and supports the counties in their efforts. For instance, the Department implements and administers a statewide uniform registry of electors ("SURE"). 25 Pa. Cons. Stat. §§ 1201, 1222. By law, SURE must be "a single, uniform integrated computer system" that "[c]ontain[s] a database of all registered electors." *Id.* § 1222(c)(1). Counties must be able to access SURE so that they can "add, modify and delete information in the system as is necessary and appropriate." *Id.* § 1222(c)(4).

Counties, with the assistance of the Department, are also required to perform certain "list maintenance" activities in order to ensure that their voter rolls are accurate and up to date, and to comply with the mandates of the NVRA and other applicable laws. *See* S.F. ¶¶ 5–7.[2] Among such efforts, counties are required to take steps to identify voters who have moved or have died. S.F. ¶ 7. Likewise, counties seek to identify

[2] "S.F." refers to the Secretary's Statement of Undisputed Material Facts, submitted with the Secretary's motion for summary judgment, ECF No. 38 (Dec. 6, 2024). Exhibit references refer to the exhibits filed with that Statement.

duplicate registrations. S.F. ¶ 7. In conducting these activities, counties must comply with the requirements of the NVRA—such as the restriction on when a voter can be removed from the rolls for having moved, *see supra*—as well as applicable state law requirements.

The Department assists the counties in their list-maintenance efforts in several ways. It provides them with instructional materials, referred to as "job aids," that give the counties guidance as to how they should conduct list maintenance. S.F. ¶ 7; Exh. C. The Department also uploads information into SURE that helps counties identify records that may require updating. S.F. ¶ 7. The uploaded materials identify voters who may have moved (either in-state or out-of-state) as well as potential duplicate registrations. S.F. ¶ 7. And the Department also serves as a conduit for other information, such as information provided by the Department of Health on deceased voters. S.F. ¶ 7.

## III. Voter Lists

Pennsylvania's voter registration law also requires the counties and the Department to make available lists of registered voters, referred to as "street lists" and "public information lists." 25 Pa. C.S. §§ 1403, 1404. The Department complies with its obligations in part by providing access

to a dataset referred to as the full voter export list ("FVE"). S.F. ¶ 10. The FVE consists of records of all voters by county and contains the following fields: voter ID number, name, sex, date of birth, date registered, status (i.e., active or inactive), date status last changed, party, residential address, mailing address, polling place, date last voted, all districts in which the voter votes (i.e., congressional, legislative, school district, etc.), voter history, and the date the voter's record was last changed. S.F. ¶ 10.[3]

By law, the Secretary is empowered to "promulgate reasonable regulations governing access to" public information lists. 25 Pa. C.S. § 1404(b)(1).[4] In addition, access to public information lists is subject to certain limitations, including that "[n]o individual who inspects the list may use information contained in the list for purposes unrelated to elections, political activities or law enforcement." *Id.* § 1404(b)(3). In furtherance of this requirement, anyone requesting the list must provide identification and "must state in writing that any information obtained from

---

[3] The lists made available by the Department and counties are collectively referred to as the "voter lists."

[4] The requirements for street lists are set forth at 25 Pa.C.S. § 1403(b).

the list will not be used for purposes unrelated to elections, political activities or law enforcement." *Id.*

In accordance with the grant of authority to the Secretary, the Department has issued regulations governing access to the lists. *See* 4 Pa. Code §§ 184.13 & 184.14. The regulations incorporate certain statutory restrictions, such as the NVRA's prohibition on identifying the registration agency through which a voter registered. *Id.* § 184.14(c)(2). They further set forth procedures by which certain categories of voters, including law enforcement officials and individuals who have protection from abuse orders, can request county registration commissions to protect the confidentiality of their home addresses. *Id.* § 183.14(4) & (5).

Finally, the regulations prohibit public information lists from being published on the internet. S.F. ¶ 11; 4 Pa. Code § 183.14(k); *see also id.* § 183.13. The Department therefore requires that anyone requesting the list must further affirm they will not publish it on the internet. S.F. ¶ 12.

## IV. Plaintiff Voter Reference Foundation

VRF operates a website, VoteRef.com, which publishes personal information of voters contained in state voter registration databases. S.F. ¶ 38. That information can include names, addresses, birth years, party

affiliations, and voting history information. S.F. ¶ 39. According to the testimony of its Executive Director, it does so "[s]o the public has oversight to ensure that proper list maintenance is being conducted." Exh. B at 52:21–53:10. Specifically, VRF envisions that users of its website will contact election officials to inform them of errors in the voter rolls. Exh. B at 56:7–18.

