# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| VOTER REFERENCE FOUNDATION, LLC, <br><br> Plaintiff, <br><br> v. <br><br> ALBERT SCHMIDT, in his official capacity as Secretary of the Commonwealth, <br><br> Defendant. | No. 1:24-cv-294 <br><br> Judge Joseph F. Saporito, Jr. |

## REPLY BRIEF IN SUPPORT OF SECRETARY SCHMIDT'S MOTION FOR SUMMARY JUDGMENT

Amelia J. Goodrich (PA 327192)
Deputy Attorney General
Office of Attorney General
1251 Waterfront Place
Mezzanine Level
Pittsburgh, PA 15222

Erich T. Greiner (PA 331601)
Deputy Attorney General
Office of Attorney General
15th Floor, Strawberry Square
Harrisburg, PA 17120

Michael J. Fischer (PA 322311)
Executive Deputy General Counsel
333 Market Street, 17th Floor
Harrisburg, PA 17101
(717) 831-2847
mjfischer@pa.gov

Kathleen A. Mullen (PA 84604)
Ian B. Everhart (PA 318947)
Pennsylvania Department of State
306 North Office Bldg.
401 North Street
Harrisburg, PA 17120

*Counsel for Defendant Al Schmidt*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................ii

DISCUSSION...................................................................................................4

    I.    The FVE Is Not Within the Scope of the NVRA's
        Disclosure Provision.............................................................4

    II.   The NVRA Does Not Preempt the Internet Restriction.........7

        A.    "Obstacle Preemption" Does Not Apply.........................8

        B.    The Internet Restriction Furthers, Rather than
              Frustrates, the Purposes of the NVRA.........................9

        C.    Accepting VRF's Arguments In Support of Its First
              Amendment Claim Would Render the NVRA
              Unconstitutional.........................................................12

    III.  The Secretary's 2022 and 2023 Responses Did Not Violate
        the NVRA.............................................................................13

    IV.  The Internet Restriction Does Not Violate the First
        Amendment.........................................................................14

        A.    The First Amendment Does Not Guarantee Access to
              the FVE.........................................................................14

        B.    Voters' Personal Information Is Not "Core Political
              Speech".........................................................................16

        C.    The Internet Restrictions Satisfies Both the
              *Anderson-Burdick* Framework and Strict Scrutiny....18

        D.    The Internet Restriction Is Not Overbroad.................21

CONCLUSION...............................................................................................22

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ...........................................18

*Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013).........8

*Buckley v. American Constitutional Law Foundation, Inc.*,
    525 U.S. 182 (1999)..................................................................17

*Burdick v. Takushi*, 504 U.S. 428 (1992) ................................................18

*City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789 (1984).......22

*City of Chicago v. Morales*, 527 U.S. 41 (1999)......................................21

*Dakotans for Health v. Noem*, 52 F.4th 381 (8th Cir. 2022)..................18

*Fusaro v. Cogan*, 930 F.3d 241 (4th Cir. 2019)......................................16

*Fusaro v. Howard*, 19 F.4th 357 (4th Cir. 2021) ...................................17

*Hewlette-Bullard on behalf of J.H-B. v. Pocono Mtn. Sch.
    Dist.*, 522 F. Supp. 3d 78 (M.D. Pa. 2021) ..........................................21

*Houchins v. KQED, Inc.*, 438 U.S. 1 (1978) ...........................................14

*L.A. Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32
    (1999)......................................................................................13

*Mazo v. N.J. Sec'y of State*, 54 F.4th 124 (3d Cir. 2022) ............ 16, 18, 19

*Pub. Int. Legal Found. v. Boockvar*,
    No. 1:19-CV-622 (M.D. Pa. Dec. 19, 2019) .........................................12

*Pub. Int. Legal Found., Inc. v. Bellows*,
    92 F.4th 36 (1st Cir. 2024)..........................................................8

*Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d
    932 (C.D. Ill. 2022).................................................................4, 5

**Constitutional Provisions**

U.S. Const. art. I, § 4 .............................................................................11

