## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **VOTER REFERENCE FOUNDATION, LLC,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No.: 1:24-CV-00294-JFS** |
| | ) | |
| **ALBERT SCHMIDT**, in his official | ) | Judge Joseph F. Saporito, Jr. |
| capacity as Secretary of the | ) | |
| Commonwealth of Pennsylvania, | ) | |
| Defendant. | ) | |

### PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS

In 2022, VRF sued New Mexico for (1) refusing to produce NVRA records and (2) banning VRF's speech that would share those records online. The Tenth Circuit held VRF had standing under the NVRA and ruled in its favor on the merits. *Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1078 (10th Cir. 2025).

In 2024, VRF sued Massachusetts for (1) refusing to produce NVRA records and (2) banning VRF's speech that would share those records online. Four days ago, the District of Massachusetts held that VRF had standing under the NVRA and ruled in its favor on the merits. *Voter Reference Found., LLC v. Galvin*, No. 24-Cv-12592-DJC, 2026 WL 836855, at *3 (D. Mass. Mar. 26, 2026).

Here again, VRF sues Pennsylvania for (1) refusing to produce NVRA records and (2) banning VRF's speech that would share those records online. Just as in *Torrez* and *Galvin*, VRF has standing under the NVRA, and VRF should again prevail on the merits. VRF's record of NVRA-related advocacy compels this result.

1

**PROCEDURAL BACKGROUND**

At issue here are two distinct claims VRF brought under the NVRA: (1) its "Access Claims," Counts II and III; and (2) its "Preemption Claim," Count I. *See Complaint* (ECF 1) at 13-33. VRF's Access Claims arise from Pennsylvania's refusal to produce records to which VRF is entitled under the NVRA's Public Disclosure Provision, 52 U.S.C. § 20507(i). VRF's Preemption Claim is distinct. It asserts that the NVRA preempts Pennsylvania's Internet Sharing Ban, which bans all speech that shares voter records online, even records the State must produce under the NVRA. VRF also contends the Secretary violated the NVRA by denying VRF's NVRA requests solely because VRF could not consent to the State's preempted Ban.

The Secretary's motion to dismiss raises a narrow argument: that VRF has not established an injury-in-fact arising from its "informational" injuries under the NVRA. *See Brief,* (ECF 66) ("Br.") at 8, 13-14. The Secretary does not otherwise challenge VRF's Article III standing. He never challenges VRF's statutory standing under the NVRA, or VRF's standing for its First Amendment speech claims.

**FACTUAL BACKGROUND**

VRF maintains two related but distinct projects. The first project is to share voter data online with citizens. **Ex. L, Nov. 2 Request[1]; Ex. A, "Swoboda", 20:16-**

---

[1] With the exception of Exhibits R and S, all citations to exhibits refer to exhibits previously filed with *Plaintiff's Statement of Uncontroverted Facts* (ECF 35).

**21:10.** This allows citizens to associate with VRF and with each other to review states' voter rolls, and then identify, report, and correct errors by reporting those errors to the appropriate election authorities. **Ex. L, Nov. 2 Request; Swoboda, 54:14-56:18; Ex. R, Dec. of J. Benson ("Benson"), ¶¶8-9.** VRF encourages these website user-associates to contact the responsible election official to remedy identified errors. **Swoboda, 37:6-38:3; 60:14-61:16.** In this manner, VRF's website "crowd-sources" the rectification of errors in the voter rolls. ***Id.* at 54:14-56:18; 60:2-13.** VRF also encourages voters to check their own registration data to ensure they are properly registered to vote. **Benson, ¶11.** VRF has posted 35 states and D.C. on VoteRef.com but hopes to post all 50 states. ***Id.*, ¶6-7.**

For VRF's second project, its in-house election professionals directly petition state election officials after analyzing and comparing state voter records. **Swoboda, 25:9-13; Benson, ¶10**. After analyzing records, VRF engages with states' chief election officials, inviting a discussion regarding its analysis and its views on best practices for how states should maintain their voter records. **Swoboda, 25:13-24; Benson, ¶10.** Through this process, VRF has identified discrepancies in other states (Colorado, Alabama, Nevada, and Georgia) and worked with state officials to reconcile those differences. **Swoboda, 118:25-119:7.** VRF also plans to conduct interstate voter roll evaluations to identify voters who might be registered in more than one state, and to provide this analysis to state election officials. **Benson, ¶12.**

This advocacy and participation in list maintenance is central to VRF's mission, and it would do these activities in Pennsylvania if it had the records. *Id.*, ¶10, 14.

