## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VOTER REFERENCE FOUNDATION, LLC, | |
| Plaintiff, | CIVIL ACTION NO. 1:24-CV-294 |
| v. | (SAPORITO, J.) |
| ALBERT SCHMIDT, in his official capacity as Secretary of the Commonwealth, | |
| Defendant. | |

## MEMORANDUM

The Voter Reference Foundation, LLC ("VRF") is a non-profit organized under Ohio law.  (Doc. 42, ¶ 1). In this action before the Court, VRF requested voter data from the Secretary of the Commonwealth of Pennsylvania (the "Secretary") under the public disclosure provision of the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20507. The Secretary denied VRF's requests due to the plaintiff's failure to comply with the Commonwealth's requirement that voter data not be published on the Internet (the "Internet Sharing Ban"). VRF brings this action under the NVRA's private right of action to any person "aggrieved by a violation of the NVRA" on the basis that it was aggrieved by the

Secretary's failure to provide it the requested voting data. VRF also argues that the Commonwealth's Internet Sharing Ban not only is preempted by the NVRA, but also violates the First Amendment of the United States Constitution. The Secretary contends that the Internet Sharing Ban is consistent with both. The parties have moved for summary judgment (Doc. 34; Doc. 37) and the matter has been fully briefed. (Doc. 35; Doc. 36; Doc. 38; Doc. 39; Doc. 44; Doc. 45; Doc. 46; Doc. 47).

## I.    Background

### A. Statutory Background

The National Voter Registration Act was enacted to "establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," 52 U.S.C. § 20501(b)(1); "enhance [ ] the participation of eligible citizens as voters in elections for Federal office," § 20501(b)(2); "protect the integrity of the electoral process," § 20501(b)(3); and "ensure that accurate and current voter registration rolls are maintained." § 20501(b)(4). The NVRA requires states to follow certain procedures to facilitate voter registration, including establishing requirements for voter removal programs and prohibiting the removal of

names from eligible voter lists unless specific conditions are met. §

20501(b); § 20501(3). Pertinent to this action, the NVRA prescribes

certain state actions regarding the public disclosure of voter records and

voter registration activities:

> (1) Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.
>
> (2) The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

52 U.S.C. § 20507(i) (the "Public Disclosure Provision.").

To supplement the NVRA, Congress passed the Help America Vote

Act ("HAVA"), requiring states to maintain "in a uniform and

nondiscriminatory manner, a single, uniform, official, centralized,

interactive computerized statewide voter registration list defined,

maintained, and administered at the State level that contains the name

and registration information of every legally registered voter in the State." 52 U.S.C. § 21083(a)(1)(A). HAVA requires a state's election system to "include provisions to ensure that voter registration records in the State are accurate and are updated regularly." 52 U.S.C. § 21083(a)(4). Pursuant to HAVA, Pennsylvania created the Statewide Uniform Registry of Electors system ("SURE"), a centralized voter registration database. 25 Pa. C.S.A § 1222(a). The SURE database, in simplest terms, is the official voter roll for Pennsylvania and is used to conduct voter list maintenance programs and activities for the Commonwealth. *See* 25 Pa. C.S.A § 1222. Pennsylvania uses the database to maintain accurate voter registration records through a range of programs and activities. *See, e.g.,* 25 Pa. C.S.A § 1203(h) (providing for county commissions' correction of voter data within the SURE registry and its own registration system); § 1501 (requiring county commissions to make and send "removal notices" to electors who are registered in the county); § 1508 (requiring the county commission to compare and correct the general and district registers of voters thirty days before each election).

As part of these programs and activities, Pennsylvania requires the

maintenance of "public information lists," which provide the name, address, date of birth, and voting history of all individual registered electors. § 1404(a)(1). Individuals may inspect this list in one of two ways pursuant to § 1404. They may either request a printed record of the list or inspect a publicly available copy of the list. *Id.* But access to the list comes with some limitations. For example, "[n]o individual inspecting the list may tamper with or alter it," § 1404(a)(2), and "[a]n individual who inspects or acquires a copy of the public information list may not use any information contained in it for purposes unrelated to elections, political activities or law enforcement." § 1404(c)(2). Section 1404(b)(1) also allows the Secretary to promulgate additional "reasonable regulations governing access to the list." § 1404(b)(1). One such regulation, the Internet Sharing Ban, states: "The list may not be published on the Internet." 4 Pa. Code § 183.14(k). The Internet Sharing Ban lies at the center of the dispute between the parties.

The Internet Sharing Ban prohibits the publishing of the public information list regardless of how the information is obtained. Pertinent to this action, under § 1404(b)(1), Pennsylvania allows individuals to digitally request a version of the public information list called the "Full

Voter Export" list ("FVE"). The FVE contains the following information concerning all voters in the Commonwealth: "voter ID number, name, sex, date of birth, date registered, status (i.e., active or inactive), date status last changed, party, residential address, mailing address, polling place, date last voted, all districts in which the voter votes (i.e., congressional, legislative, school district, etc.), voter history, and the date the voter's record was last changed." *See* PA Full Voter Export List, Pennsylvania Department of State, https://www.pavoterservices.pa.gov/pages/purchasepafullvoterexport.as px (last visited Apr. 23, 2026). The FVE is updated weekly and may be purchased for twenty dollars. But the data is subject to the Internet Sharing Ban, and purchasers must agree not to publish the list online. Individuals who do not agree to these terms will not be provided access to the FVE.

### B. Relevant Facts

On March 7, 2022, VRF sent a voter data request to the Department of State seeking a copy of the FVE. (Doc. 35, ¶ 117). The request specified that the information would not be used for commercial purposes, but solely for purposes permitted by law, including those related to elections,

political activities, and law enforcement. (Doc. 35, ¶ 117, 118). VRF did not, however, agree to refrain from publishing the requested data online. (Doc. 35, ¶ 120). The Department denied VRF's request for that data, noting that the voting data is "only available upon completion of an affirmation that the information will only be used for purposes relating to elections, political activities, and law enforcement." (Doc. 35, ¶ 123). The Department also noted in its denial that "[i]n a previous request, [VRF] obtained access to the Full Voter Export list but violated the voter registration law and the Department's regulations by publishing the information obtained on the internet." (Doc. 35, ¶ 126).

On November 2, 2023, VRF sent a second voter data request to the Secretary, seeking a copy of the voter data. (Doc. 35, ¶ 128). VRF made the Secretary and the Department aware of its intention to use the data for two specific projects. (Doc. 35, ¶ 129). First, VRF informed the Secretary and the Department that it intended to "publish the requested information on its website for election related purposes, allowing citizens who agree to the terms of VRF's website to review the data and report any errors to the relevant election authority." (*Id.*) Second, VRF notified the Department that it intended to "analyze the records, information and

- 7 -

data provided in response to the above request in order to engage in a discrepancy review of the Pennsylvania voter rolls." (*Id.*). VRF again, however, failed to affirm that it would not publish the contents of the voter data online. (*Id.*).