Despite its goals, VRF itself does not take any steps to inform election officials of errors in voter registration information. S.F. ¶ 53. Nor does it make any effort to monitor whether users of its website are actually contacting election officials regarding errors they have identified. S.F. ¶ 54. And it likewise does not communicate with state or county election officials to determine whether users of the website have contacted them about errors. S.F. ¶ 55.

Upon first accessing the VoteRef.com website, a user is presented with the following pop-up box:



Exh. E. After clicking "I Agree," the user has access to all of the data posted on the website. S.F. ¶ 41. However, the website does not require a user to actually read the terms of service before clicking "I Agree." S.F. ¶ 41. Likewise, it does not track whether users of the site click on the link to those terms. S.F. ¶ 61.

VRF also takes no steps to monitor whether users of its website comply with its terms of service. S.F. ¶ 61. It has never taken legal action in response to a violation of its terms of service. S.F. ¶ 60. In fact, VRF's Executive Director testified that she had never been made aware of a

violation of the terms of service. S.F. ¶ 58. She testified that, if VRF became aware of a violation of its terms of service, it would simply report it to the relevant state election agency and would not take any action on its own to enforce its terms of service. S.F. ¶ 56.

The record establishes that voters who discover that their data has been made available on the internet reach out to VRF or election officials to express their concern. Such voters often express fear for their safety. *See, e.g.*, Exh. J. For instance, one voter informed VRF that she "was the victim of online harassment from a man who found my information online and doxxed me using this website." Exh. F at 1919. Yet, VRF's Executive Director testified that VRF did not take any action to investigate or otherwise respond to this email, beyond providing its generic response to voter complaints. Exh. B 103:21–105:24. In fact, with the exception of those voters who are protected under state law, VRF does not honor requests to remove a voter's data. S.F. ¶ 43.

Similarly, voters inform VRF of the risks their website creates, to no avail. One voter wrote, "[h]aving been part of identity fraud before, it is very disheartening to find out that a simple google search for my name can now give anyone my name, address, date of birth, and party

affiliation." Exh. G at 361. This individual continued, "[y]our website however, makes it extremely easy for someone with technical expertise to scrub all of the data from your website anonymously and use it for whatever purpose they wish." *Id.* VRF does not remove voter data in response to such concerns, however. S.F. ¶ 43.

The net result is predictable: voters are less inclined to participate in the political process out of concerns for their privacy and safety. As one voter wrote: "This is why people do not register to vote. Because you take our names and addresses which are private and you broadcast them across the entire world. Opening us up to all kinds of threats." Exh. J. at 201.

## PROCEDURAL HISTORY

In October 2021, the Department became aware of the fact that VRF had posted personal information about Pennsylvania voters on its website, in violation of the internet restriction. S.F. ¶ 22. The Department therefore wrote to VRF and demanded that it remove the information about Pennsylvania voters, which VRF did in January 2022. S.F. ¶ 22, Exh. B at 87:16–22; Exh. M (letter).

After removing the Pennsylvania voter information from its website, VRF filed a request pursuant to the Pennsylvania Right-to-Know Law, 65 P.S. §§ 67.101 *et seq.* ("RTKL"), on March 7, 2022, seeking a copy of the Full Voter Export list. S.F. ¶ 26; Exh. N. That request was made solely pursuant to the RTKL and did not mention the NVRA. S.F. ¶ 27. While VRF included an attestation that it would only use the FVE for statutorily permissible purposes, it made clear it would not agree to refrain from publishing Pennsylvania voter data on the internet. S.F. ¶ 28.

The Department denied the request on April 13, 2022, because of VRF's refusal to adhere to the internet restriction. S.F. ¶ 29; Exh. O. The Department also noted that VRF had previously published Pennsylvania voter information on the internet, in violation of the internet restriction. S.F. ¶ 29.

VRF appealed the Department's denial to the Pennsylvania Office of Open Records and then to Pennsylvania Commonwealth Court, which affirmed the Department's decision on October 20, 2023. S.F. ¶ 30; *Swoboda v. Pa. Dep't of State*, No. AP 2022-1069R (Pa. Open Records July 15, 2022); *aff'd*, 304 A.3d 105, 116 (Pa. Cmwlth. 2023).

Shortly thereafter, on November 2, 2023, VRF sent the Secretary and Department a document entitled "Notice of Violation of the NVRA," claiming that the Department's denial of its March RTK Request was a violation of the NVRA—notwithstanding the fact that the March 2022 Request was solely made pursuant to the RTKL. S.F. ¶ 34; Exh. P. Also on November 2, 2023, VRF sent a separate letter containing a new request for the FVE, this time pursuant to the NVRA. S.F. ¶ 35 Exh. Q. The Secretary responded to both the Notice and the request on November 16, 2023, granting the request on the condition that VRF sign the affirmation required pursuant to Pennsylvania law. S.F. ¶ 36; Exh. R. VRF refused to do so and again wrote to the Secretary and Department on November 17, 2023, contending that the Department continued to violate the NVRA. S.F. ¶ 37; Exh. S.