**Statutes**

52 U.S.C. § 20501 .................................................................................11

52 U.S.C. § 20507 .......................................................................... *passim*

25 Pa. C.S. § 1403 ....................................................................................4

25 Pa. C.S. § 1404 ....................................................................................4

## REPLY BRIEF IN SUPPORT OF SECRETARY SCHMIDT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Voter Reference Foundation asserts that Pennsylvania's efforts to protect voter privacy by prohibiting the publication of its voter rolls on the internet are preempted by the National Voter Registration Act because they "frustrate" two of that law's "main objectives"—protecting the integrity of elections and keeping accurate voter records. VRF Br. at 17. Yet in responding to the Secretary's motion for summary judgment, VRF identifies no factual evidence to support this conclusion.

While VRF claims that its publication of voter data on the internet allows citizens to contact their election officials so that those officials can fix errors in their voter rolls, and that such activities are "the very reason for [VRF's] existence," VRF Opening Br. at 31,[1] it cannot point to *any* evidence in the record showing that a state has *ever* made such a correction based on outreach from someone who accessed VRF's website—much less that states' voter rolls have been improved in a meaningful way as a result of its activities. Its assertion that Pennsylvania's reasonable

---

[1] *See* ECF No. 36 (Dec. 6, 2024).

privacy protections frustrate the objectives of the NVRA is thus based on pure conjecture—and, at summary judgment, conjecture is not enough.

Likewise, VRF cannot point to anything in the record to rebut the evidence showing that the data it publishes is subject to misuse; that voters are frustrated and upset to learn that VRF has broadcast their data on the internet; and that their political participation is chilled as a result. For instance, one voter informed VRF that she "was the victim of online harassment from a man who found my information online and doxxed me using *this [VRF's] website*." Exh. F at 1919 (emphasis added).[2] Yet VRF did nothing in response, and instead claims that it has "*never become aware of*" a violation of its terms of service. VRF Br. 6 (emphasis original). VRF goes so far as to brush off the reports it received from voters who "experienced threats to their safety" because of VRF's activities as "classic hearsay." Br. 6.[3]

---

[2] Exhibit references refer to the exhibits filed with the Secretary's motion for summary judgment, ECF No. 38 (Dec. 6, 2024).

[3] VRF strangely asserts that these claims are not credible because the Secretary was not aware of them. *See* Br. 6 ([T]hey are directly contradicted by the Secretary's testimony regarding his lack of knowledge or evidence of any misuse of the data."). Of course, the Secretary is not expected to have knowledge of documents in *VRF's* possession. In any

Similarly, as another voter told VRF: "This is why people do not register to vote. Because you take our names and addresses which are private and you broadcast them across the entire world. Opening us up to all kinds of threats." Exh. J. at 201. VRF does not offer any substantive response; instead, the best it can do is to belittle these legitimate concerns as "a few emails unhappy with VRF's activities." Br. 6.

The factual assertions VRF has made in this litigation are not supported by the record. Its legal arguments fare no better. For instance, the principle of "obstacle preemption"—the entire basis for VRF's claim that the NVRA prohibits Pennsylvania's privacy protections—has no application to cases involving the Elections Clause. Additionally, VRF has no constitutional right to information in the possession of the Secretary, and the Secretary's conditions of access to the information are reasonable and nondiscriminatory regardless, so VRF's First Amendment claims fail.

For these reasons, the Secretary's motion should be granted in its entirety.

---

event, the Secretary offered his own unrebutted evidence of voter complaints regarding VRF's activities. *See* Exhs. I and V at 322, 377–79.

## DISCUSSION

## I. The FVE Is Not Within the Scope of the NVRA's Disclosure Provision

VRF does not dispute that the Full Voter Export plays no role in Pennsylvania's list maintenance activities. Nor could it. As the Secretary previously explained, the FVE is produced pursuant to a statutory mandate and is not used by the Department or Pennsylvania's counties in conducting list-maintenance activities. *See* 25 Pa. C.S. §§ 1403, 1404. As a result, the FVE is not a "record[] concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *See* 52 U.S.C. § 20507(i).