On August 19, 2021, prior to posting any Pennsylvania data on its website, VRF emailed the Secretary inviting a discussion about VRF's analysis of Pennsylvania's records, including a comparison of the total ballots cast in the 2020 election and the number of registered voters in the state. **Ex. G, Aug. 19, 2021 Email.** VRF shared its analysis in the same email. *Id.* The Secretary never responded. VRF subsequently posted the Pennsylvania voter roll to its website, VoteRef.com. While the data was posted, several users of VoteRef.com reached out to VRF indicating that their information, as reflected in the data obtained from the Secretary, was incorrect. *See* **Ex. S, Selected Emails from VoteRef.com Users.**

On January 21, 2022, Timothy Gates, DOS Chief Counsel, sent a letter demanding that Pennsylvania data on VoteRef.com be removed and accusing VRF of violating Pennsylvania law. **Ex. H, Jan. 21, 2022 Takedown Letter.** VRF complied because of this threat. **Swoboda, 78:6-22, 86:8-21.** After the removal, several Pennsylvania voters contacted VRF expressing disappointment that they were no longer able to review Pennsylvania's records to identify errors. **Ex. S**.

VRF made two subsequent NVRA requests to the Secretary for statewide voter data. *See* **Ex. I, March 7, 2022 Request; Ex. L, Nov. 2 Request.** The Secretary refused the requests solely because VRF planned to share the records with

its website users on VoteRef.com. **Ex. B, Marks Dep. Tr. ("Marks"), 143:8-16.** VRF provided notices of violation under the NVRA. *See* **Exs. M &O.**

## ARGUMENT

Contrary to the Secretary's argument, VRF is situated here more like itself in *Torrez* and *Galvin* than like the plaintiff in *Public Interest Legal Foundation v. Secretary of the Commonwealth of Pennsylvania*, 136 F.4th 456, 463 (3d Cir. 2025), *cert. denied sub nom.*, No. 25-379, 2026 WL 568366 (Mar. 2, 2026) ("*PILF*"). VRF brings the same claims, under the same law, to do the same activities, as were at issue in *Torrez* and *Galvin*. Just as it did in those cases, VRF's record here establishes "downstream consequences" that are more than sufficient to meet the "not…burdensome" requirements for standing. *Id.* at 469 (quoting *Campaign Legal Ctr. v. Scott*, 49 F.4th 931, 940 (5th Cir. 2022) (Ho., J., concurring)).

The Secretary's attack on VRF's NVRA standing fails for two distinct reasons. First, the Secretary ignores substantial record evidence establishing that his denial of VRF's requests thwarted the advocacy of VRF and its VoteRef.com users to promote voter list maintenance, election integrity, and voter participation—all express NVRA purposes. Specifically, the Secretary's refusal to provide VRF the requested NVRA records: (1) blocked VRF from reviewing the records and associating with VoteRef.com users to identify errors in state voter rolls; (2) blocked VRF's efforts to allow voters to ensure they were properly registered to vote; (3)

5

blocked VRF's efforts to engage with and lobby the Secretary for better list maintenance; and (4) chilled VRF's speech sharing the records VRF already had, and discussing the state's list maintenance efforts. *See* Section I, below.

Second, the Secretary's standing analysis mistakenly treats VRF's NVRA Access Claims and Preemption Claim as if they are the same. They are not. Unlike the Access Claims, the NVRA Preemption Claim does not assert an informational injury. Rather, VRF's injury-in-fact is (1) the Secretary's ban on VRF's speech sharing the data it already had; and (2) the Secretary's denial of VRF's NVRA requests solely because VRF planned to engage in speech sharing that data in the future. VRF's Preemption Claim asserts that the NVRA entitles VRF to access and share this very data, and the Secretary's speech restrictions frustrate the object of the NVRA. For these injuries, standing is evaluated under the traditional Article III analysis, rather than *PILF* and *TransUnion, LLC v. Ramirez*, 549 U.S. 413 (2021). Nevertheless, like in *Galvin*, VRF satisfies either standard. *See* Section II, below.

I.    **VRF has Sufficiently Demonstrated an Injury-in-Fact for Purposes of its NVRA Access Claims.**

a. **Just four days ago, another district court found VRF to have standing under analogous circumstances.**

Just four days ago, the District of Massachusetts held that VRF had standing under the NVRA to challenge Massachusetts' refusal to provide VRF with voter data to engage in the same activities it seeks to do here. *See Galvin*, 2026 WL 836855, at

*3. Observing that since *TransUnion*, circuits have split over whether a heightened standing requirement applies to informational injuries, the court determined VRF satisfied even the "heightened" standing test applied in *PILF*. *Id.* at *5.