On that same date, VRF sent the Secretary a Notice of Violation of the NVRA, claiming that the Secretary's denial of VRF's March 7, 2022, request for voter data violated the NVRA's public disclosure provision. (Doc. 35, ¶¶ 131, 132). VRF also notified the Department that it believed that the Commonwealth's Internet Sharing Ban was preempted by the NVRA's public disclosure provision. (Doc. 35, ¶ 133). Therefore, VRF requested that the Secretary correct its violation by making the requested information available to VRF. (Doc. 35, ¶ 134). It notified the Secretary that if voter information was withheld, it would seek legal recourse. (*Id.*).

On November 16, 2023, the Department responded to VRF's November 2, 2023, request for voter data and its Notice of Violation in a single letter. (Doc. 35, ¶ 135). The Department again denied VRF's request for voter data and articulated "that request is granted on the condition that VRF completes the affirmation required for obtaining this

data pursuant to Pennsylvania law." (Doc. 35, ¶ 137). The Department further explained that VRF's March 7, 2022, request for voter data was "defective" because that data was requested under Pennsylvania's Right to Know Law rather than the NVRA. (Doc. 35, ¶ 136).

In response, on November 17, 2023, VRF sent the Secretary a second NVRA notice informing the Secretary that he had violated the NVRA by failing to produce the requested records. (Doc. 35, ¶ 139). VRF again notified the Secretary that the Internet Sharing Ban was preempted by the public disclosure provision of the NVRA. (Doc. 35, ¶ 140). The Secretary and VRF both concede that VRF's refusal to abide by the Internet Sharing Ban represented the sole reason for the denial of its voter data requests. (Doc. 35, ¶ 143).

On February 19, 2024, VRF initiated this action against Secretary Albert Schmidt. (Doc. 1). First, VRF argues that Pennsylvania's Internet Sharing Ban is preempted by the NVRA as the Ban prevents access to "records" which must be made available under the NVRA's public disclosure provision. (Doc. 1, ¶¶ 89–106). Second, VRF contends that the Secretary's denials of VRF's requests for voter data on March 7, 2022, and November 2, 2023, constitute violations of the NVRA's public

disclosure provision. (*Id.*, ¶¶ 107–118). Third, VRF asserts that the Internet Sharing Ban is a violation of the First Amendment as the Ban "is a direct restriction on constitutionally protected, core political speech." (*Id.*, ¶¶ 119–138). Fourth, VRF maintains that the Internet Sharing Ban "is overbroad in that it regulates and prohibits more protected speech than is necessary to accomplish any legitimate government interests furthered by the restriction." (*Id.*, ¶¶ 139-147). Finally, VRF seeks a declaratory judgment asking the Court to hold that the Internet Sharing Ban violates the First Amendment while being unconstitutionally overbroad. Moreover, VRF requests the Court to permanently enjoin the defendants from enforcing the Internet Sharing Ban. (*Id.*, ¶¶ 148–153).

## II.    Legal Standard

Rule 56 of the Federal Rules of Civil Procedure dictates summary judgment should only be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at

- 10 -

248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

Parties seeking summary judgment bear "the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotext Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251–52. A court must first determine if the moving party has made *prima facie* showing that it is entitled to summary judgment when evaluating such a motion. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Only once that *prima facie* showing has been made does the burden shift to the nonmoving party to demonstrate the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331.

Parties may cite to "particular parts of materials in the record,

including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers or other materials." Fed. R. Civ. P. 56(c)(1)(A). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "Although evidence may be considered in a form which is inadmissible at trial, the content of the evidence must be capable of admission at trial." *Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 599 (M.D. Pa. 2014); *see also Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387 n.13 (3d Cir. 1999) (noting that it is not proper, on summary judgment, to consider evidence that is not admissible at trial).

### III.   Standing

### A.   General Standing

"Under Article III of the Constitution, a federal court may exercise jurisdiction only where there is an actual case or controversy to be decided." *1st Westco Corp. v. Sch. Dist. of Philadelphia*, 6 F.3d 108, 112–13 (3d Cir. 1993) (citing *Golden v. Zwickler*, 394 U.S. 103, 108 (1969)); *see*

*also* U.S. Const. Art. III, § 2, cl. 1. The "existence of a case and controversy is a prerequisite to all federal actions, including those for declaratory or injunctive relief." *Belitskus v. Pizzingrilli*, 343 F.3d 632, 639 (3d Cir. 2003). "The standing doctrine defines what is a 'case' or controversy.'" *Long v. Se. Pa. Transp. Auth.*, 903 F.3d 312, 320–21 (3d Cir. 2018).

> [T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). A lack of standing is a defect of subject matter jurisdiction. *See McCray v. Fide. Nat'l Title Ins. Co.*, 682 F.3d 229, 243 (3d Cir. 2012) ("Absent Article III standing, a federal court does not have subject matter jurisdiction to address a plaintiff's claims, and they must be dismissed."). Standing is evaluated at the time of the filing of the complaint. *Laidlaw*, 528 U.S. at 190–91.

"[A] plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). If a plaintiff fails to link his claims to the conduct of one defendant, then he

lacks standing to sue that particular defendant because he has failed to allege the requisite traceability as to that defendant. *Easter v. Am. W. Fin.*, 381 F.3d 948, 961–62 (9th Cir. 2004) (concluding that plaintiffs who could not trace injury to a particular defendant lacked standing to sue that defendant); *accord Rabin v. NASDAQ OMX PHLX LLC*, 182 F. Supp. 3d 220, 230–31; *Polanco v. Omnicell, Inc.*, 988 F. Supp. 2d 451, 465 (D.N.J. 2013); *see also In re Takata Airbag Prods. Liab. Litig.*, 396 F. Supp. 3d 1101, 1126 (S.D. Fla. 2019) ("[S]tanding is defendant specific.") (citing *DaimlerChrysler*, 547 U.S. at 342).

Our standing analysis in this action is guided by the Supreme Court's decision in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021). In *TransUnion*, the Court reiterated that tangible harms, such as physical harms or monetary harms, readily qualify as concrete injuries under Article III. *TransUnion*, 594 U.S. at 425 ("If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III."). The Court also noted that intangible harms can also qualify as concrete injuries under Article III. *Id.* (noting reputation harms, disclosure of private information, and those harms specified by the Constitution).

Pertinent to this action, the Supreme Court specified that "[c]ourts must afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant, and to grant a plaintiff a cause of action to sue over the defendant's violation of that statutory prohibition or obligation." *Id.* (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340–41 (2016)). The Court acknowledged that "Congress may 'elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law.'" *Id.* at 426 (quoting *Spokeo*, 578 at 341). But the Court rejected that "a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id.* (quoting *Spokeo*, 578 U.S. at 341). The Court emphasized that "Article III standing requires a *concrete injury* even in the contest of a statutory violation." *Id.* (quoting *Spokeo*, 578 U.S. at 341) (emphasis added).