On February 19, 2024, filed its complaint in this matter.

## QUESTIONS PRESENTED

1. Does Pennsylvania's restriction on posting personal voter information on the internet violate the NVRA? *Suggested Answer: No*

2. Did the Department violate the NVRA in its responses to VRF's 2022 and 2023 requests for the Full Voter Export? *Suggested Answer: No*

3. Does the prohibition on publishing personal voter information on the internet violate the First Amendment, either because it restricts core political speech or is overbroad? *Suggested Answer: No*

4. Is VRF entitled to declaratory or injunctive relief? *Suggested Answer: No*

## SUMMARY OF ARGUMENT

VRF's motion for summary judgment should be denied.

First, VRF's claim that the NVRA preempts the internet restriction fails, because the NVRA does not require disclosure of the voter information at issue here, and, even if it did, it does not prohibit reasonable regulations governing the use of such sensitive information. Second, because the internet restriction is not preempted, the Department's prior responses to VRF that simply sought to enforce that restriction likewise did not violate the NVRA. Third, the internet restriction does not run afoul of the First Amendment. There is no general right of access to information in the government's possession and, even if there were, the minor burden of the internet restriction is amply justified by the

17

Commonwealth's strong interest in ensuring that its citizens are not chilled in the exercise of their right to vote by concerns about the misuse of their personal information. Finally, because VRF's substantive claims all fail on the merits, and because it cannot show irreparable harm, its request for an injunction should be denied.

## ARGUMENT

A moving party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.

## I. The Internet Restriction Is Not Preempted by the NVRA

Pennsylvania's voter-privacy protections are not preempted by the NVRA. As an initial matter, the materials covered by the internet restriction—the FVE and other voter lists—do not "concern[] the implementation" of the Commonwealth's list-maintenance programs and therefore are not covered by the NVRA at all. But even if that were not the case, VRF's preemption argument fails, for two reasons. First, the theory of preemption relied on by VRF—obstacle preemption—does not apply to claims under the Elections Clause at all. Second, even if obstacle

18

prevention did apply, the internet restriction furthers, rather than frustrates, the purposes of the NVRA, and therefore cannot be preempted.

## A. The Voter Lists Are Not Within the Scope of the NVRA's Disclosure Provision

To fall within the disclosure provision, a document must relate to the "implementation" of "programs and activities" that are conducted to "ensur[e] the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i). Pursuant to federal and state law, counties in Pennsylvania, with assistance from the Department, carry out certain activities to ensure the accuracy of their voter rolls. *See supra*; S.F. ¶¶ 3–8. Such activities include efforts to identify voters who have moved, as well as voters who are deceased. S.F. ¶ 7.

The disclosure provision only applies to documents relating to the "implementation" of such efforts. 52 U.S.C. § 20507(i). And, "in common usage of the word, something is 'implemented' only at the time it is initially given practical effect or commenced, such as when a plan first goes into effect." *Lebanon Farms Disposal, Inc. v. Cnty. of Lebanon*, No. 1:CV-03-0682, 2004 WL 7338460, at *12 (M.D. Pa. July 9, 2004). So to be

covered under the NVRA's disclosure provision, a document must relate to the actual carrying out of the relevant list-maintenance efforts.

VRF cites no evidence that the voter lists themselves play any role in the implementation of these programs. S.F. ¶ 14. Rather, it argues that, because counties update voter records in SURE as part of their list maintenance activities, and because the FVE draws on records in SURE, the FVE therefore relates to the "implementation" of those programs. *See* Br. at 6–8.[5] But completely absent from VRF's brief is any discussion of how the FVE is used in the implementation of these programs, because it is not used at all.

In Pennsylvania, only counties can conduct list-maintenance activities, because only counties can update registration information for their voters or remove their voters from the rolls. S.F. ¶ 3,4,8. Those efforts utilize information from the Department to identify voters who may have moved, as well as other sources of information, like records of fatalities, but it is the counties who actually carry out these maintenance efforts.

---

[5] VRF describes the SURE system as a "centralized online voter database and official voter roll." Br. at 6. But the SURE system is not "online"; rather, access is limited to those with specific computer terminals that are capable of accessing it.

S.F. ¶ 3.4.7. By contrast, the Department produces the FVE and the other voter lists because it has a statutory obligation to do so—not because the lists play any role in list maintenance. S.F. ¶ 9.