In response, VRF points to *Public Interest Legal Foundation v. Matthews*, a decision from the Central District of Illinois requiring certain voter lists to be produced under the NVRA. *See* 589 F. Supp. 3d 932 (C.D. Ill. 2022); VRF Br. 12–13. But that decision rested on an obvious error in its reading of the statute. The NVRA's disclosure provision states, in relevant part:

> Each State shall … make available for public inspection … all records concerning the implementation of *programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters*.

4

52 U.S.C. § 20507(i). While the phrase beginning with "for the purpose of" thus modifies "programs and activities," the *Matthews* court incorrectly read it as a statement of the underlying purpose of the provision as a whole. Based on this flawed reading, it analogized the disclosure provision to "a statute mandating, *for the purpose of ensuring the accuracy of the results of math equations*, the public disclosure of all records involved in the production of math equations." 589 F. Supp. 3d at 941 (emphasis added).

Relying on this faulty analogy, the court then concluded that the voter list at issue had to be produced under the NVRA because otherwise "the phrase 'for the purpose of ensuring the accuracy and currency' is rendered a nullity, as the accuracy and currency cannot be ensured without the list itself." *Id.* at 941. But this assertion makes no sense in light of the way the statute is actually written. The phrase "for the purpose of ensuring the accuracy and currency" helps to clarify *which* records are covered under the disclosure provision; it does not explain *why* the disclosure provision exists.

Nothing in the NVRA supports the notion that the purpose of the disclosure provision is to allow individuals to conduct their own list-

maintenance activities, such as the "crowdsourcing" VRF claims it supports. Elsewhere in the statute, Congress imposed strict limits on the processes by which states could remove voters from the rolls. For instance, it prohibited states from removing a voter based on a change of address unless that voter did not vote for several years after having failed to respond to a mailing from the state. 52 U.S.C. § 20507(b)(2). It likewise mandated that all list-maintenance efforts were to be "uniform [and] non-discriminatory." *Id*. § 20507(b)(1). Nowhere does the statute (or any relevant other law) authorize states to make changes in their rolls based on third-party information from individuals who access personal data on a website and, as the Department of Justice has recently suggested, in many cases, it would actually violate the NVRA for a state to do so. *See* Exh. T.

The disclosure provision provides one example of the records it encompasses: states must make available "the lists of the names and addresses of all persons to whom notices described in subsection (d)(2) [relating to the removal of individuals who have moved, *see infra*] are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is

6

made." 52 U.S.C. § 20507(i)(2). While the Secretary does not suggest that the disclosure provision solely encompasses such information, the example provides some clarity as to the types of records that Congress believed "concern[ed] the implementation" of list-maintenance activities." The FVE, which includes the personal information of nearly every registered voter in Pennsylvania, is not such a record.

At the summary judgment stage, VRF is required to put forward evidence supporting its claim that the FVE "concern[s] the implementation" of list-maintenance programs. It is not enough to point to noncontrolling decisions from other district courts that analyzed other states' practices and found that certain voter lists generated by those states fit this description. The FVE plays no role in Pennsylvania's list-maintenance efforts, and therefore does not fall within the scope of the NVRA's disclosure provision.

## II.   The NVRA Does Not Preempt the Internet Restriction

Even if the NVRA does apply to the FVE, it does not preempt the internet restriction.

## A. "Obstacle Preemption" Does Not Apply

VRF's entire preemption argument rests on the theory that the doctrine of "obstacle preemption" prohibits Pennsylvania from enforcing the internet restriction. But "obstacle preemption" derives from cases implicating the Supremacy Clause; it has no utility in cases arising under the Elections Clause.