*Galvin* held that VRF sufficiently demonstrated several downstream consequences caused by the denial of its NVRA records requests, and that those consequences have a sufficient nexus to the NVRA's purposes. *Id.* Specifically, VRF had shown "a range of adverse effects from the alleged denial of its requested data that are also relevant to NVRA's purpose of 'ensur[ing] that accurate and current voter registration rolls are maintained…'" including the "inability to share the data online so interested citizens, including Massachusetts voters, can review the data and help identify and report inaccuracies or inconsistencies" and "the inability to conduct comparative analysis on voting history." *Id.* at *6 (cleaned up).

### b. In 2025, the Tenth Circuit likewise held that VRF had NVRA standing under analogous circumstances.

Likewise, in *Torrez*, the Tenth Circuit held that VRF adequately demonstrated an injury-in-fact and had standing to challenge New Mexico's similar refusal to provide VRF with voter records to engage in the same activities it seeks to do here. 160 F.4th at 1078. *Torrez* viewed VRF's injury as resting not merely on a denial of information, as with the plaintiffs in *PILF*, but also on the chilling effect of the state's prohibition on posting the records on VRF's website. *Id.* VRF faced a credible threat of prosecution if it violated New Mexico's data sharing ban—which VRF argued

7

was preempted by the NVRA—that kept VRF from "exercising its First Amendment right to publish voter data on its website for free." *Id.* In short, VRF wished to engage in speech to further its mission and the state was willing to prosecute it for doing so. *Id.* This was sufficient to show a concrete injury for its NVRA claims. *Id.*

        **c. This case tracks the facts of *Galvin* and *Torrez* and, in any event, VRF's record demonstrates several "downstream consequences" with a nexus to NVRA purposes.**

Just as it did in *Galvin*, VRF has adequately demonstrated the "downstream consequences" it is suffering and will continue to suffer as a result of the Secretary's refusal to produce the requested records, all of which directly relate to the NVRA purposes of "protect[ing] the integrity of the electoral process and "ensur[ing] that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(3)-(4). And, just as in *Torrez*, VRF is injured by the state's credible threat of enforcement that actively chills VRF's NVRA-sanctioned speech.

Although the Secretary's brief frames VRF's showing as insurmountable, the Third Circuit has plainly held the opposite: "although plaintiffs at the summary judgment stage must set forth specific facts by affidavit or other evidence supporting standing, the requirement of a downstream consequence required by *TransUnion* is *not burdensome*." *PILF*, 136 F.4th at 469 (cleaned up) (emphasis added).

Here, just as in *Torrez* and *Galvin*, VRF requested records which must be produced under the NVRA, and the Secretary refused to produce them. But VRF's

8

request to the Secretary was not made in a vacuum. VRF told the Secretary exactly what analysis, advocacy, and speech it planned to conduct with the records and how it would be harmed if the Secretary withheld them. *See* **Ex. L, Nov. 2 Request.** The record confirms those harms and their centrality to the NVRA's purposes.

First, the Secretary's refusal to provide VRF with the Pennsylvania records impedes VRF's ability to "protect the integrity of the electoral process" and "ensure that accurate and current voter registration rolls are maintained," 52 U.S.C. § 20501(b)(3)-(4), by finding errors in the voter rolls and enabling Pennsylvanians to do the same. **Benson, ¶¶8-10**. VRF's speech sharing the data with its users on VoteRef.com empowers the public to join VRF's review; promoting election integrity and the accuracy and currency of voter rolls. **Ex. C, "Swoboda Dec.", ¶15.** VRF also makes voter rolls available so voters can ensure they are registered and that their registration information is correct. **Benson, ¶11.**

Second, VRF also engages in advocacy relative to its discrepancy analysis, a comparison of total ballots cast in an election to the number of registered voters in the state. **Benson, ¶10; Ex. G, Aug. 19, 2021 Email from VRF to Secretary**; *see Torrez*, 160 F.4th at 1074. VRF uses that analysis to advocate for better recordkeeping procedures in furtherance of the NVRA purpose of "ensur[ing] that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(4). **Benson, ¶10.** It also analyzes the rolls to identify voters that are

9

potentially registered in multiple states so that it can provide states with reports about those potential duplicates. *Id.*, ¶12. But VRF cannot engage in this advocacy here:

> [T]he Secretary's denial of voter data to which it is entitled under the NVRA prevents VRF from carrying out its mission of engaging with the public to ensure the accuracy and currency of state voter rolls and also prevents it from lobbying election officials to correct errors before additional elections take place. These injuries cannot be remedied by monetary damages.