In other words, the Court noted the difference between "(i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law." *Id.* at 426–27. Indeed, while:

> Congress may enact legal prohibition and obligations … [a]nd … create causes of action for plaintiffs to sue defendants who violate those legal prohibitions or obligations … [o]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court.

*Id.* at 427. In this action, VRF's statutory cause of action to sue the Secretary arises under the NVRA, which allows a private right of action to any person "aggrieved" by a violation of the NVRA. (Doc. 1, ¶¶ 18, 19). The central issue of standing before this Court is whether VRF's injury pursuant to the NVRA is sufficiently concrete to constitute standing.

VRF brings this action based on the Secretary's failure to provide voter data in response to VRF's requests. In short, VRF has alleged an "informational injury." *See Kelly v. RealPage Inc.*, 47 F.4th 202, 211–12 (3rd Cir. 2022) ("[T]he Supreme Court has repeatedly recognized that an 'informational injury,' where a plaintiff alleges that she 'failed to receive … information' to which she is legally entitled, is sufficiently concrete to confer standing.") (citations omitted). The Third Circuit has held that an informational injury constitutes standing when a party has showed: "(1) the omission of information to which they claim entitlement, (2) 'adverse effects' that flow from the omission, and (3) the requisite nexus to the

- 16 -

'concrete interest' Congress intended to protect." *Kelly*, 47 F.4th at 214;

*Pub. Int. Legal Found. v. Sec'y Commonwealth of Pennsylvania*, 136 F.4th

456, 464 (3d Cir. 2025). Put differently, "a plaintiff seeking to assert an

informational injury must establish *a nexus* among the omitted

information to which she has entitlement, the purported harm *actually*

*caused* by the specific violation, and the *'concrete interest'* that Congress

identified as 'deserving of protection' when it created the disclosure

requirement." *Id.* at 213 (citing *Tailford v. Experian Info. Sols., Inc.*, 26

F.4th 1092, 1100 (9th Cir. 2022)) (emphasis added).

Here, it is undisputed that the Secretary denied VRF's request for

voter data on March 7, 2022, and November 16, 2023, and denied

information in which VRF's claims entitlement. But,

> [I]t is insufficient for Article III standing purposes for a
> plaintiff asserting an informational injury from a
> violation of a statute that contains a public disclosure
> aspect as part of its overall scheme to *allege only* that he
> has been denied information. Rather, he must *establish*
> a nexus among a downstream consequence, his alleged
> harm, and the interest Congress sought to protect.
> Without such a nexus, a plaintiff can claim no
> informational standing.

*Pub. Int. Legal Found.*, 136 F.4th at 465 (emphasis added). Upon review

of the record, VRF has failed to establish the necessary nexus between a

harm and downstream consequence relating to an interest that Congress sought to protect.

B.   Informational Standing in the Context of the NVRA — *Public Interest Legal Foundation v. Secretary Commonwealth of Pennsylvania*

The Third Circuit recently decided an analogous case to this action concerning an "informational injury" under the NVRA in *Public Interest Legal Foundation v. Secretary Commonwealth of Pennsylvania*, 136 F.4th 456 (3d Cir. 2025). The plaintiff in the action, a self-described "public interest organization that seeks to promote the integrity of elections nationwide[,]" had requested records from the Secretary of the Commonwealth of Pennsylvania under the public inspection provision of the NVRA.[1] *Pub. Int. Legal Found.*, 136 F.4th at 459. The Secretary rejected the plaintiff's requests, and the plaintiff sued the Secretary on the basis that it had "suffer[ed] a clear *informational injury* as a direct result of the [Secretary's] violations of the NVRA because the [Secretary] denied [it] access to the records to which it [wa]s entitled under the law." *Id.* (emphasis included). The central issue before the Third Circuit was

---

[1] This public inspection provision is the same one at issue in the current action: 52 U.S.C. § 20507.

whether the plaintiff had suffered an informational injury sufficient to confer Article III standing.

Under the guidance of the three-pronged informational injury analysis seen in *Kelly* and articulated in *TransUnion*, the Third Circuit first analyzed the interest Congress sought to protect when enacting the NVRA. It observed that:

> Congress enacted the NVRA principally because it "was wary of the devastating impact [voter roll] purging efforts previously had on the electorate." *Am. C.R. Union v. Phila. City Comm'rs*, 872 F.3d 175, 178 (3d. Cir. 2017); *see also Welker v. Clarke*, 239 F.3d 596, 598–99 (3d Cir. 2001) (noting that "[o]ne of the NVRA's central purposes was to dramatically expand opportunities for voter registration"); *Ortiz v. Phila. Off. of City Comm'rs Voter Regis. Div.*, 28 F.3d 306, 318 (3d Cir. 1994) (Scirica, J., concurring) ("For some time now, Congress and the state legislatures, concerned by low voting rates, have commendably *sought to increase voter participation* .... [C]iting a steady decline of citizen participation in federal elections … Congress decided to promote voter registration by passing the [NVRA]." (emphasis added)). Indeed, "Congress noted that … 'there is a long history of such cleaning mechanisms [being] used to violate the basic rights of citizens" to vote. *Am. C.R. Union*, 872 F.3d at 178 (alteration in original) (quoting S. Rep. No. 103-6, at 18 (1993)).

*Pub. Int. Legal Found.*, 136 F.4th at 466–67. Moreover, while looking at the language of the statute, the Court recognized that the NVRA sought:

> (1) to establish procedures that will increase the number

of eligible citizens who register to vote in elections for Federal office;

(2) to make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;

(3) to protect the integrity of the electoral process; and

(4) to ensure that accurate and current voter registration rolls are maintained.

*Id.* at 467 (quoting 52 U.S.C. § 20501(b)). The Court therefore concluded that "the statute aims at increasing citizen participation in federal elections." *Id.* In light of that analysis, the Court then considered the plaintiff's alleged harms and downstream consequences resulting from the Secretary's refusal to provide the required information.