This Court's decision in *Public Interest Legal Foundation v. Chapman*, 595 F. Supp. 3d 296 (M.D. Pa. 2022) ("*PILF II*") is thus distinguishable. *PILF II* concerned a request for specific records from SURE relating to individuals the Department had identified as potential non-citizens whose registrations were cancelled. *Id.* at 305. Thus, the request related to what the plaintiff argued was a specific list-maintenance program— the effort to identify non-citizens who were inadvertently registered— and records of specific individuals who were identified, using the SURE database, through that program. As this Court recognized, "the [SURE] database was … used to augment the reliability of voter rolls by identifying registrants in need of further 'scrutiny' by the counties." *Id.* at 305– 06. Thus, the district court found in *PILF II* that plaintiff had shown that the records at issue related to the "implementation" of a list-maintenance program. Here, the requested records are several steps removed from such programs and do not fall within the scope of the NVRA's disclosure provision.

## B. The Internet Restriction Does Not Conflict with the NVRA

Even if the voter lists fall within the scope of the NVRA's disclosure provision, there is no conflict between the requirements of that section and the internet restriction. As a result, VRF's claim that the NVRA preempts the internet restriction fails.

As an initial matter, VRF does not claim that the internet restriction is inconsistent with the NVRA's text. Nor could it. Nothing in the NVRA, which was written before internet access was common, speaks to whether a state can prohibit publication of personal voter information on the internet. Rather, VRF rests its entire argument on the theory of "obstacle preemption"—the claim that the internet restriction frustrates the purpose of the NVRA, and is therefor invalid. This argument fails for two reasons.

### 1. *"Obstacle Preemption" Does Not Apply*

Congress passed the NVRA pursuant to its authority under the Elections Clause, which provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of

chusing Senators." U.S. Const. art. I, § 4, cl. 1. The power given to Congress is thus the power to "make or alter" state laws relating to elections for members of Congress.

Because the preemptive force of the NVRA rests on the Elections Clause, principles of Supremacy Clause preemption are of limited relevance. *See Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 13–14 (2013). In *Arizona*, the Supreme Court held that, "[b]ecause the power the Elections Clause confers is none other than the power to preempt, the reasonable assumption is that the statutory text accurately communicates the scope of Congress's pre-emptive intent." *Id.* at 14. It is the text—and the text alone—that controls. VRF's reliance on "obstacle preemption"—a principle derived from Supremacy Clause cases—is thus misplaced.[6]

Under the Elections Clause, the states and Congress both have authority to prescribe rules for federal elections. Assessing whether a state

---

[6] *Public Interest Legal Foundation, Inc. v. Bellows*, relied on extensively by VRF, missed this important distinction. *See* 92 F.4th 36 (1st Cir. 2024). In *Bellows*, the First Circuit cited the above language from *Arizona* on how courts should address Elections Clause claims, but then proceeded to apply principles derived wholly from the Supremacy Clause context. *Id.* at 51–52.

law is preempted under the Elections Clause simply requires reading the two provisions together and determining whether they conflict. Supremacy Clause cases, by contrast, typically present asserted conflicts between different types of laws entirely—such as a federal requirement regulating interstate commerce and a state tort law. *See, e.g.*, *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 326 (2011). In such cases, the preemption analysis requires assessing whether the "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of a federal law." *Id.* at 330 (cleaned up). Elections Clause cases require no such probing analysis. And here, VRF does not and could not claim that the internet restriction conflicts with the NVRA, thus defeating its claim.

> 2. *The Internet Restriction Furthers, Rather than Frustrates, the Purposes of the NVRA*

VRF's case would be no stronger if obstacle preemption did apply. Not only is the internet restriction consistent with the text of the NVRA, it also furthers that law's purposes by protecting voter privacy and ensuring that voters are not discouraged from participating in the electoral process. It is VRF's efforts to post voter data on the internet that threaten

the goals of the NVRA. VRF's claim that the internet restriction "stands as an obstacle" to the goals of the NVRA is contradicted by the evidence in this case and defies common sense.

In enacting the NVRA, Congress specifically found that "the right of citizens of the United States to vote is a fundamental right" and that "it is the duty of the Federal, State, and local governments to promote the exercise of that right." 52 U.S.C. § 20501(a)(1)–(2). The first two stated goals of the statute both focus on increasing voter participation: Congress sought "to establish procedures that *will increase the number of eligible citizens who register to vote* in elections for Federal office" and to "make it possible for Federal, State, and local governments to implement [the statute] in a manner that *enhances the participation of eligible citizens as voters* in elections for Federal office." *Id.* § 20501(b)(1)–(2) (emphasis added).