As the Supreme Court has held, "[b]ecause the power the Elections Clause confers is none other than the power to preempt, the reasonable assumption is that *the statutory text* accurately communicates the scope of Congress's pre-emptive intent." *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 14 (2013) (emphasis added).[4] Determining whether a state provision is preempted by a law enacted under the Elections Clause simply requires reading the two provisions together and determining whether they conflict; no further analysis is required. And here,

---

[4] *Public Interest Legal Foundation, Inc. v. Bellows*, 92 F.4th 36 (1st Cir. 2024) (*"PILF"*), relied on extensively by VRF, failed to grasp this important distinction. The decision began its preemption analysis by stating, "The Supremacy Clause sits at the epicenter of every preemption question," which is not accurate. 92 F.4th at 51. And wile *PILF* subsequently acknowledged that the NVRA was enacted under the Elections Clause, it nonetheless relied almost entirely on cases raising Supremacy Clause claims in conducting its analysis. *Id.* at 51–52.

VRF does not and cannot dispute that the text of the NVRA does not conflict with the internet restriction. That concession is fatal to its preemption argument.

### B. The Internet Restriction Furthers, Rather than Frustrates, the Purposes of the NVRA

Even if obstacle preclusion applied here, VRF's arguments would fail.

VRF claims that Pennsylvania's decision to protect the privacy of its voters by prohibiting the publication of voter lists on the internet frustrates the NVRA's purposes of "preserving the integrity of elections" and "maintaining accurate rolls." Br. 17. But it offers no actual facts in support of this claim.

Despite asserting that it facilitates the "crowdsourcing" of list maintenance, VRF cannot identify a single instance in which a state made a correction to its voter rolls based on outreach from someone who had accessed VRF's website. Surely if such "crowdsourcing" occurred to any meaningful extent, VRF would have some awareness of it. But it

apparently does not.[5] Because there is no evidence in the record to support VRF's claim that the internet restriction frustrates the goals of maintaining accurate and current voter rolls or protecting the integrity of the electoral process, the Secretary is entitled to summary judgment.

Furthermore, VRF does not meaningfully dispute that the internet restriction *furthers* the NVRA's purposes of "increas[ing] the number of eligible citizens who register to vote" and "enhanc[ing] the participation of eligible citizens as voters." The evidence in the record identified by the Secretary shows that voters' political participation is chilled by learning that their information has been broadcast to the world. *See* Secy's Op. Br. at 13–15.[6] VRF suggests that this fact does not matter, because as long as the internet restriction frustrates one of the statute's purposes, it is irrelevant that it actually furthers others. But, as explained, VRF has

---

[5] Contrary to VRF's argument, the Secretary is not suggesting that "VRF insert[] itself as middleman" between its website's users and state election officials. *See* Br. 4. Rather, if VRF's primary purpose is to improve the accuracy of state election rolls, one might expect that it would take some steps to determine whether its tactics actually achieve that goal.

[6] ECF No. 39 (Dec. 6, 2024).

offered no evidence that the internet restriction actually does frustrate any of the statute's purposes.

More fundamentally, it is not the obligation of courts to decide which congressional purposes are more worthy. Interpreting the disclosure provision to preempt regulations like the internet restriction would, at least according to VRF, further two of the statute's goals—but it would undermine two others. On what basis could it be concluded that Congress intended such a result, rather than the alternative? While the Court need not answer this question now because VRF's assertions about the effects of its activities are wholly unsupported, it does show the limited utility of applying obstacle preemption to a case such as this.

Moreover, to the extent there is tension among the NVRA's various goals, Congress made clear where its priorities lay. The opening sentence of the NVRA asserts that "the right of citizens of the United States to vote is a fundamental right" and "it is the duty of the Federal, State, and local governments to promote the exercise of that right." 52 U.S.C. § 20501(a)(1)–(2). It would be nonsensical to read the statute to require the prohibition, under the theory of obstacle preemption, of a reasonable limitation that "promotes the exercise of" the fundamental right to vote.

Finally, VRF misses the point of the Secretary's discussion of cases holding that states may redact certain sensitive information in materials they produce in response to requests under the NVRA. *See* VRF Br. 16–17. VRF has not demonstrated why, if the NVRA allows a state to redact the documents it provides, it does not also allow it to require requestors to agree not to publish the information on the internet. As this Court has previously recognized, "the Disclosure Provision does not guarantee unfettered access to confidential sensitive information." *Pub. Int. Legal Found. v. Boockvar,* No. 1:19-CV-622, ECF No. 23, at 14 n.3 (M.D. Pa. Dec. 19, 2019). The Secretary is not denying VRF access to the FVE; he is simply requiring that it agree not to threaten the privacy of nearly every registered Pennsylvania voter by making the data easily accessible by anyone. Because the NVRA does not give VRF "unfettered access" to such records, it does not preclude him from doing so.