2026 WL 836855, at *13 (cleaned up); *cf. Torrez*, 160 F.4th at 1078 (observing that VRF wants to engage in the speech of publishing voter data on its website "to further its organizational purpose."). It goes without saying that before VRF can "engage in public advocacy" related to Pennsylvania's voter list maintenance, VRF must first get the records. *See Scott*, 49 F.4th at 940 (Ho., J., concurring) (*TransUnion* could be satisfied by showing "the information is necessary to engage in public advocacy about a pressing matter of policy" or "is essential to furthering Plaintiffs' mission.").

Under *PILF*, "the denial of the right to information, *without more*, is [not] enough for standing." 136 F.4th at 461-62. But here, the record shows that if the Secretary blocks access to the records, VRF and its Pennsylvania users lose the ability to make sure they are properly registered, to identify errors, to engage in speech with each other about those errors, and then lobby and engage with state officials regarding list maintenance. This implicates the NVRA's core purposes and is sufficient to demonstrate standing.

**d. The record shows that VRF's injuries far exceed those of the plaintiff in *PILF*.**

The Secretary tries but fails to diminish VRF's injuries to resemble those in *PILF*. The *PILF* court described plaintiff's alleged "downstream consequences" as (1) inability to "study and analyze the Secretary's voter list maintenance activities"; (2) "frustrat[ion] of the Foundation's production and dissemination of educational materials"; and (3) "in seeking records from the Secretary, PILF expended considerable time and financial resources." *PILF*, 136 F.4th at 467 (cleaned up). These adverse effects, it held, were insufficient to establish standing. *Id.* at 467-69.

While *part* of VRF's work might *start* with research like PILF's, VRF has established a track record of doing far more with its analysis—to say nothing of VRF's direct voter speech and association via its user interface on VoteRef.com. As discussed in Section I(c) above, VRF has shown that it must use the data "to engage in public advocacy about a pressing matter of policy." *Scott*, 49 F.4th at 940 (Ho., J., concurring); *see, e.g.*, **Ex. G, Aug. 19, 2021 Email from VRF to Secretary.** And completely apart from VRF's petitioning officials in Pennsylvania and other states regarding gaps between voting records and voter list records, VRF also uses the data to engage in speech and association with Pennsylvania voters and others to fix list errors. The record shows that concerned citizens used VRF's published Pennsylvania data to identify errors, just as intended. **Ex. S.** And though the Secretary urges the Court to ignore the NVRA's goal to ensure the accuracy and

11

currency of the voter rolls, *see* Br. (ECF 66) at 11, he concedes that he has an interest in being notified regarding these errors. **Marks, 17:7-16.** The Secretary's threats against VRF have severed this worthy dialogue of political speech and association. As the Secretary intended, his threat has chilled VRF from engaging in NVRA-sanctioned speech sharing data regarding the state's voter list. **Ex. H, Jan. 21, 2022 Takedown Letter.** The injuries here are not a mere loss of research material. They include the smothering of VRF's efforts to use the blocked records to petition the state for changes to its voter list maintenance, and the complete elimination of VRF's speech with citizens who take an interest in fixing errors in their own voter data.

The Secretary cites yet another, more recent PILF decision in a footnote, Br., at 7, n.2 (citing *Pub. Int. Legal Found. v. Fontes*, No. CV-25-02722, 2026 WL 45037, at *3 (D. Ariz. Jan. 5, 2026)), but fails to mention that after a thorough analysis of *TransUnion* and *PILF*, the district court held that PILF had standing to pursue its NVRA claims. *Fontes*, 2026 WL 45037 at *5. Those injuries included: (1) the inability to evaluate Arizona's compliance with its list maintenance obligations, (2) the inability to propose best practices regarding list maintenance to Arizona election officials, (3) preventing speech about erroneous disenfranchisement of voters and voter roll accuracy, and (4) detracting from PILF's institutional knowledge and organizational mission. *Id.* The record here reflects that VRF is suffering many of the same injuries.

12

Rather than attempt to shoehorn VRF into *PILF's* distinct facts, the Court should look to *Torrez* and *Galvin*, and hold that VRF has shown its injury-in-fact.