The plaintiff argued that its inability to study and analyze the Secretary's voter data hampered its "activity … to promote election integrity and compliance with federal and state statutes." *Id.* at 467. The Court held that this argument proved to be an insufficient nexus to the interest that Congress sought to prevent when passing the NVRA. Specifically, the Court explained that studying, analyzing, and scrutinizing records "is not an enumerated purpose of the NVRA … [and] … these aims [do not] advance the expansion of voter registration and

participation in federal elections." *Id.* Moreover, the Court rejected the plaintiff's argument that "frustrat[ion] [of] the educational aspect of its mission," and the plaintiff's inability to publish "education materials" constituted downstream consequences sufficient to establish Article III standing. *Id.* at 468. The Court reasoned that "the facilitation and creation of educational materials is not a purpose of the NVRA" and "even if we assumed that the Secretary's actions actually hampered [the plaintiff's] ability to publish such materials, such harm has no 'nexus to the concrete interest Congress intended to protect' by requiring disclosure of the information." *Id.* (citations and quotations omitted). Finally, the Court noted that the plaintiff failed to submit "evidence of any specific plans for the records it sought relating to the purpose of the NVRA." *Id.* It held that "[w]ithout evidence that [the plaintiff] had 'concrete plans to imminently pursue a desired course of action' bearing a nexus to an interest Congress sought to protect that was hindered only by the Secretary's refusal to turn over the records, [the plaintiff] had no standing." *Id.* (citing *Ellison v. Am. Bd. of Orthopaedic Surgery*, F.4th 200, 207 n.5 (3d Cir. 2021)). The Court further explained that "'inchoate plans for future programs' of a general nature are insufficiently concrete

- 21 -

for Article III purposes," and therefore, "[a] general desire to audit a state's NVRA records without concrete plans to act upon information contained in the records in a manner consistent with the purpose of the statute does not establish standing…." *Id.* at 468–69 (quoting *Fair Hous. Concil of Suburban Phila. v. Montgomery Newspapers*, 141 F.3d 71, 77 (3d Cir. 1998)).

In sum, the Third Circuit concluded:

> [A]s an out-of-state "public interest organization," that has adduced insufficient evidence of a nexus among any adverse effect or downstream consequence and a harm it has suffered because of the Secretary's refusal to provide access to the requested records under *TransUnion* and its progeny, [the plaintiff] has no standing to sue. [The plaintiff] does not represent any Pennsylvania citizens who have been affected by the Secretary's purported violation of the NVRA. It has no direct ties to Pennsylvania voters and has not alleged how access to the records it seeks would "directly lead to action" or that *its* "direct participation in the electoral process [has been] hindered…" It has not suffered any concrete harm. And as the Supreme Court has proclaimed: "No concrete harm, no standing." *TransUnion*, 594 U.S. at 417.

*Id.* at 469 (citations and quotations omitted).

## C.    The Current Action

Like *Public Interest Legal Foundation v. Secretary Commonwealth of Pennsylvania*, VRF brings claims against the Secretary for an

informational injury under the NVRA, claiming that the Secretary violated the NVRA when he refused to make Pennsylvania voter data available to VRF. (Doc. 1, ¶ 3). We will employ the same analytical framework used by the Third Circuit. As noted above, a plaintiff seeking to assert an informational injury must establish *a nexus* among the omitted information to which she has entitlement, the purported harm *actually caused* by the specific violation, and the '*concrete interest*' that Congress identified as 'deserving of protection' when it created the disclosure requirement." *Kelly*, 47 F.4th at 213 (emphasis added). Therefore, VRF must establish a nexus between the denial of the available voter data, the purported harm actually caused by the denial, and the "aim[] at increasing citizen participation in federal elections." *Pub. Int. Legal Found.*, 136 F.4th at 467 (quoting 52 U.S.C. § 20501(b)). VRF has failed to do so here.

VRF has characterized its harm in various ways. In its complaint, VRF states that it "has, and intends to, post this data for the public to access and view free of charge so that the public can fulfill its oversight duties under the NVRA." (Doc. 1, ¶ 51). Moreover, it "desires to access, post, distribute, and otherwise use publicly available Pennsylvania voter

data on the Website in the future so that the public may become and remain informed….” (*Id.*, ¶ 53). In its statement of facts, VRF noted that:

> [It] intends to use the Voter List for two distinct projects. For its first project … VRF intends to publish the requested information on its website for election related purposes, allowing citizens who agree to the terms of VRF's website to review the data and report any errors to the relevant election authority… For its second project, VRF intends to analyze the records, information and data provided in response to the above request in order to engage in a discrepancy review of the Pennsylvania voter rolls.

(Doc. 35, ¶ 129). In an opposition brief, VRF writes about “its belief that sharing the requested information would foster confidence in the integrity of the electoral system, thereby encouraging voter participation.” (Doc. 53, ¶ 1) (citing Doc. 1, ¶¶ 8, 42). But, however VRF chooses to characterize its harm, it is clear that its allegations fall into those types of harm deemed by the Third Circuit to have an insufficient nexus to the purposes of the NVRA.

First, VRF states that the denial impeded on its plans “to analyze the records, information and data provided in response to the above request in order to engage in a discrepancy review of the Pennsylvania voter rolls.” (Doc. 35, ¶ 129). Nonetheless, the Third Circuit has deemed this argument unavailing, explaining that studying, analyzing, and

- 24 -

scrutinizing records "is not an enumerated purpose of the NVRA … [and] … these aims [do not] advance the expansion of voter registration and participation in federal elections." *Pub. Int. Legal Found.*, 136 F.4th at 467. Second, VRF contends that the denial frustrated its intention to "post this data for the public to access and view free of charge so that the public can fulfill its oversight duties under the NVRA" (Doc. 1, ¶ 51), and the denial further frustrated VRF's "desire[] to access, post, distribute, and otherwise use publicly available Pennsylvania voter data on the Website in the future so that the public may become and remain informed…." (*Id.*, ¶ 53). But again, the Third Circuit has rejected the argument that the "frustrat[ion] [of] the educational aspect of [a] mission" and the inability to publish "educational materials" constitutes downstream consequences envisioned by the NVRA to establish Article III standing. *Pub. Int. Legal Found.*, 136 F.4th at 467. It held that "the facilitation and creation of educational materials is not a purpose of the NVRA" and "bears no nexus to an interest protected by the statute." *Id.* Finally, VRF appears to argue that the Secretary's denial of voter data somehow hinders confidence in the integrity of the electoral system. (Doc. 53, ¶ 1). However, cognizable injures must be "concrete and

particularized" and not "speculative." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Here, the detriment of the integrity of the electoral system is neither concrete nor particularized. Indeed, it is wholly speculative.

In sum, to the extent that VRF alleges an informational injury under the NVRA for the Secretary's failure to make requested records available for inspection, our holding mirrors that of the Third Circuit in *Public Interest Legal Foundation v. Secretary Commonwealth of Pennsylvania*:

> [The plaintiff] does not represent any Pennsylvania citizens who have been affected by the Secretary's purported violation of the NVRA. It has no direct ties to Pennsylvania voters and has not alleged how access to the records it seeks would "directly lead to action" or that *its* "direct participation in the electoral process [has been] hindered… It has not suffered any concrete harm. And as the Supreme Court has proclaimed: "No concrete harm, no standing." *TransUnion*, 594 U.S. at 417.

*Pub. Int. Legal Found.*, 136 F.4th at 469 (emphasis in original). Therefore, we find that VRF has failed to allege Article III standing based on the informational injuries asserted in Counts II and III of its complaint for the Secretary's failure to make the voter data available for inspection in violation of the public disclosure provision under 52 U.S.C.

§ 20507.