Under VRF's reading of the NVRA, any citizen who chooses to register to vote must accept that her personal information, including her name, address, date of birth, sex, political party, and voting history, among other information, will be subject to posting on the internet for the entire world to access. Putting potential voters to such a Hobson's

choice discourages voter participation, as the record shows. S.F. ¶ 46; *see also* Exh. V at 322, 377–79. Notably, VRF does not even attempt to refute the evidence in the record showing that posting voters' personal information on the internet discourages participation and leads some to cancel their voter registrations.

Whether VRF intends to omit some personal information from what it posts on the internet is irrelevant to the legal question. VRF's preemption claim is boundless, and nothing in its complaint suggests that it could be legally precluded from putting all of the information it receives on the internet. Likewise, its efforts to limit access to users in the United States do not alter the breadth of its legal claim.

The internet restriction was adopted to prevent voters from having to sacrifice protection against the widespread disclosure of their personal information—and the increased risk of identify theft, harassment, and other harms that could result—in order to exercise their fundamental rights. By registering to vote, citizens do not consent to the widespread dissemination through the internet of their personal information. To suggest that a statute Congress enacted well before the internet became a household word, and for the express purpose of *increasing* voter

registration, nevertheless *requires* all voters to face these risks, is absurd. VRF's claim should be rejected on this basis alone.

Likewise, VRF has identified nothing in the record to suggest that its activities further the NVRA's other two goals: "to protect the integrity of the electoral process" and "to ensure that accurate and current voter registration rolls are maintained." VRF points to no evidence in the record that users of its website actually identify and report errors, and whether states act on those reports. S.F. ¶¶ 52, 54, 55. In fact, it is doubtful that states could do so consistent with the NVRA or state law, both of which set forth specific processes and strict requirements governing the removal of voters from the rolls. *See* 25 Pa.C.S. § 1901. Neither state nor federal law authorizes counties to remove voters based solely on claims made by individuals who reviewed the voter file on a website.[7]

---

[7] The Department of Justice has published guidelines on voter registration list maintenance making clear that "[t]he prohibitions of the NVRA extend to any list maintenance activity based on third-party submissions." *See* Exh. T, U.S. Dept. of Justice, *Voter Registration List Maintenance: Guidance under Section 8 of the National Voter Registration Act, 52 U.S.C. § 20507* at 3 (Sept. 2024), *at* https://www.justice.gov/crt/media/1366561/dl

The Department's regulations were promulgated to institute safeguards to protect voter registration information from potential misuse. Publication of the FVE on the internet would expose every registered voter in Pennsylvania to an increased risk of identity theft and the misuse of their private information, and would have a chilling effect on voter registration, in direct contravention of the purposes and intent of the NVRA. The record proves as much, as Pennsylvania voters reached out to complain to VRF as well as the Department about having their personal information exposed during the brief time that it was previously available. *See* Exhs. F–L. Again, VRF makes no effort to counter this evidence.

Indeed, courts interpreting the NVRA's public inspection provision have recognized that it does not foreclose reasonable privacy protections. *See Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 264, 267 (allowing for redaction of "uniquely sensitive information"); *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1345 (N.D. Ga. 2016); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 729 (S.D. Miss. 2014) (rejecting suggestion that "personal, otherwise protected information would lose its protection once a citizen registered to vote.").

Neither the Pennsylvania voter registration law nor the Department's regulations prohibit VRF from obtaining the records it seeks. They simply set reasonable terms as to accessibility of such records. VRF has refused to abide by these terms and, in fact, has previously violated them. S.F. ¶ 21. But nothing in the NVRA gives VRF the right to disregard Pennsylvania's reasonable voter privacy protections.

## II. The Secretary's 2022 and 2023 Responses Did Not Violate the NVRA

### A. VRF's 2022 Request

In 2022, VRF requested a copy of the FVE under Pennsylvania's Right-to-Know Law (RTKL), without ever invoking the NVRA. S.F. ¶ 26; Exh. N. The Department therefore responded under the RTKL, which, by its terms, "shall not apply" if its provisions "regarding access to records conflict with any other Federal or State law." 65 P.S. § 67.3101.1. So, because access to the FVE is governed by a separate state law, the Department denied the RTKL request on April 13, 2022. S.F. ¶ 29; Exh. O. VRF appealed the denial to the Office of Open Records; both that office and the Commonwealth Court affirmed the Department's decision. *Swoboda v. Pa. Dep't of State*, No. AP 2022-1069R (Pa. Open Records July 15,

2022); *aff'd*, 304 A.3d 105, 116 (Pa. Cmwlth. 2023). VRF declined to seek further appellate review.