C.    **Accepting VRF's Arguments In Support of Its First Amendment Claim Would Render the NVRA Unconstitutional**

Finally, VRF fails to recognize the inconsistencies in its own arguments. In claiming that strict scrutiny applies to its First Amendment claims, VRF contends that "The Internet Sharing Ban does not regulate

the mechanics of the electoral process: how, where, or when people vote." Br. 30. But Congress's authority under the Elections Clause is limited to regulating "The Times, Places and Manner of holding Elections for Senators and Representatives"—in other words, "how, where, or when people vote." U.S. Const. art. I, § 4. So, taking VRF's arguments at face value, Congress has no authority under the Elections Clause to regulate the conduct implicated by the internet restriction, and the NVRA is unconstitutional as applied to these facts.

## III. The Secretary's 2022 and 2023 Responses Did Not Violate the NVRA

VRF does not dispute that Counts II and III of its complaint—which assert that the Secretary's responses to its 2022 and 2023 requests for voter data violated the NVRA—rest entirely on its argument that the internet restriction is preempted. *See* VRF Br. 21–22. Because that argument is erroneous, the Secretary is entitled to summary judgment on those counts.[7]

---

[7] Its claim with respect to the 2022 request fails for the additional reason that that request did not mention the NVRA at all. Contrary to VRF's suggestion, no "magic words" are required, VRF Br. at 21, but the Secretary was not required to assume that the basis for VRF's request was something other than what the request actually stated.

## IV. The Internet Restriction Does Not Violate the First Amendment

### A. The First Amendment Does Not Guarantee Access to the FVE

VRF does not dispute that the First Amendment does not guarantee a right of access to information in the possession of the government. *See Houchins v. KQED, Inc.*, 438 U.S. 1, 14 (1978). Instead, it argues that this case should be treated as a situation in which the government seeks to restrict the dissemination of information already in an individual's possession. This claim is factually and legally wrong.

Pennsylvania has made agreement to the internet restriction a condition of access to the FVE. It does not try to restrict the use of information individuals already possess, but simply ensures that, *before they obtain such information*, they agree to certain reasonable limitations on its use. And it may do so, provided that the criteria it uses are not "illegitimate." *L.A. Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 43–44 (1999) (Ginsburg, J., concurring). Indeed, such types of requirements are common with respect to sensitive information, and VRF does not claim otherwise.

VRF nonetheless argues that the First Amendment "curtails a state's ability to prohibit the publication of lawfully obtained information, or even information unlawfully obtained through a third party." *See* Br. 22. But this assertion has no relevance here: under Pennsylvania law, "lawfully obtain[ing]" the FVE requires agreeing to the internet restriction. VRF refuses to do so, and as a result the Department cannot fulfill its request. VRF's argument is tantamount to claiming that a government employee should be entitled to a security clearance even if the employee refuses to agree not to disclose classified information he would subsequently receive.

VRF is thus fundamentally wrong in arguing that its First Amendment claim should be evaluated in accordance with precedent governing when the government may limit access to information an individual already possesses. And nowhere does VRF argue that, when analyzed simply as a reasonable condition that Pennsylvania has imposed on *access* to data, the internet restriction violates the First Amendment. For this reason alone, the Secretary is entitled to summary judgment on VRF's First Amendment claims.

**B.** **Voters' Personal Information Is Not "Core Political Speech"**

VRF next repeats its assertion that personal information about Pennsylvania voters is "core political speech." VRF Br. at 23–25. But it offers no meaningful justification for this proposition. While it acknowledges the Third Circuit's holding that the "lodestar" of core political speech is "interactive communication concerning political change," *Mazo v. New Jersey Sec'y of State*, 54 F.4th 124, 142 (3d Cir. 2022) (cleaned up), it does not attempt to explain how the names, addresses, dates of birth, and other information about citizens of the Commonwealth could possibly fit this description.