**II.    VRF has Demonstrated Injury-in-Fact for its NVRA Preemption Claim, Which is not Based on a Mere Informational Injury.**

Although the record shows that VRF has standing for all its NVRA claims under the "downstream consequences" test, VRF's NVRA Preemption claim should not be subject to the higher standard in *TransUnion* and *PILF* because it does not seek to redress an informational injury; a "deprivation of information to which one is legally entitled." *PILF*, 136 F.4th at 464 (cleaned up). The Preemption Claim seeks to redress the conflict between Pennsylvania law, on the one hand, which bans speech sharing voter records, and the NVRA, on the other hand, which permits and encourages such speech. VRF's injury which would be redressed by a favorable ruling is its lost (banned) speech to disseminate voter records, not its access to the records themselves. VRF wants to (1) restore its right to engage in speech sharing the records it already has; (2) end the state's policy of denying VRF's access to records because of VRF's planned speech sharing those records, and (3) vindicate its right to publish records it obtains in the future. Thus, to establish Article III standing, VRF must demonstrate "(1) an injury-in-fact; (2) that is fairly traceable to the defendant's challenged conduct; and (3) that is likely to be redressed by a favorable judicial decision." *Kelly v. RealPage, Inc.*, 47 F.4th 202, 211 (3d Cir. 2022) (quotation omitted); *see also Synagro-WWT, Inc. v. Rush Twp., Penn.*, 299 F.

13

Supp. 2d 410, 415 (M.D. Pa. 2003) (plaintiff had standing on preemption claim due to "recognizable injury in it's being unable to proceed with its business activity").

The Secretary only takes issue with the injury-in-fact element of the Preemption Claim. But it is well-established that the injury-in-fact requirement is satisfied where a plaintiff alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (internal citation and quotation marks omitted).

VRF's injury-in-fact for purposes of its Preemption Claim is two-fold. First, VRF has a cognizable injury in fact based on the chilling effect of the State's actual threat of enforcement against VRF for publishing the voter data it already had in its possession. ECF 35-9, **Ex. H, Jan. 21, 2022, Takedown Letter**. The NVRA permits VRF to share that data online. *See Torrez*, 160 F.4th 1068, 1083-1084 (10th Cir. 2025); *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 54 (1st Cir. 2024); *Galvin*, 2026 WL 836855, at *6. VRF has refrained from exercising its federal right to share this voter data out of fear of prosecution. **Swoboda Dec., ¶14;** *see Torrez*, 160 F.4th at 1078; *see also Bellows*, 92 F.4th at 50.

VRF's second preemption related injury arises from the Secretary's repeated refusal to fulfill VRF's records requests solely because of VRF's intent to publish those records in the future. To effectively advocate for accurate and current voter

14

rolls, VRF must continually update its website with updated records. **Swoboda Dec., ¶18.** And the Secretary concedes that the NVRA entitles VRF to these records. **Ex. D, November 16, 2023, Letter from DOS to VRF** (conditionally granting request for FVE under NVRA). But the Secretary will not fulfill VRF's requests unless it forswears its federal (NVRA) right to share them.

Pennsylvania's Internet Sharing Ban frustrates the core purposes of the NVRA. It is chilling VRF's speech and association that seeks to advance those same core NVRA purposes. This non-informational injury-in-fact is redressable under VRF's Preemption Claim, and VRF has cleared its low evidentiary burden.

## CONCLUSION

The Secretary asks the Court to compare apples to oranges, arguing that VRF should be judged on *PILF*'s facts and argument. But the Court can, and should, compare apples to apples: VRF should be compared to itself in *Galvin* and *Torrez*. Just as in those cases, the record amply demonstrates VRF's injuries-in-fact arising from the Secretary's refusal to comply with its obligations under the NVRA to both provide VRF with voter records and allow VRF to engage in speech containing those records. VRF has standing, regardless of whether the Court applies the "downstream consequences" analysis or a traditional Article III analysis.

Respectfully submitted this 30th day of March, 2026.

**GRAVES GARRETT GREIM LLC**
*/s/Edward D. Greim*
Edward D. Greim (MO 54034)*
Matthew R. Mueller (MO 70263)*
*Admitted *Pro Hac Vice*
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
edgreim@gravesgarrett.com
mmueller@gravesgarrett.com

**BECKLEY & MADDEN, LLC**
Charles O. Beckley, II (PA 47564)
212 North Third Street, Suite 301
Harrisburg, PA 17101
Tel: (717) 233-7691
cbeckley@pa.net

*Attorneys for Plaintiff*
*Voter Reference Foundation, LLC*

16

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on March 30, 2026, I filed the above document with the Court's CM/ECF system. Service will be accomplished on all counsel of record through the CM/ECF system.

*/s/ Edward D. Greim*
Edward D. Greim