But, contrary to *Public Interest Legal Foundation v. Secretary Commonwealth of Pennsylvania*, our analysis of standing does not end at the allegations of an informational injury. VRF argues that it has standing for its remaining claims because it suffered "reasonable apprehension that it faced criminal or civil enforcement if it followed through with its plans" to publish the voter data that it acquired from a third-party. (Doc. 53, at 7). It bases this assertion on a takedown letter it received from chief counsel at Pennsylvania's Department of State, demanding that VRF "take immediate action to remove all Pennsylvania-voter information … and any other related websites under their custody or control." (Doc. 19-1). Unlike with VRF's informational standing claim, we find this action sufficient to constitute standing for purposes of VRF's remaining claims.

As we noted above, to establish the existence of standing, a plaintiff must demonstrate that:

> [T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely

speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc*, 528 U.S. at 180–81. However, "in a case involving a pre-enforcement facial challenge to a statute alleged to be in violation if the First Amendment, 'even the remotest threat of prosecution, such as the absence of a promise not to prosecute,' can satisfy the injury-in-fact requirement." *Project Vote v. Kelly*, 805 F. Supp. 2d 152, 165 (W.D. Pa. 2011) (quoting *Peachlum v. City of York, Pennsylvania*, 333 F.3d 429, 435 (3d Cir. 2003)); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) ("[W]e have held that a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'") (quoting *Babbitt v. Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979)). "Where a statutory prohibition implicates First Amendment rights, there is a danger that the statute's 'very existence' will cause individuals to refrain from engaging in constitutionally-protected activities rather than run the risk of being prosecuted." *Id.* (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)). "The Supreme Court has described this danger of 'self-censorship' as 'a harm that can

be realized even without an actual prosecution.'" (*Id.*, at 165–66) (quoting *Virginia v. American Booksellers Association, Inc.*, 484 U.S. 383, 393 (1988)). We find that the Department of State's takedown letter satisfies the injury-in-fact requirement.

Pennsylvania statute §1707(a)(4) prohibits any person from "[a]cess[ing] … official documents or records … with the intent to publicize or otherwise unlawfully misuse the equipment or information contained therein." 25 Pa. C.S.A. § 1707(a)(4). It further articulates that "any person who violates subsection (a) commits a misdemeanor of the first degree and shall, upon conviction, be sentenced to pay a fine of not more than $6,000 or to imprisonment for not more than three years, or both." 25 Pa. C.S.A. § 1707(b). When VRF accessed the full voter export list and published that data on the internet, it faced monetary fines or imprisonment under the confines of § 1707(a)(4). Therefore, we find that the Department of State's takedown letter satisfies the injury-in-fact requirement concerning VRF's remaining claims: (1) Internet Sharing Ban: Preemption by the National Voter Registration Act (Count I); (2) Internet Sharing Ban: First Amendment—Ban on Core Political Speech (Count VI); and (3) Internet Sharing Ban: First Amendment-

Overbreadth (Count V).

## IV.   NVRA Preemption Claim

We turn to VRF's argument in Count I of its complaint that the Commonwealth's Internet Sharing Ban is preempted by the NVRA, specifically under its public disclosure provision. As we noted above, the public disclosure provision is as follows:

> (1)  Each State shall maintain for at least 2 years and shall *make available for public inspection* and, where available, photocopying at a reasonable cost, *all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters*, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.
>
> (2) The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

§ 20507(i) (emphases added). Before we address VRF's preemption argument, however, we must first determine whether the full voter export list falls under the purview of the NVRA's public disclosure provision. Put differently, we face the question of whether the full voter

export list constitutes a record "concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *Id.* Unsurprisingly, VRF and the Secretary share two different perspectives on this issue. VRF asserts that the SURE database, and the full voter export list contained within it, are "records" subject to public inspection under the NVRA. (Doc. 36, at 14). The Secretary contends that the full voter export list is not a record within the scope of the NVRA's disclosure provision. (Doc. 39, at 25).

The NVRA requires states to disclose "all records" related to efforts by the state to ensure "the accuracy and currency" of voter registration lists. The Secretary uses the SURE database to accomplish its goals in maintaining the accuracy and currency of lists through a variety of means. *See* (Doc. 35, ¶¶ 26–54) (admitting to using the database to, among other activities, documenting voter history, updating voter information, identifying duplicate registration, and tracking changes made to a voter's registration status or profile). These actions help Pennsylvania maintain accurate and current official lists of eligible voters as citizens register to vote, relocate, or otherwise update their

personal information. The Commonwealth does so with the help of the information contained in the full voter export list. Therefore, the Commonwealth's use of the voting data to ensure the accuracy and currency of its voter registration lists brings it within the universe of disclosable records under the NVRA.

But the full voter export list also constitutes a "record" under its plain and ordinary meaning in the context of the NVRA. *See Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) ("It is a 'fundamental canon of statutory construction' that, 'unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.'") (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). For starters, the Commonwealth placed the requirements for the public information lists under a chapter explicitly labeled "Records." *See* 25 Pa.C.S. § 1404; *See also Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) ("We also note that 'the title of a statute and the heading of a section' are 'tools available for the resolution of a doubt' about the meaning of a statute.") (quoting *Trainmen v. Baltimore & Ohio R. Co.*, 331 U.S. 519, 528–29 (1947)). Moreover, in *Voter Reference Foundation LLC v. Torrez*, 160 F.4th 1068, 1089 (10th Cir. 2025), the Tenth Circuit analyzed and

interpreted the ordinary meaning of the term "record" at the time Congress enacted the NVRA. It found that:

> [A] "record" is "knowledge or information preserved or handed down" "by being put into writing." *Records*, Oxford English Dictionary (2d ed. 1989). And "writing" is defined as "[t]hat which is in a written (now also typewritten) state or form" or "something penned or recorded." *Writing*, Oxford English Dictionary (2d ed. 1989). Significantly, as far back as 1946, "writing" was understood to include recording information on a computer storage medium. *Id.* ("To enter (an item of data) *in*, *into*, *on*, or *to* a storage medium" such as "computers"). Thus, we interpret "records" to mean knowledge or information that is preserved by being put into written form—whether penned or not.

*Voter Reference Found., LLC*, 160 F.4th at 1085 (emphasis included). We agree with the Tenth Circuit that online or computer records constitute "records" under the NVRA. *Id.* Here, the full voter export list contains the following fields: voter ID number, name, sex, date of birth, date registered, status (i.e., active or inactive), date status last changed, party, residential address, mailing address, polling place, date last voted, all districts in which the voter votes (i.e., congressional, legislative, school district, etc.), voter history, and date the voter's record was last change. (Doc. 35, ¶ 15). Thus, the full voter export list contains voter information that is put into writing and recorded in the SURE database, a computer

- 33 -

storage medium. It therefore is encompassed under the definition of a "record." Moreover, we find that the full voter export lists concerns "the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i). The NVRA seeks "to ensure that accurate and current voter registration rolls are maintained." *Id.*, § 20501(b). Accordingly, the Commonwealth of Pennsylvania determines whether voter information is accurate and current by providing the public with the opportunity to inspect the information contained in the full voter export list.