VRF's argument for summary judgment fails to mention that its 2022 request was submitted under the RTKL, and that the Department treated it as a RTKL request. *See* Br. 14–15. Commonwealth Court affirmed the Department's decision rejecting the request. Nowhere in its request did VRF mention the NVRA. As a result, there is no merit to VRF's claim that the Secretary violated the NVRA in denying VRF's 2022 request for the FVE.

## B.    VRF's 2023 Request

VRF does not dispute that, when it requested the FVE the following year, it made clear that it refused to comply with the internet restriction. As a result, the Department declined to provide VRF with a copy of the FVE, but communicated that it would be happy to do so if VRF agreed simply to comply with the requirements that applied to all requests for the FVE, including the internet restriction. S.F. ¶ 36; Exh. R. VRF refused to do so, choosing instead to argue over the legality of the internet restriction. S.F. ¶¶ 36, 37.

Because the internet restriction is fully consistent with the NVRA, *see supra*, there is no merit to VRF's claim that the Secretary violated the NVRA in requesting that VRF, like any other requestor, agree to comply with the internet restriction before receiving a copy of the FVE.

## III. Protecting Voter Privacy Does Not Violate the First Amendment

VRF's claims that the internet restriction violates the First Amendment fail for numerous reasons. First, the internet restriction does not restrict core political speech in any way, and VRF's arguments to the contrary are meritless. Second, the government may impose reasonable restrictions on access to information that an individual does not already possess, as Pennsylvania has done here. Third, even if the internet restriction did restrict core political speech, it is more than amply justified by the need to protect voter privacy. And, finally, VRF's claim that the internet restriction is overbroad is largely a repetition of its other First Amendment arguments, and should be similarly rejected.

### A. Pennsylvania Does Not Restrict Core Political Speech

The "speech" at issue in this case is strictly personal information—names, addresses, and other details—about individuals who have

registered to vote in Pennsylvania. VRF's claim that such information constitutes "core political speech" is without support.

As the Third Circuit has recognized, the "lodestar" of core political speech is "'interactive communication concerning political change.'" *Mazo v. New Jersey Sec'y of State*, 54 F.4th 124, 142 (3d Cir. 2022) (quoting *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 186 (1999)). The "speech" VRF wishes to engage in is not "interactive," nor does it "concern[] political change." In *Mazo*, the Third Circuit held that a regulation governing the slogans used by candidates on the ballot did not implicate "core political speech," despite the indisputably expressive nature of such slogans. *Id.* at 146. Here, the "speech" at issue, personal data, is not expressive at all, and is thus further removed from the concept of "core political speech" than was that at issue in *Mazo*.

In fact, the internet restriction serves to *protect* core political speech in an important way. It protects the speech of *voters*, by ensuring that the act of registering to vote does not subject an individual to having their personal information published on the internet. This concern is very real and well-founded, as the correspondence from voters to VRF and to the Department demonstrates. S.F. ¶¶ 45, 46.

By way of example, the Supreme Court and other courts have held that the First Amendment can be implicated by requiring the disclosure of personal information of paid petition circulators. *See, e.g.*, *Buckley*, 525 U.S. at 197–204; *see also NAACP v. Alabama*, 357 U.S. 449, 462–63 (1958) (discussing chilling effect that could result from mandatory disclosure of members of organization). Relying on *Buckley*, the Eight Circuit recognized that "[b]eing forced to publicly disclose one's phone number, email address, and residential address in order to exercise the right to circulate a petition—even as a paid circulator—is chilling in today's world." *Dakotans for Health v. Noem*, 52 F.4th 381, 392 (8th Cir. 2022). VRF's position is even more extreme, as it would chill the right of every voter to participate in our democracy.

The fact that voter lists can be used to facilitate political speech—for instance, by contacting registered voters directly—does not turn the information on the lists into political speech itself, and VRF has not identified any decision holding to the contrary. In *Fusaro*, which VRF cites, the Fourth Circuit found that voter information could be a "valuable tool for political speech," but never held that such information itself constituted core political speech. *Fusaro v. Cogan*, 930 F.3d 241, 251 (4th Cir.

33

2019) (*Fusaro I*). And the Fourth Circuit ultimately held that reasonable restrictions on the use of voter information intended to protect privacy are fully consistent with the First Amendment, rejecting the precise claim VRF makes here. *See Fusaro v. Howard*, 19 F.4th 357, 369–70 (4th Cir. 2021) (*Fusaro II*).

### B. There Is No Right of Access to Information in the Government's Possession

Individuals have no right to demand information in the possession of the government. *Houchins v. KQED, Inc.*, 438 U.S. 1, 14 (1978). States may restrict access to public information—such as by establishing certain criteria for granting access—so long as the criteria applied are not "illegitimate." *L.A. Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 43–44 (1999) (Ginsburg, J., concurring). Indeed, governments do so all the time: no one would seriously argue, for instance, that it violates the First Amendment to require individuals given access to classified information to agree not to disclose it, or that protective orders entered by courts limiting disclosure of discovery documents are unconstitutional.