Instead, VRF relies on the Fourth Circuit's decision in *Fusaro v. Cogan*, 930 F.3d 241 (4th Cir. 2019), but that case did *not* decide that voter lists constituted "core political speech." Rather, it simply concluded that such lists can be used "to further" political speech, inasmuch as they allow for political messages to be better targeted to voters, and that restrictions on the use of the lists were therefore not "immune to constitutional scrutiny." *Fusaro*, 930 F.3d at 251–52. Pennsylvania's regulations—which allow access to the FVE while limiting its use to purposes

relating to "elections, political activities or law enforcement," § 1404(b)(3)—are consistent with this conclusion. And the Fourth Circuit subsequently upheld the restriction at issue in *Fusaro*—which is similar to the internet restriction here—under the *Anderson-Burdick* framework. *See Fusaro v. Howard*, 19 F.4th 357, 369–70 (4th Cir. 2021) (*Fusaro II*).

While publishing personal information on the internet is not "core political speech," participating in the electoral process clearly is. Yet VRF would read the NVRA to require, as a condition of registering to vote, that each citizen of Pennsylvania submit to having his or her personal information made available on the internet. A federal or state statute requiring the posting of voters' information on the internet would certainly implicate the First Amendment, and a court could reasonably conclude that such a law chilled the exercise of core political speech. A law that requires states to allow third parties to do so would be no different.

Indeed, cases addressing requirements that information about paid petition circulators be disclosed have been held unconstitutional for precisely this reason. *See, e.g.*, *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 197–204 (1999). As the Eighth Circuit

17

recognized, "[b]eing forced to publicly disclose one's phone number, email address, and residential address in order to exercise the right to circulate a petition—even as a paid circulator—is chilling in today's world." *Dakotans for Health v. Noem*, 52 F.4th 381, 392 (8th Cir. 2022). VRF would read the NVRA to impose such a requirement on individuals who simply wish to register to vote.

So, not only does the internet restriction not restrict core political speech; it actually protects it.

### C. The Internet Restrictions Satisfies Both the *Anderson-Burdick* Framework and Strict Scrutiny

To the extent the First Amendment applies at all, the internet restriction is constitutional under the *Anderson-Burdick* framework.[8] VRF claims that that framework is irrelevant (based on an argument that is fatal to its preemption claim, *see supra*), ignoring the Third Circuit's conclusion that "a wide range of electoral-process regulations" fall under *Anderson-Burdick*, including those relating to "registration." *Mazo*, 54 F.4th at 140. To participate in elections in Pennsylvania, citizens must register

---

[8] *See Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992)).

18

and provide certain personal information. The internet restriction regulates how that required information can be used. It therefore falls within the "wide range of electoral-process regulations" that implicate *Anderson-Burdick*. In fact, the Third Circuit recognized as much, when it noted that the Fourth Circuit, in *Fusaro*, had applied *Anderson-Burdick* to the "regulation of voter data." *Mazo*, 54 F.4th at 141 & n.25 (listing *Mazo* as a case addressing a rule "primarily directed at regulating specific mechanics of the electoral process").

Because the internet restriction is "reasonable [and] nondiscriminatory" and justified by "the State's important regulatory interests," it easily survives scrutiny under the *Anderson-Burdick* framework, as the Secretary explained in his opening brief. *See Mazo*, 54 F.4th at 145 (cleaned up); Secy's Op. Br. at 36–37.

In response, VRF dismisses the interests that are protected by the internet restriction, and claims that it "takes substantial steps to protect the data it posts" and that, because requestors can still obtain the FVE, no one should complain about having it posted on the internet. VRF Br. at 26–27. These arguments strain credulity. Making data available to individuals who formally request it (and provide the Department with their

19

names and contact information in doing so) is a far cry from making that data available on the internet to anyone in the United States, as well as anyone in the rest of the world with a degree of technical sophistication. And the suggestion that, for instance, VRF's terms of service (which VRF concedes it has never tried to enforce, and which simply require users to click a box one time) act as a meaningful protection against identity theft and other abuses of individual data is nonsensical.