For these reasons, we find that the full export voter list is a "record" ensuring the accuracy and currency of information pertaining to eligible voters. It therefore falls under the scope of the public disclosure provision of the NVRA. We also note that, while persuasive but not dispositive, many courts have found that voting data serves as a "record" under the NVRA. *See Pub. Int. Legal Found. Inc.*, v. *Bellows*, 92 F.4th 36, 49 (1st Cir. 2024) (finding that Maine's voter file is a "record" subject to the public disclosure provision); *Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1089 (10th Cir. 2025) (affirming that state voter data is a "record" under the NVRA); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp.

3d 932, 942 (C.D. Ill. 2022), *clarified on denial of reconsideration*, No. 20-CV-3190, 2022 WL 1174099 (C.D. Ill. Apr. 20, 2022) (finding that statewide voter registration list is a "record" under the NVRA); *Pub. Int. Legal Found., Inc. v. Knapp*, 749 F. Supp. 3d 563, 569 (D.S.C. 2024) (concluding that voter data are "records" under the NVRA); *Jud. Watch, Inc. v. Lamone*, 399 F. Supp. 3d 425, 446 (D. Md. 2019) (finding that a voter registration list including "name, home address, most recent voter activity, and active or inactive status" were "records" under the NVRA). Having concluded that the full voter export list is subject to the NVRA's public disclosure provision, we must decide whether the Internet Sharing Ban is preempted by that provision.

Preemption is based on the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2, which invalidates state law that "interferes with or is contrary to federal law." *Free v. Bland*, 369 U.S. 663, 666 (1962) (citations omitted). "Federal law can preempt state law in three ways: (1) express preemption, (2) field preemption, and (3) conflict preemption." *Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010) (citing *Hillsborough Cnty. Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985)).

> Express preemption applies where Congress, through a statute's express language, declares its intent to displace state law. Field preemption applies where "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. Conflict preemption nullifies state law inasmuch as it conflicts with federal law, either where compliance with both laws is impossible or where state law erects an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Id.* (internal citations omitted). VRF argues that the Internet Sharing Ban is preempted under the theory of conflict prevention (hereinafter "obstacle preemption").[2] (Doc. 36, at 18).

The Secretary argues that the NVRA cannot preempt the Internet Sharing Ban because obstacle preemption does not apply to provisions under the Elections Clause, such as the public disclosure provision. (Doc. 44, at 22). But as VRF points out, many federal courts have applied obstacle preemption in NVRA cases concerning the public disclosure provision under the Elections Clause. *See Bellows*, 92 F.4th at 54; *Torrez*, 160 F.4th at 1084; *Knapp*, 2024 WL 4792051, at *7; *Lamone*, 399 F. Supp.

---

[2] "Conflict preemption" and "obstacle preemption" are interchangeable terms. Here, VRF and the Secretary both use "obstacle preemption" in their briefs. Therefore, we have chosen to use that term as well.

3d at 445; *Matthews*, 589 F. Supp. 3d at 943. Generally, courts presume that Congress did not intend to preempt state law absent a clear and manifest purpose to do so. *Gregory v. Ashcroft*, 501 U.S. 452, 460–61 (1991); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). But that presumption does not apply to legislation pertaining to the Elections Clause, such as the NVRA, *see Arizona v. Inter Tribal Council of Arizona Inc.*, 570 U.S. 1, 13 (2013), because the text of the Elections Clause states: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress *may at any time by Law make or alter such Regulations,* except as to the Places of chusing Senators." U.S. Const. Art. 1, § 4, cl. 1 (emphasis added). In other words, because the Elections Clause "empowers Congress to 'make or alter' state election regulations[,]" "[the] assumption that Congress is reluctant to pre-empt does not hold when Congress acts" under the Clause. *Inter Tribal*, 570 U.S. at 14. "[T]he reasonable assumption is that the statutory text accurately communicates the scope of Congress's pre-emptive intent." *Id.* Therefore, without a presumption against preemption in the Elections Clause and in NVRA jurisprudence, we must examine the text of the

NVRA and the text of the Internet Sharing Ban to determine whether the Ban presents an obstacle to the accomplishment, execution, and intent of the NVRA.

The public disclosure provision of the NVRA requires the public release of the voter export file by ordering "all records concerning the implementation of" Pennsylvania's voter list registration and maintenance activities to be "ma[d]e available for *public inspection*." 52 U.S.C. § 20507(i)(1) (emphasis added). As we did when analyzing the meaning of "record" in the context of the NVRA, we must therefore determine the ordinary meaning of the words "public inspection," keeping in mind the "fundamental canon of statutory construction" that words take "their ordinary meaning at the time Congress enacted the statute." *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019). In *Greater Birmingham Ministries v. Sec'y of State for Alabama*, 105 F.4th 1324 (11th Cir. 2024), the Eleventh Circuit analyzed and interpreted the ordinary meaning of the words "public inspection" at the time Congress enacted the NVRA. It determined that "[t]o 'inspect' is to 'look carefully' or to 'view closely and critically.'" *Id.* at 1332 (citing *Inspect*, Oxford English Dictionary (2d ed. 1989)). "To make something available for

public inspection, then, is to make it available in public, or to the public, for close scrutiny." *Id.* We agree that the Eleventh Circuit's interpretation of "public inspection" accurately reflects its ordinary meaning. Therefore, we must determine whether the Commonwealth adequately provides the full voter export file in a manner that allows for meaningful public scrutiny, and whether the Internet Sharing Ban impedes the public's ability to access and examine that data.

We conclude that the Commonwealth's process for requesting the voter data affords such scrutiny and that the Internet Sharing Ban does not meaningfully obstruct it. As we noted above, Pennsylvania allows any individual to request the full voter export list online for viewing provided that the individual purchases that data for twenty dollars. *See* PA Full Voter Export List, Pennsylvania Department of State, https://www.pavoterservices.pa.gov/pages/purchasepafullvoterexport.aspx (last visited Apr. 23, 2026). Individuals may then "look carefully" or "view closely and critically" the entirety of the weekly-updated list to "ensure that accurate and current voter registration rolls are maintained," as required by the NVRA. § 20501(b)(4). Those individuals may then reach out to the Commonwealth to rectify any errors in that

voting data. Therefore, the Commonwealth follows the guidelines of the Public Disclosure Provision of the NVRA. 52 U.S.C. § 20507(i)