This is therefore "not a case in which the government is prohibiting a speaker from conveying information that the speaker already

possesses." *United Reporting*, 528 U.S. at 40. Rather, VRF seeks access to information in the Department's possession, and refuses to agree not to publish the information on the internet before receiving the information. The First Amendment does not give it any right to such information free of all restrictions.

As the Fourth Circuit recognized in *Fusaro II*, which upheld a very similar restriction under Maryland law, "restricting access on how a state voter list can be utilized is not a unique proposition." 19 F.4th at 370. That court concluded that the state's interests in limiting the use of voter data, which included "shielding Maryland registered voters from harassment," were sufficient to justify the modest restrictions Maryland imposed on access to its voter lists. *Id.* at 370. The same is true here.

### C. The Internet Restriction Is Justified by Pennsylvania's Interest in Protecting Its Electoral Process

If the First Amendment were to apply at all—and, as explained above, it does not—the internet restriction is constitutional. Contrary to VRF's arguments, the *Anderson-Burdick* balancing test governs the analysis of First Amendment claims challenging election-related rules, such as VRF's here. The Third Circuit has held that the *Anderson-Burdick*

balancing test applies even if "an election law burdens a fundamental right" if that law also "regulates the mechanics of the electoral process." *Mazo*, 54 F.4th at 140 (cleaned up). The *Mazo* court reached this conclusion by reviewing a number of cases in which courts have applied the *Anderson-Burdick* test to a broad range of election-related laws, including laws relating to "regulation of voter data." 54 F.4th at 140–41 & n.25 (citing *Fusaro II*).

Under the *Anderson-Burdick* framework, restrictions that are "reasonable [and] nondiscriminatory," are permitted if they are justified by "the State's important regulatory interests." *Mazo*, 54 F.4th at 145 (cleaned up). Here, the internet restriction applies to all requesters and the Department applies it even-handedly, which VRF does not contest. S.F. ¶ 13. VRF cannot represent that it is uniquely or especially burdened by this rule, and any burden it does face is minimal. *Mazo*, 54 F.4th at 146 (holding that the burden is minimal when "(a) the requirement is nondiscriminatory and applies equally to all candidates . . . (b) the requirement leaves open ample and adequate alternatives . . . and (c) [there is no] evidence of any specific burden on either themselves or any other candidate.").

By contrast, the Department has strong interests in protecting voter privacy and in ensuring that voters are not discouraged from participating in the political process. The complaints that both VRF and the Department itself received underscore the legitimacy of this interest. *See Fusaro II*; *see also Pa. State Educ. Ass'n v. Commw. Dep't of Cmty. & Econ. Dev.*, 148 A.3d 142, 158 (Pa. 2016) (finding inherent right of privacy in residential addresses under state constitution).

For these reasons, even if VRF were correct that strict scrutiny applies here, the internet restriction would not violate the First Amendment. The undisputed evidence shows that the publication of voter information on the internet discourages citizens from participating in the political process. S.F. ¶ 46. Indeed, for the brief period during which VRF posted Pennsylvania voter data on the internet in violation of the internet restriction, the Department received multiple complaints from registered voters.

VRF argues that protecting voter privacy cannot be a compelling interest because Congress "clearly established a policy favoring transparency, even at the expense of privacy" in enacting the NVRA's disclosure provision. Br. at 25. As explained above, VRF has the NVRA precisely

backwards: the law was enacted primarily to *increase* voter participation, yet VRF would use it as a weapon to discourage citizens from participating in the electoral process.

Likewise, the internet restriction is narrowly tailored. VRF argues that it is broader than necessary due to the existence of other state and federal regulations that protect sensitive information. *See* Br. 27. But this argument is circular: VRF does not explain why those regulations are permitted under the First Amendment, and the internet restriction is not. For instance, VRF seems to accept the validity of Pennsylvania's programs that allow certain voters (including law enforcement officials, judges, and victims of domestic violence) to remove their information from the FVE entirely. Nowhere does it explain why Pennsylvania can remove information about certain voters from the rolls entirely, but cannot take the small step of prohibiting the publication of information about other voters on the internet. Regardless, Pennsylvania seeks to protect the right of *all* voter to participate in the political process without having their privacy threatened.

### D. The Internet Restriction Is Not Overbroad

For the same reasons, VRF's claim that the internet restriction is overbroad fails. The internet restriction simply requires requestors to agree to reasonable restrictions before accessing sensitive voter information; it does not interfere with their First Amendment rights in any meaningful way.