Thus, for the same reasons, the internet restriction would survive strict scrutiny if it were to apply here.

States certainly have a compelling interest in encouraging participation in the political process, and the internet restriction serves that goal by protecting the privacy of voter data. The record in this case makes this fact clear: voters react strongly to the publication of their personal information on the internet, and their political expression can be chilled as a result. Pennsylvania undoubtedly has a compelling interest in preventing this result.

Likewise, the internet restriction is narrowly tailored. Given the unique privacy risks presented by the posting of personal information on the internet, Pennsylvania has reasonably imposed the modest

20

restriction of requiring requestors of the FVE to agree not to do so. VRF's response—that other laws, such as Pennsylvania's criminal laws against stalking and harassment, represent less restrictive means of achieving the same goals, VRF Br. at 28—completely misses the point. Because the posting of voters' personal data on the internet can chill political participation, Pennsylvania's modest restriction on the use of such data passes constitutional muster.

### D. The Internet Restriction Is Not Overbroad

Finally, VRF's claim that the internet restriction is overbroad fails. The internet restriction simply requires requestors to agree to reasonable restrictions before accessing sensitive voter information; it does not interfere with their First Amendment rights in any meaningful way.

VRF cannot show that "the impermissible applications of the law are substantial when judged in relation to the statute's plainly legitimate sweep." *Hewlette-Bullard on behalf of J.H-B. v. Pocono Mtn. Sch. Dist.*, 522 F. Supp. 3d 78, 96 (M.D. Pa. 2021) (*quoting City of Chicago v. Morales*, 527 U.S. 41, 52 (1999)). In fact, for the reasons discussed above, it cannot show that that there are any impermissible applications of the internet restriction. VRF likewise cannot show that the internet

restriction "significantly compromise[s] recognized First Amendment protections of parties not before the Court." *City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984). The internet restriction applies equally to everyone who requests a copy of the FVE, and the department applies it evenhandedly.[9] There is no basis for arguing that it is unconstitutionally overbroad.

## CONCLUSION

For the reasons set forth above and in his opening brief, the Secretary's motion for summary judgment should be granted and judgment should be entered in his favor on all counts.

---

[9] VRF's assertion that the internet restriction "has no valid applications to weigh against its invalid applications," VRF Br. at 32, makes clear that its overbreadth claim is simply a repackaging of its other First Amendment claim. The Court should rejected it for the same reasons.

January 31, 2025                         Respectfully submitted,

*/s Amelia J. Goodrich*            */s Michael J. Fischer*
Amelia J. Goodrich (PA 327192)   Michael J. Fischer (PA 322311)
Deputy Attorney General          Executive Deputy General Counsel
Office of Attorney General        333 Market Street, 17th Floor
1251 Waterfront Place            Harrisburg, PA 17101
Mezzanine Level                (717) 831-2847
Pittsburgh, PA 15222             mjfischer@pa.gov
(412) 565-7680
agoodrich@attorneygeneral.gov   Kathleen A. Mullen (PA 84604)
                                  Ian B. Everhart (PA 318947)
Erich T. Greiner (PA 331601)    Pennsylvania Department of State
Deputy Attorney General          306 North Office Bldg.
Office of Attorney General        401 North Street
15th Floor, Strawberry Square   Harrisburg, PA 17120
Harrisburg, PA 17120

*Counsel for Defendant Al Schmidt*

# CERTIFICATE OF WORD COUNT

I certify that the above brief contains 4,291 words. In making this certificate, I have relied on Microsoft Word's word-count feature.

Dated: January 31, 2025

_/s Michael J. Fischer_
Michael J. Fischer

# CERTIFICATE OF SERVICE

I hereby certify that I filed the above document using the Court's CM/ECF system. Service will be accomplished on all counsel of record through the CM/ECF system.

Dated: January 31, 2025      */s Michael J. Fischer*
                                     Michael J. Fischer