We find that the Internet Sharing Ban does not present an obstacle to the NVRA's purposes and goals. The Internet Sharing Ban does not restrict any party's access to data to which they are entitled. *See Project Vote/Voting for AM., Inc. v. Long*, 813 F. Supp. 2d 738, 743 (E.D. Va. 2011), *aff'd and remanded*, 682 F.3d 331 (4th Cir. 2012) (finding the NVRA preempted a Virginia statute foreclosing disclosure of certain records required under the NVRA). It does not selectively limit parties' access to voter data to which they are entitled. *See Jud. Watch, Inc. v. Lamone*, 399 F. Supp. 3d 425, 445 (D. Md. 2019) (finding that the NVRA preempted a Maryland election law provision only allowing Maryland registered voters to access voter registration lists). It does not redact voter data to which parties are entitled. *See Voter Reference Foundation, LLC v. Galvin,* No. 24-CV-12592-DJC, 2026 WL 836855, at *8 (D. Mass. Mar. 26, 2026) (finding that the NVRA preempted a Massachusetts statute that redacted information required to be disclosed under the NVRA). Moreover, it does not constrain a party's ability to conduct a thorough inspection of the data. *See Pub. Int. Legal Found., Inc. v. Matthews*, 589

F. Supp. 3d 932, 942 (C.D. Ill. 2022), *clarified on denial of reconsideration,* No. 20-CV-3190, 2022 WL 1174099 (C.D. Ill. Apr. 20, 2022) (finding that the NVRA preempted an Illinois statute that prevented parties from viewing a voter registration list in full). Indeed, the Internet Sharing Ban does not in any way prevent any party from accessing and publicly inspecting the full voter data to which they are entitled under the NVRA; it only prevents the full voter export list from being published on the Internet. Therefore, we are unpersuaded that the Ban presents an obstacle to the purposes and goals of the NVRA's public disclosure provision. Accordingly, we conclude that the NVRA does not preempt the Internet Sharing Ban, 4 Pa. Code § 183.14(k).

As VRF points out, however, our finding runs counter to those holdings of the First and Tenth Circuits, where they concluded that similar state prohibitions preventing voter data from being published on the internet were preempted by the NVRA. In *Public Interest Legal Foundation, Inc. v. Bellows*, 92 F.4th 36 (1st Cir. 2024), the First Circuit held that a Maine statute prohibiting the publication of voter registration

information on the Internet (the "Publication Ban") [3] was preempted by the NVRA. The Court explained that the public disclosure provision of the NVRA provision "evinces Congress's belief that public inspection, and thus *public release, of Voter File data* is necessary to accomplish the objectives behind the NVRA. Indeed, the analysis and subsequent *dissemination of Voter File data* to the public is necessary if members of the public, or organizations … are ever to identify, address, and fix irregularities in states' voter rolls." *Bellows*, 92 F.4th at 54 (emphasis added). Similarly, in *Voter Reference Foundation, LLC v. Torrez*, 160 F.4th 1068 (10th Cir. 2025), the Tenth Circuit held that a New Mexico statute prohibiting voter data to be made publicly available on the internet (the "Data Sharing Ban")[4] was preempted by the NVRA. The

---

[3] The Publication Ban provided that a person obtaining voter data may not:

> Cause the voter information or any party of the voter information that identifies, or that could be used with other information to identify, a specific voter, including but not limited to a voter's name, residence address or street address, to be made accessible by the general public on the Internet or through other means.

Me. Rev. Stat. Ann. Tit. 21-A, § 196-A(1)(J)(2).

[4] The Data Sharing Ban detailed that the unlawful use of voter data

*(continued on next page)*

- 42 -

Tenth Circuit explained that the NVRA "encourages broad and extensive public disclosure of relevant records without restrictions on who provides it. That makes sense because the consequent goal in *widely circulating the voter data* is that any inaccuracies can be identified and corrected." *Torrez*, 160 F.4th at 1083 (emphasis added). Therefore, the First and Tenth Circuits concluded that NVRA's purpose through public inspection was not limited strictly to the availability of voting data, but rather also to the dissemination of that data, concluding that the data's release and circulation prove critical to the goals of the NVRA. But we do not read the NVRA's plain text as broadly as those Circuits, and thus, we disagree with their interpretation of the statute. The NVRA only requires the availability of the voting data for public inspection; it does not require its

---

or special voter lists consists of:

> (2) causing voter data, mailing labels or special voter lists or any part of the voter data, mailing label or special voter lists that identifies, or that could be used to identify, a specific voter or the voter's name, mailing or residence address to be made publicly available on the internet or through other means.

N.M. Stat. Ann. § 1-4-5.6(A)(2).

- 43 -

dissemination through public release or circulation.

Courts "cannot change the requirements of a statute just because doing so seems consistent with its goals." *Greater Birmingham Ministries*, 105 F.4th at 1334. "[P]urpose cannot be used to contradict text or to supplement it." *Id.* (quoting *Bellitto v. Snipes*, 935 F.3d 1192, 1201 (11th Cir. 2019)) (alteration adopted) (quotation omitted). Indeed, "the NVRA is particularly ill-suited to focus on purpose rather than text because the statute's purposes are multiple and in tension with each other." *Id.* (quoting *Bellitto*, 935 F.3d at 1201). When analyzing its text, the NVRA's public disclosure provision does not require broad dissemination of the voting data; it only speaks of "public inspection" and "where available, photocopying." 52 U.S.C. § 20507(i)(1). "The exigencies of one case, however compelling, cannot expand unambiguous text beyond its plain command." *Greater Birmingham Ministries*, 105 F.4th at 1334. "The statute says what it says–or perhaps better put here, does not say what it does not say." *Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 583 U.S. 416, 426 (2018). And here, the unambiguous text of the NVRA only requires the Commonwealth of Pennsylvania to make the voting data available so that the public may inspect it; it does not speak the

- 44 -

requirements of its public release or public circulation.[5] Therefore, we respectfully disagree with the opinions of the First Circuit and the Tenth Circuit that the NVRA's purposes include the dissemination of the voter data, rather than just its availability to the public, as their interpretation expands the requirements of the statute beyond just its plain statutory text. As the Eleventh Circuit succinctly held, "[n]o amount of purpose-driven inference can expand the meaning of a statute, and we cannot step in to help." *Greater Birmingham Ministries*, 105 F.4th at 1333.

## V.    First Amendment Claims

Finding that the NVRA does not preempt the Internet Sharing Ban, we move to VRF's contention that the Internet Sharing Ban violates the First Amendment of the United States Constitution because it constitutes a ban on core political speech. The First Amendment states:

---

[5] The Eleventh Circuit also noted that when the NVRA was passed in 1993, the meaning of the phrase "public inspection" in the Freedom of Information Act's ("FOIA") nearly identically worded provision was widely understood to require "only availability, not delivery." *Greater Birmingham Ministries*, 105 F.4th at 1333 (quoting *Mandel Grunfeld & Herrick v. U.S. Customs Serv.*, 709 F.2d 41, 42 (11th Cir. 1983)). Further, while Congress amended FOIA three years later to include disclosure measures, it consciously chose not to update the same language in the NVRA's public disclosure provision despite having the opportunity to do so. *Id.*

"Congress shall make no law … abridging the freedom of speech, or of the press." U.S. Const. amend. I. It secures the "freedom of expression upon public questions." *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964). "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002). But "this principle, like other First Amendment principles, is not absolute." *Id.* (quoting *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 65 (1983)); *see also Dennis v. United States*, 341 U.S. 494, 503 (1951) (noting that the First Amendment does not protect an "unlimited, unqualified right," because the "societal value of speech must, on occasion, be subordinated to other value and considerations."). For example, the First Amendment only regulates "government regulation of private speech," not government speech or private speech regulations. *Pleasant Grover City, Utah v. Summum*, 555 U.S. 460, 467 (2009). But pertinent to this action, the Supreme Court has held that the First Amendment does not "mandate[] a right of access to government information or sources of information within the government's control." *Houchins v. KQED*, 438 U.S. 1, 15 (1978) (plurality opinion); *id.*, at 16

- 46 -

(Stewart, J., concurring) (stating that the First Amendment "do[es] not guarantee the public a right of access to information generated or controlled by the government"); *see Whiteland Woods, L.P. v. Twp. of W. Whiteland*, 193 F.3d 177, 182 (3d Cir. 1999).