A statute is overly broad under the First Amendment and therefore facially invalid only "if the impermissible applications of the law are substantial when judged in relation to the statute's plainly legitimate sweep." *Hewlette-Bullard on behalf of J.H-B. v. Pocono Mtn. Sch. Dist.*, 522 F. Supp. 3d 78, 96 (M.D. Pa. 2021) (*quoting City of Chicago v. Morales*, 527 U.S. 41, 52 (1999)). Accordingly, "it is not enough for a plaintiff to point to one impermissible application of the law." *Id.* (*citing Free Speech Coal., Inc. v. Att'y Gen. of U.S.*, 677 F.3d 519, 537 (3d Cir. 2012)). Rather, a plaintiff must show the law is "*substantially* overbroad." *United States v. Williams*, 553 U.S. 285, 303 (2008). That is, the provision must create a real risk that it will "will significantly compromise recognized First Amendment protections of parties not before the Court." *City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984).

VRF cannot identify any impermissible applications of the internet restriction, much less enough such applications to render the requirement "substantially overbroad." The internet restriction applies to anyone who seeks copies of the voter lists, and the Department administers it evenhandedly. S.F. ¶ 13. It is likewise content and viewpoint neutral. S.F. ¶ 13. And it serves the Commonwealth's strong interest in protecting the privacy of its voters and in ensuring that its citizens are not chilled from exercising their right to vote.[8]

## IV. VRF Is Not Entitled to an Injunction

Finally, VRF's request for a permanent injunction should be denied. As an initial matter, VRF must show more than "a reasonable probability of success on the merits" to obtain a permanent injunction. *Contra* VRF Br. at 30. Rather, it must actually prevail on the merits. *TD Bank N.A. v. Hill*, 928 F.3d 259, 278 (3d Cir. 2019) (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)). For the reasons explained above, it cannot do so.

---

[8] By the same reasoning, even if the prohibition against publishing voter lists on the internet were considered to implicate speech, it would be valid as a reasonable "time, place, or manner" regulation. *See Ward v. Rock Against Racism*, 491 U.S. 781, 798, (1989).

Similarly, VRF cannot show irreparable harm from the denial of a preliminary injunction. To satisfy this factor, a movant must show that the alleged harm is "actual and imminent, not merely speculative." *Macchione v. Coordinator Adm'r in Washington, D.C.*, 591 F. App'x 48, 49 (3d Cir. 2014) (nonprecedential). Here, it is unclear how being unable to publish Pennsylvania voter information on the internet would harm VRF in ay concrete way. It could, of course, obtain the FVE at any time, provided it simply agrees to the same requirements that apply to anyone else who requests it. VRF's apparent desire to post personal information about Pennsylvanians on the internet does not give it a legal basis for obtaining a permanent injunction from this Court.

Similarly, the public interest here overwhelmingly weighs against an injunction, for the many reasons discussed above. Pennsylvania citizens should not have to have their personal information exposed in order to participate in the political process. Yet that it precisely the result that VRF seeks. Such an outcome is decidedly not in the public interest.

## CONCLUSION

For the reasons set forth above, VRF's motion for summary judgment should be denied.

January 10, 2025                           Respectfully submitted,


 /s Amelia J. Goodrich                      /s Michael J. Fischer
Amelia J. Goodrich (PA 327192)      Michael J. Fischer (PA 322311)
Deputy Attorney General             Executive Deputy General Counsel
Office of Attorney General          333 Market Street, 17th Floor
1251 Waterfront Place               Harrisburg, PA 17101
Mezzanine Level                     (717) 831-2847
Pittsburgh, PA 15222                mjfischer@pa.gov
(412) 565-7680
agoodrich@attorneygeneral.gov       Kathleen A. Mullen (PA 84604)
                                    Ian B. Everhart (PA 318947)
Erich T. Greiner (PA 331601)        Pennsylvania Department of State
Deputy Attorney General             306 North Office Bldg.
Office of Attorney General          401 North Street
15th Floor, Strawberry Square       Harrisburg, PA 17120
Harrisburg, PA 17120


*Counsel for Defendant Al Schmidt*

# CERTIFICATE OF WORD COUNT

I certify that the above brief contains 7,999 words. In making this certificate, I have relied on Microsoft Word's word-count feature.

Dated: January 10, 2025

_/s Michael J. Fischer_
Michael J. Fischer

# CERTIFICATE OF SERVICE

I hereby certify that I filed the above document using the Court's CM/ECF system. Service will be accomplished on all counsel of record through the CM/ECF system.

Dated: January 10, 2025          /s Michael J. Fischer
                                 Michael J. Fischer