Here, we find that VRF is seeking voting data information within the Commonwealth's control, and therefore we conclude that the Commonwealth's decision to limit access to that information is entitled to "deference as a policy matter." *Voter Reference Found., LLC v. Torrez*, 727 F. Supp. 3d 1014, 1225 (D.N.M. 2024), *aff'd*, 160 F.4th 1068 (10th Cir. 2025) (finding that New Mexico's decision to "allow access in its control is entitled to 'deference as a policy matter.'") (citation omitted); *see Fusaro v. Cogan*, 930 F.3d 241, 256 (4th Cir. 2019) ("[W]e emphasize that the gravamen of [the plaintiff's] claims remains a request for government information. Thus … the initial decision to release such information remains, fundamentally, a policy choice. And the judgment of the Maryland legislature regarding the release of government information is entitled to substantial deference…."). The Commonwealth's restrictions are "best conceptualized as restrictions on access to information within government control and not as restrictions on speech." *Torrez*, 727 F.

Supp. 3d at 1225; *see McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 344–46 (1995) (distinguishing between "a regulation of pure speech," and election-related restrictions that are one step removed from pure speech); *Los Angeles Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 42 (1999) ("I join the Court's opinion, which recognizes that [the statute] is properly analyzed as a restriction on access to government information, not as a restriction on protected speech."); *Travis v. Reno*, 163 F. 3d 1000, 1007 (7th Cir. 1998) ("Peering into public records is not part of the 'freedom of speech' that the first amendment protects."). Therefore, we find that VRF's contention that the Internet Sharing Ban constitutes a direct restriction on core political speech to be meritless, as the Internet Sharing Ban does not offend the First Amendment. *See Mouzone v. Cmty. Improvement, Agency*, No. 24-2679, 2025 WL 740832, at *1 (3d Cir. Feb. 20, 2025) ("[The plaintiff's] First Amendment claims fail because he has failed to show a constitutional right of access to information generated or controlled by the government.").

VRF also contends that the Internet Sharing Ban violates the First Amendment of the United States Constitution because it is overbroad "in that it regulates and prohibits substantially more protected speech than

is necessary to accomplish any legitimate government interests furthered by the restriction." (Doc. 1, ¶ 140). A law may be invalidated facially as "overbroad" if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Free Speech Coal., Inc. v. Att'y Gen. United States*, 974 F.3d 408, 427 (3d Cir. 2020) (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)) (quotation marks omitted). An "overbreadth claimant bears the burden of demonstrating, from the text of the law and from actual fact, that substantial overbreadth exists." *Id.* (quoting *Virginia v. Hicks*, 539 U.S. 113, 122 (2003)) (alterations and quotation marks omitted). The Supreme Court has "vigorously enforced the requirement that a statute's overbreadth be substantial." *Stevens*, 559 U.S. at 485 (emphasis omitted). "The hesitation to label a statute overbroad arises from a court's need to strike a balance between competing social costs[.]" *Turco v. City of Englewood, New Jersey*, 935 F.3d 155, 171 (3d Cir. 2019).

> On the one hand, the threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas. On the other hand, invalidating a law that in some of its application is perfectly constitutional ... has obviously harmful effects.

*McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 241 (3d Cir. 2010)

(quoting *United States v. Williams*, 553 U.S. 285, 292 (2008)) (emphasis in original).

However, we need not undergo an analysis to determine whether the Internet Sharing Ban is "overbroad." As we held above, the Internet Sharing Ban does not implicate the protections of the First Amendment, and thus, does not regulate protected speech. Accordingly, because the Internet Sharing Ban does not fall under the purview of the First Amendment, it cannot be said its requirements are substantially overbroad in violation of that Amendment. Therefore, we find VRF's First Amendment claims to be meritless.

## VI.    Declaratory Judgment

The federal Declaratory Judgment Act, 28 U.S.C. § 2201, provides that "[i]n a case of actual controversy within its jurisdiction .. any court of the United States … may declare the rights and other legal relations of any interested party seeking such declaration, whether further relief is or could be sought." 28 U.S.C. § 2201(a). "District courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *Wilton v. Seven Falls Co.*,

515 U.S. 277, 282 (1995). Moreover, the Act is "an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." *Id.* at 287 (internal quotations and citations omitted).

Courts within the Third Circuit have consistently found that the party seeking declaratory judgment has the burden of establishing the existence of an actual case or controversy. *Team Angry Filmworks, Inc. v. Geer*, 214 F. Supp. 3d 432, 441 (W.D. Pa. 2016); *Dodge-Regupol, Inc. v. RB Rubber Prod., Inc.*, 585 F. Supp. 2d 645, 650 (M.D. Pa. 2008) ("[A] party seeking to base jurisdiction on the Declaratory Judgment Act bears the burden of proving that the facts alleged, 'under all the circumstances, show that there is a substantial controversy, between the parties having adverse legal interest, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'") (quoting *Benitec Australia, Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1343 (Fed. Cir. 2007)). VRF has based its request for a declaratory judgment on the same claims that we have granted summary judgment against in the underlying action. Therefore, as we found there were no genuine issues of material fact precluding us from granting summary judgment on VRF's claims, we will grant summary judgment as to this claim because VRF no longer pleads claims

with an existing actual case or controversy. *See Brugler v. Unum Grp.*, No. 4:15-CV-01031, 2018 WL 5734680, at \*4 (M.D. Pa. Nov. 2, 2018) (granting summary judgment on the plaintiff's request for a declaratory judgment due to the absence of genuine issues of material fact concerning the declaratory judgment).

## VII.  Conclusion

For the foregoing reasons, we will grant the Secretary's motion for summary judgment in its entirety, and we will deny VRF's motion for summary judgment in its entirety.

An appropriate order follows.

Dated: April 23, 2026                    *s/Joseph F. Saporito, Jr.*
                                         JOSEPH F. SAPORITO, JR.
                                         United States District Judge